**UNITED STATES DISTRICT COURT**
**THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IRAQ TELECOM LIMITED, | |
| Petitioner, | Civil Action No. |
| v. | |
| IBL BANK S.A.L, | |
| Respondent. | |

## VERIFIED PETITION TO CONFIRM A FOREIGN ARBITRATION AWARD AND FOR AN *EX PARTE* ORDER OF ATTACHMENT IN AID OF ARBITRATION

Petitioner Iraq Telecom Limited ("**Iraq Telecom**" or "**Petitioner**"), by and through its undersigned counsel, respectfully submits this Petition to Confirm a Foreign Arbitration Award, and for an *Ex Parte* Order of Attachment in Aid of Arbitration (the "**Petition**").

## NATURE OF THE ACTION

1.     This proceeding arises from two related foreign arbitral proceedings.  Iraq Telecom seeks recognition of a foreign arbitral award granting declaratory and monetary relief against Respondent IBL Bank S.A.L. ("**IBL**" or "**Respondent**").  Iraq Telecom also seeks attachment in aid of a second, related arbitral proceeding it initiated on December 13, 2021. Both arbitrations arise from IBL's fraudulent scheme to steal nearly $100 million from Iraq Telecom.

2.     Iraq Telecom indirectly owns nearly half of Korek Telecom Company L.L.C. ("**Korek**"), a telecommunications company based in the Kurdistan region of Iraq.  Sirwan Saber Mustafa (also known as "**Mr. Barzani**") is one of Korek's original shareholders and its

managing director.  Mr. Barzani is also a member of the notorious Barzani family, which controls the Kurdistan Regional Government of Iraq.  Mr. Barzani's uncle and first cousin have served as President of the Kurdistan Regional Government going back to 2005.  Media outlets, think tanks, and leaked U.S. State Department cables have repeatedly accused the Barzani family of widespread corruption.[1]

3.    In 2011, Iraq Telecom extended a $285 million loan to Korek (the "**Iraq Telecom Shareholder Loan**").  Later that year, Korek required an immediate infusion of additional cash.  Mr. Barzani and his representatives arranged for IBL to offer a new high-interest loan to Korek (the "**IBL Loan**").  A duly certified and authenticated copy of the IBL Loan is attached hereto as Exhibit A.  IBL, Mr. Barzani, and his close associate, Mr. Raymond Rahmeh ("**Mr. Rahmeh**") misrepresented to Iraq Telecom that because the IBL Loan was unsecured, IBL would extend the loan only if Iraq Telecom agreed to subordinate the Iraq Telecom Shareholder Loan to the IBL Loan.  This was a lie: the IBL Loan was secured by collateral that Mr. Barzani himself posted, in exchange for a 96% cut of the interest to be paid.  Based on these misrepresentations, Iraq Telecom, IBL, Korek and IHL entered into a subordination agreement (the "**Subordination Agreement**").

---

[1]    *See, e.g.*, Chloe Cornish, *Iraqi Kurdistan's authoritarian turn: western ally 'discards idea of democracy,'* FINANCIAL TIMES (May 11, 2021), https://www.ft.com/content/cd943209-b26b-45b2-a34a-e0d432b2e3f1; Michael Rubin, *Why Masrour Barzani should resign from leading Iraqi Kurdistan*, THE NATIONAL INTEREST (Dec. 11, 2020), https://www.aei.org/op-eds/why-masrour-barzani-should-resign-from-leading-iraqi-kurdistan/; Zack Koplin, *How Taxpayer Dollars May Have Bought a Kurdish Strongman's Beverly Hills Mansions*, THE NEW REPUBLIC (July 24, 2020), https://newrepublic.com/article/158609/iraq-barzani-pentagon-oil-beverly-hills-mansion; *Barzani family members seal rule over Iraqi Kurds*, THE ARAB WEEKLY (June 15, 2019), https://thearabweekly.com/barzani-family-members-seal-rule-over-iraqi-kurds; Kawa Hassan, *Kurdistan's Politicized Society Confronts a Sultanistic System*, MALCOLM H. KERR CARNEGIE MIDDLE EAST CENTER (Aug. 18, 2015), https://carnegie-mec.org/2015/08/18/kurdistan-s-politicized-society-confronts-sultanistic-system-pub-61026.

4.        The IBL Loan and Subordination Agreement were in fact an elaborate fraudulent scheme perpetrated by IBL, Korek, Mr. Barzani, and their affiliates (the "**Scheme**"). Korek could not meet IBL's exorbitant interest payments.  IBL declared Korek to be in default but declined to seize Mr. Barzani's collateral.  IBL instead invoked the Subordination Agreement and directed Korek to stop repaying the Iraq Telecom Shareholder Loan.  All the while, IBL secretly funneled 96% of Korek's IBL Loan payments back to Mr. Barzani as a kickback in this corrupt Scheme.  IBL doctored its annual reports to try to hide these kickbacks.  Through this corrupt Scheme, Mr. Barzani drained more than $100 million from Korek, his own company. Iraq Telecom meanwhile has received no payments on its $285 million loan since 2015.

5.        Iraq Telecom brought arbitral proceedings against IBL, Korek, and International Holdings Limited ("**IHL**"), a holding company that directly holds the Korek shares, in June 2018.  On September 21, 2021, a tribunal convened under the auspices of the Lebanese Arbitration Center of the Chamber of Commerce, Industry and Agriculture of Beirut and Mount Lebanon (the "**Tribunal**") issued a Final Award (the "**Award**") in Case No. 175/2018 (the "**First Arbitration**").  A duly certified and authenticated copy of the Award is attached hereto as Exhibit B.  In sum, the Award found that IBL, Mr. Barzani, and Mr. Rahmeh engaged in all the fraudulent conduct summarized above.  Based on these findings, the Tribunal declared that the Subordination Agreement was void.  The Award also granted Iraq Telecom nearly $3 million in attorneys' fees and costs.  IBL has not paid the Award, nor have the other respondents in the First Arbitration.

6.        The Award should be recognized pursuant to the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards (1958), as codified by the Federal Arbitration Act ("**FAA**"), 9 U.S.C. §§ 201-208 (the "**New York Convention**").

A declaratory and money judgment should be entered in Iraq Telecom's favor against IBL, and injunctive and such other relief as the Court deems just and proper should be granted.

7.      Iraq Telecom ultimately chose not to seek damages in the First Arbitration. With the Tribunal's permission, Iraq Telecom sought (and obtained) declaratory relief only, and it is now seeking damages in a second arbitral proceeding.  Iraq Telecom commenced that second arbitration on December 13, 2021—again, in the Lebanese Arbitration Center of the Chamber of Commerce, Industry and Agriculture of Beirut and Mount Lebanon (the "**Second Arbitration**").  Iraq Telecom seeks at minimum $97 million in damages from IBL in the Second Arbitration.   A duly certified and authenticated copy of the Second Arbitration demand is attached hereto as Exhibit C.

8.      In aid of the Second Arbitration, Iraq Telecom seeks an *ex parte* order of attachment pursuant to Rule 64 of the Federal Rules of Civil Procedure ("**FRCP**") and Articles 62 and 75 of the New York Civil Practice Law and Rules ("**CPLR**").  More specifically, Iraq Telecom seeks (1) attachment of assets, accounts, or other property maintained by IBL in the United States, up to the amount of $100 million, including the funds maintained in its New York correspondent banks, J.P. Morgan Chase Bank N.A., Citibank N.A., and The Bank of New York Mellon; and (2) a temporary restraining order forbidding the concealment, transfer, or removal of any assets, accounts, or other property that may be subject to the attachment order.  Iraq Telecom requires attachment of up to $100 million, approximately equal to the sum of (1) the nearly $3 million in fees and costs that the Tribunal granted in the Award, and (2) the $97 million anticipated monetary award to which Petitioner will be entitled in the Second Arbitration.

9.      Attachment is necessary to ensure that the Award and the Second Arbitration will not be rendered ineffectual.

10.         IBL is by all accounts insolvent.  It is based in Lebanon, which is in the midst of its worst financial crisis brought on by fraudulent practices in Lebanon's banking sector. By all public accounts, Lebanon's leading banks—including IBL—are generally insolvent.

11.         IBL is a criminal organization that, having paid kickbacks to co-conspirators to defraud Iraq Telecom of its assets, will not hesitate to dissipate its assets to avoid enforcement.  The Scheme is only one of several that Mr. Barzani, Korek, IBL, Mr. Rahmeh and others have orchestrated to deprive Iraq Telecom of its property.  In 2019, the Government of Iraq purported to expropriate Iraq Telecom's ownership stake in Korek, after blocking it a few years earlier from taking a majority stake in Korek.  Iraq Telecom learned that Mr. Barzani bribed Iraqi officials to undertake this expropriation.  Of course, Mr. Barzani used IBL to route the funds necessary to pay some of the bribes.  Allegations detailing this separate criminal scheme can be found in still another arbitral proceeding that Iraq Telecom brought earlier this year (the "**Shareholder Loan Arbitration**").  A duly certified and authenticated copy of Iraq Telecom's arbitration demand in that proceeding is attached hereto as Exhibit D.

12.         IBL and its conspirators also appear to have begun dissipating assets. Earlier this month, in connection with a request for interim relief against Mr. Barzani and Korek submitted in the Shareholder Loan Arbitration, the tribunal asked counsel for Mr. Barzani and Korek for information on the current whereabouts of the collateral underlying the IBL Loan. Counsel responded:  "we're in the somewhat—and I accept unfortunate—situation of not having instructions on that money.… I accept that's a problem for us but I'm afraid that's the position that I'm in."  *Infra* ¶ 81.  Counsel for Mr. Barzani and Korek also stated that he did not know "whether at the moment my client has $100 million in cash available" to satisfy Iraq Telecom's

claims.  *Id.*  A duly certified and authenticated copy of relevant portions of the transcript is attached hereto as Exhibit E.

13.      This Petition is Iraq Telecom's one meaningful chance to recover from IBL the money that it and its co-conspirators stole in connection with the IBL Loan Scheme.

## PARTIES

14.      Petitioner Iraq Telecom is a private limited company incorporated under the laws of the Dubai International Financial Centre ("**DIFC**") under register number 1019 and having its registered office at: Unit 11, Level 3, Gate Village Building 10, Dubai International Financial Centre, Dubai, 507043 United Arab Emirates.  As explained more fully below, Iraq Telecom was established as a joint venture company to invest in telecommunications services in Iraq.

15.      Respondent IBL is a joint-stock company registered with the Commercial Registry of Beirut (number 10472) with its registered offices at: Al Itihadia Building, Achrafieh, Beirut, Lebanon.  IBL operates as a commercial and retail bank with 21 branches in Lebanon, as well as branches in Cyprus and Iraq.  IBL is the eleventh largest Lebanese bank with correspondent U.S. banking relationships.[2]

16.      According to IBL's annual report and website, IBL maintains (or has maintained) correspondent relationships with several New York-based U.S. banks as follows: (1) J.P. Morgan Chase Bank NA (2018 to the present); (2) Citibank N.A. (2013 to present); (3) The Bank of New York Mellon (2011 to present); and (4) Wells Fargo Bank N.A. (2011 to

[2]      *See* U.S. Commercial Serv., Dep't of Commerce, "Lebanon Country Commercial Guide 2021," at 32-33 (2021), https://lb.usembassy.gov/wp-content/uploads/sites/200/2021-Lebanon-Country-Commercial-Guide-Final.pdf.

2012).[3]  (The correspondent accounts maintained at J.P. Morgan Chase Bank N.A., Citibank, N.A., and The Bank of New York Mellon are referred to herein collectively as the "**New York Accounts**.")  In addition to the New York Accounts, upon information and belief, IBL also maintains accounts in the United States at Deutsche Bank USA and Wells Fargo & Company. At all times relevant to this Petition, IBL has regularly and systemically used New York-based correspondent banks to avail itself of the advantages of utilizing the U.S. banking and financial systems.

17.        According to its most recently released annual report "[IBL] provides its clients with a full range of commercial banking services and products, in addition to trade finance services through its network of international correspondent banks" including its New York-based correspondent banks.[4]  Upon information and belief, these correspondent banking relationships require IBL to keep its own funds (and not those of its customers) on deposit at each of its correspondent banks.

18.        Upon information and belief, as part of its correspondent banking relationships, IBL regularly engages in overnight lending of the funds it has on deposit with its New York-based correspondent banks and derives regular, substantial revenue from the overnight lending of these funds.  Upon information and belief, IBL maintains a "sweep

---

[3]    *See* IBL Bank Annual Reports: 2011 to present, IBL Bank, https://www.ibl.com.lb/english/about-ibl/annual-reports; U.S. Commercial Serv., Dep't of Commerce, "Lebanon Country Commercial Guide 2021," at 32-33 (2021), https://lb.usembassy.gov/wp-content/uploads/sites/200/2021-Lebanon-Country-Commercial-Guide-Final.pdf.

[4]    *See* IBL Bank Annual Reports: 2018 IBL BANK (the "**Annual Report**"), https://www.ibl.com.lb/english/about-ibl/annual-reports. The 2018 IBL Annual report includes a "LIST OF MAIN CORRESPONDENTS" and identifies The Bank of New York Mellon (New York), Citibank NA (New York) and JP Morgan Chase Bank NA (New York) as its "Main Correspondents" for U.S. dollar transactions.

account" with its correspondent banks and loans out the funds that remain in the account overnight and earns interest on the amounts loaned.

19.        Lebanese banks like IBL are particularly dependent on U.S.-based banks because, among other reasons, the Lebanese economy has been dollarized since 1997.  Many commercial transactions, including those relevant to the Petition, are completed in U.S. dollars. IBL's Annual Reports disclose that that its "loans … are predominantly in US Dollars."[5]

20.        In fact, according to IBL's most recent Annual Report, "[t]he primary currency of the economic environment in which the Group operates (functional currency) is the U.S. Dollar."  Consistent with this, IBL maintains well over half of its customer accounts in U.S. dollars: "As at 31 December 2018, Customers' and Related Parties' accounts held in Foreign Currencies, *principally in US Dollars*, represented 59.09% of total Customers' and Related Parties' accounts …." (emphasis added).  The Annual Report also reveals that "[t]he Bank's loans are mainly granted in Foreign Currency, *and are denominated predominantly in US Dollars*" in North American banks (emphasis added).

21.        The Annual Report reflects that although its assets are denominated in U.S. dollars, the majority of IBL's assets are located in Lebanon.  It is a well-known fact that Lebanon is currently mired in a major financial crisis.  The entire Lebanese banking sector, including IBL, is severely impacted by this crisis and all of Lebanon's commercial banks are widely reported to be insolvent.[6]

---

[5]    IBL Bank Annual Report: 2018, at 9, IBL BANK, https://www.ibl.com.lb/english/about-ibl/annual-reports

[6]    *See, e.g.*, Ben Hubbard & Liz Alderman, *As Lebanon Collapses, the Man With an Iron Grip on Its Finances Faces Questions*, N.Y. TIMES (Aug. 4, 2021), https://www.nytimes.com/2021/07/17/business/lebanon-riad-salameh.html ("[Lebanon's] banks are largely insolvent …."); *see also* James Rickards, *Crisis in Lebanon: Anatomy of a Financial Collapse* 8, FOUNDATION FOR DEFENSE OF DEMOCRACY (Aug. 2020), https://www.fdd.org/wp-

## JURISDICTION AND VENUE

### I.    Subject Matter Jurisdiction

22.        This Petition seeks confirmation of the Award, which was rendered in the First Arbitration, and attachment in aid of the Second Arbitration.

23.        The Award and the Second Arbitration are governed by the New York Convention because this is an action to enforce an arbitral award rendered in Lebanon, a New York Convention contracting state.

24.        The Court has subject matter jurisdiction over this action pursuant to 9 U.S.C. §§ 202-203, which provides, in relevant part: "An arbitration agreement or arbitral award arising out of a legal relationship, whether contractual or not, which is considered as commercial, including a transaction, contract, or agreement described in section 2 of this title, falls under the Convention."  An arbitral award is "international" and falls under the Convention if it (1) arises out of a legal relationship; (2) that is commercial in nature; and (3) is not entirely between citizens of the United States.  *See* 9 U.S.C. § 202.  9 U.S.C. § 203 provides: "An action or proceeding falling under the Convention shall be deemed to arise under the laws and treaties of the United States.  The district courts of the United States (including the courts enumerated

---

content/uploads/2020/08/fdd-monograph-crisis-in-lebanon.pdf    ("The central bank claims to have gross amounts of foreign exchange available, but the central bank is insolvent on a *net* basis once bad assets are written down against capital. The commercial banks are also insolvent despite claims of having assets on deposit with the insolvent central bank. This is all accounting smoke and mirrors."); Matt Smith & Mohammad Abbas Taqi, *After Blast, Lebanon's 'Uninvestable' Banks Face Sector Rebuild, Depositor Pain*, S&P GLOBAL (Aug. 12, 2020) ("'All Lebanon's banks are technically insolvent …' [Jaap Meijer, managing director of research at Dubai's Arqaam Capital] said."); Tom Arnold & Ellen Francis, *As Lebanon's Banks Struggle to Raise Capital, a Deadline Looms*, REUTERS (Feb. 15, 2021), https://www.reuters.com/article/us-lebanon-crisis-banks-insight/as-lebanons-banks-struggle-to-raise-capital-a-deadline-looms-idUSKBN2AF0JQ ("'[Lebanon's banks] are all insolvent,' said Mike Azar, a debt finance advisor and a former lecturer in international economics at John Hopkins School of Advanced International Studies.").

in section 460 of title 28) shall have original jurisdiction over such an action or proceeding, regardless of the amount in controversy."

25.        The First Arbitration and Second Arbitration both arose out of a commercial legal relationship between Iraq Telecom and IBL—both foreign entities—and therefore meets the criteria of 9 U.S.C. §§ 202-203.  *See, e.g.*, *Lakah v. UBS AG*, 996 F. Supp. 2d 250, 259 (S.D.N.Y. 2014) (indenture agreements were "commercial in nature"); *Kenney, Becker LLP v. Kenney*, 494 F. Supp. 2d 252, 254 (S.D.N.Y. 2007) ("Whether an agreement 'falls under' the [New York] Convention depends on the commercial nature of the parties' *relationship*—not the specific dispute ….").  The "intended purpose" of the New York Convention is "to encourage the recognition and enforcement of international arbitral awards."  *Bergesen v. Joseph Muller Corp.,* 710 F.2d 928, 932 (2d Cir. 1983).

26.        The critical banking transaction that formed a basis for the claims in the First Arbitration and the Second Arbitration took place in New York via a New York-based correspondent bank.   The Lebanese economy is dollarized, and the parties' agreements (discussed below) provide for the payment of funds in U.S. dollars.  This necessarily required that the transactions be routed through U.S. correspondent banks, including IBL's correspondent banks in New York.

27.        Iraq Telecom also seeks an order of attachment of IBL assets and accounts in aid of a future arbitration award pursuant to Federal Rule of Civil Procedure 64 and New York CPLR Section 7502(c).

## II.    <u>Personal Jurisdiction</u>

28.        The Court has personal jurisdiction over IBL pursuant to CPLR § 301 and the Due Process Clause of the Fifth Amendment to the U.S. Constitution because IBL regularly and systematically conducts business in New York through, among other things, its

correspondent banking relationships with banks located in and/or operating in New York, as well as its regular overnight lending of funds on deposit with its New York-based correspondent banks.  IBL thus routinely avails itself of the privileges of conducting business in New York. The Court also has personal jurisdiction over IBL pursuant to CPLR §§ 302(1)-(2) because IBL transacts business in New York and committed tortious acts in this state in connection with the Scheme.

29.        IBL is also subject to the Court's *quasi-in-rem* jurisdiction because IBL maintains property in the form of U.S. dollars on account in the New York Accounts and the current action seeks to attach such property.

**III.    Venue**

30.        Venue in this District is proper pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events and omissions giving rise to the claims herein occurred in this District.  In the alternative, venue in this District is proper pursuant to 28 U.S.C. § 1391(b)(3), because IBL is subject to personal jurisdiction in this District.

## FACTUAL BACKGROUND

**I.    The Underlying Dispute**

31.        The underlying dispute arose out of an elaborate Scheme orchestrated by IBL and certain stakeholders and representatives of Korek, an Iraqi telecommunications company, to defraud Iraq Telecom out of its investment of hundreds of millions of dollars in Korek.

32.        Korek commenced operations in 2000 and initially held a regional mobile telephone license to provide services in the Kurdistan region of Iraq.  The original shareholders of Korek were three high net worth Iraqi Kurdish individuals, including Mr. Barzani, a member of the well-known and notorious Kurdistan regional Barzani family.

33.    In 2007, Korek received a nationwide mobile telecommunications license that required it to pay a $1.2 billion fee to the Iraqi government over several installments.  Korek sought external funding to pay the license fee, which was provided by a multinational Kuwaiti logistics company, Agility Public Warehousing Company KSCP ("**Agility**").  Years later, when additional investment was required, Agility formed an investment vehicle, Iraq Telecom, with a French multinational telecommunications corporation, Orange S.A. (f/k/a France Telecom).  Iraq Telecom then became the critical investor in Korek, extending the $285 million Iraq Telecom Shareholder Loan to Korek in 2011 and receiving an indirect 44% share in Korek.  The other 56% of Korek is indirectly held by CS Ltd, an entity owned by the three original Iraqi national Korek shareholders, including Mr. Barzani.

34.    Despite the significant investments Korek had already received, in November/December 2011, just months after the Investment Transaction, Korek required additional funds to pay an installment of the license fee required by the Iraqi media regulator. Korek claimed that it required these additional funds on an expedited timeline.

35.    Representatives of CS Ltd followed suit, representing that the best option for securing the additional funding was from IBL, a third-party bank.  Mr. Barzani and his close associate, Mr. Rahmeh (a CS Ltd. appointee to the IHL board) arranged for IBL to offer the high-interest IBL Loan of $150 million to Korek at an interest rate of 13.25% per annum; if Korek were to default, the interest rate would increase to 15.25%.  *See* Exhibit A ¶¶ 2.1-2.2. Critically, IBL, Mr. Barzani, and Mr. Rahmeh falsely represented to Iraq Telecom that because the IBL Loan was unsecured, IBL would extend the loan only if Iraq Telecom subordinated the Iraq Telecom Shareholder Loan to the IBL Loan.  Iraq Telecom was extremely resistant to the proposed subordination, as well the other terms of the IBL Loan, including the high interest rate,

all of which were highly favorable to IBL. Yet Messrs. Barzani and Rahmeh held firm that the IBL Loan was (1) an unsecured, third-party bank loan at market terms; and (2) the only loan that Korek could procure in the necessary time frame. Based on these representations, Iraq Telecom agreed. The unsecured nature of the IBL Loan was reflected in the legal documentation related to the IBL Loan, prepared by IBL.

36.        In December 2011, Iraq Telecom, IBL, Korek and IHL entered into the Subordination Agreement, under which Iraq Telecom's $285 million loan was subordinated in favor of the IBL Loan. The Subordination Agreement provided that if Korek defaulted on the IBL Loan, Korek would be barred from making any payments to Iraq Telecom under the $285 million Iraq Telecom Shareholder Loan while the IBL Loan remained in default.

37.        The IBL Loan and Subordination Agreement was part of an elaborate Scheme orchestrated by Mr. Barzani, IBL, and others. Contrary to the representations of IBL, Mr. Barzani, and Mr. Rahmeh, the IBL Loan was ***not*** unsecured but instead secretly secured by collateral that Mr. Barzani posted with IBL's cooperation and knowledge. Thus, the fraudulent Scheme disguised a shareholder loan from Mr. Barzani as an arms' length, unsecured bank loan. The Subordination Agreement was a key element of the fraud, as it ensured that the IBL Loan backed by Mr. Barzani took preference over Iraq Telecom's loan. Without the Subordination Agreement, the Iraq Telecom loan would have been *pari passu* with the IBL Loan. Iraq Telecom was thus fraudulently induced to (1) approve the IBL Loan at the exorbitant interest rate described above; and (2) enter into the Subordination Agreement.

38.        Unsurprisingly in hindsight, Korek failed to repay the IBL Loan when due. On July 9, 2015, IBL wrote to Korek asserting that Korek's failure to repay the IBL Loan constituted an event of default under the terms of the IBL Loan, and demanding repayment in

one month.  Despite the fact that Korek failed to repay in the required time frame, IBL granted

Korek another extension in September 2015, conditioned upon, in part, "continued compliance

with the terms of the Subordination Agreement."  Korek again failed to repay.

39.         Following the 2015 declaration of a default, IBL invoked the Subordination

Agreement and demanded that Korek and IHL cease payments on the Iraq Telecom Shareholder

Loan and make payments solely on the IBL Loan.  From then on, and continuing to this day,

Korek and IHL relied on the Subordination Agreement to justify their non-payments of any

amounts due under Iraq Telecom Shareholder Loan while continuing to pay IBL interest on the

IBL Loan.

40.         Mr. Barzani and IBL thus ensured that Korek remained in default under the

IBL Loan, even though a full cash collateral was available.  IBL notably declined to seize the

available collateral, despite that being the only commercially reasonable option available in light

of the default.  Not only did this further demonstrate IBL's participation in the fraudulent

Scheme, it also blocked any payments on the Iraq Telecom Shareholder Loan for years,

significantly enriching Mr. Barzani and IBL in the process.

41.         The fraudulent Scheme began to unravel when, in August 2017, IBL

revealingly requested not only full repayment of the IBL Loan, but also "additional collateral" to

secure the supposedly uncollateralized loan.  The reference to "additional collateral," among

other things, led Iraq Telecom question the true nature of the loan, because the IBL Loan had

originally been represented as "unsecured" by Messrs. Barzani and Rahmeh, as well as by IBL in

the IBL Loan's legal documentation.

42.         Iraq Telecom wrote to IBL on four separate occasions inquiring what it

meant by "additional collateral" and requesting details regarding the collateral that was already

in place but received no response. Instead, IBL continued to engage in a pattern of deception and obfuscation by behaving as if the IBL Loan was unsecured when, in fact, it maintained cash collateral exceeding the amount of the IBL Loan.

43.     Although Mr. Barzani and IBL steadfastly denied the existence of the cash collateral, wire transfer data produced to Iraq Telecom in response to discovery sought under 28 U.S.C. § 1782 from one of IBL's New York correspondent banks, Bank of New York Mellon ("**BNYM**"), left no room for any doubt that IBL Loan was fully collateralized, and that Mr. Barzani personally provided IBL with the funds for the secret cash collateral. The wire transfer records demonstrate that on December 20, 2011, the day before Korek entered into the IBL Loan, Mr. Barzani made a $155 million transfer from his account at HSBC in Dubai to an account in his name at IBL in Beirut, Lebanon. The data reflects that the payment was routed from Mr. Barzani's HSBC account in Dubai, to an HSBC correspondent account in New York, *to a BNYM correspondent account in New York*, and finally to Mr. Barzani's account at IBL in Lebanon. Mr. Barzani then posted the payment as collateral in connection with the IBL Loan. The amount transferred by Mr. Barzani corresponds with the quantum of cash collateral that has been repeatedly disclosed by IBL in its financial statements (apart from its English-language 2018 accounts). Award ¶¶ 39, 429, 620, 911.

44.     IBL eventually admitted in the First Arbitration that the IBL Loan was collateralized. *Id.* ¶¶ 490-91, 510.

45.     Iraq Telecom later discovered that IBL kicked back 96% of the interest it received on the IBL Loan to Mr. Barzani. Under this secret agreement, IBL agreed to pay Mr. Barzani 12.75% of the 13.25% total interest payments made by Korek to IBL under the terms of

the IBL Loan, while keeping the remainder as commission for its role as fictitious uncollateralized lender.  *Id.* ¶¶ 392, 404, 410, 420, 430, 439, 629, 953.

46.        IBL also doctored its annual reports to hide this kickback arrangement.  Its annual reports from 2012 on described its kickbacks to Mr. Barzani as an interest expense on Mr. Barzani's secret collateral.  *See* Witness Statement of Nicholas Jonah Bortman ¶¶ 125-27 (Dec. 8, 2020), attached as hereto Exhibit F.  After Iraq Telecom confronted IBL with evidence of the IBL-Mr. Barzani kickback Scheme, IBL altered its annual reports to obscure these kickbacks. *Id.* ¶ 128.

47.        In short, Mr. Barzani had secretly subordinated the Iraq Telecom Shareholder Loan to his own, undisclosed, personal shareholder loan.  Exacerbating the fraud and Iraq Telecom's injury, was his receipt of $215 million in secret kickback payments from Korek.  *See* Ex. C ¶ 5.

II    **The Arbitration Provision**

48.        Section 5.2 of the Subordination Agreement includes an arbitration agreement, which provides as follows:

> *Any dispute, claim, question or disagreement arising out of or relating to this Agreement or the transactions contemplated herein (a "Dispute"), shall be settled by binding arbitration in accordance with the Rules of Conciliation and Arbitration of the Beirut Chamber of Commerce and Industry by one or more arbitrators, and the procedures set forth below. Judgment upon the award rendered by the arbitrator may be enforced in any court having jurisdiction over such dispute. The Arbitration is to take place in Beirut in the English language unless otherwise agreed by the parties. The award shall be final and binding and the parties waive their rights to lodge an appeal against the award. Nothing in this Agreement including this Section 5.2 shall prevent a party from seeking injunctive relief including but not limited to injunctive relief before the Fast Track Judge in the case of any breach or alleged breach by another party.*

Award ¶ 47.  A duly certified and authenticated copy of the Subordination Agreement containing the arbitration agreement is attached hereto as Exhibit G.

**III      The First Arbitration Proceedings**

49.      Iraq Telecom filed a request for arbitration against IBL (and others) on June 26, 2018 before the Lebanese Arbitration Center of the Chamber of Commerce, Industry and Agriculture of Beirut and Mount Lebanon, Case No. 175/2018.  In the First Arbitration, Iraq Telecom alleged that Mr. Barzani and IBL fraudulently induced Iraq Telecom to enter into the Subordination Agreement, pursuant to which Iraq Telecom subordinated the debts owed to it by IHL and Korek in favor of the $150 million IBL Loan.  In support of this claim, Iraq Telecom detailed the IBL Loan Scheme and sought declaratory relief that the Subordination Agreement be deemed null, void and/or no longer in force and effect.

50.      On January 8, 2019, Ms. Nadine Debbas Achkar and Mr. Choucri Sader were nominated by claimant and respondents in the First Arbitration, respectively, to serve as arbitrators.  Mr. Pierre-Yves Gunter, a renowned Swiss arbitrator, was then confirmed as President of the Tribunal.

51.      After over two years of pre-hearing proceedings and submissions, the evidentiary hearing before the Tribunal commenced on February 1, 2021 and lasted for 4 days, ending on February 4, 2021.  Due to the Covid-19 pandemic, the evidentiary hearing was conducted virtually.

**IV      The Award**

52.      After reviewing the evidence presented, hearing the witness testimony, and considering the parties' arguments, the Tribunal rendered its 245-page Award on September 21, 2021.

53.     Based on its review of the parties' extensive factual and legal submissions and witness testimony the Tribunal concluded: "[P]rior to the signature of the Subordination Agreement, there were deliberate and intentional acts from [Barzani and IBL] which induced [Iraq Telecom] to enter into the Subordination Agreement, [Barzani and IBL's] silence clearly amounting to an act of concealment." Award ¶ 966.  In particular, the panel found that IBL, Korek and IHL "knowingly refrained from indicating to [Iraq Telecom] that the cash collateral was part of [the] requirements" to agree to the loan, that IBL, Korek and IHL failed in their "duty to disclose," in "violation of the requirements of good faith and honesty in banking transactions, in particular in transactions amongst shareholders and partners," and "actively participated in the commission of *dol*" (*i.e.,* fraudulent misrepresentation) as a matter of Lebanese law.  *Id.* ¶¶ 949, 953-54, 966.

54.     The Tribunal also concluded that the IBL Loan was a "carefully orchestrated" plan designed to "conceal the fact that Mr. [Barzani] was in reality providing a shareholder loan" and "prioritise Mr. [Barzani]'s creditor-rights over [those of Iraq Telecom], notwithstanding Mr. [Barzani] agreeing to the contrary in the [Shareholders' Agreement]." *Id.* ¶ 953.  The existence of this Scheme "cannot be disputed," as "more than 96% of the total interest expense paid by [Korek] to [IBL] was paid to Mr. [Barzani]." *Id.*

55.     The Tribunal further concluded that had "[Iraq Telecom] known the existence of the cash collateral and Mr. [Barzani]'s interest-splitting arrangement with [IBL], it would never have agreed to the IBL Loan and it would never have agreed to enter into the Subordination Agreement […] under any circumstances." *Id.* ¶ 956.

56.     With respect to IBL specifically, the Tribunal found that IBL "denied the existence of the cash collateral *('Borrower represents, warrants and agrees with the Lender'*

that, *inter alia,* the loan is *'unsecured')* and fraudulently concealed its existence." *Id.* ¶ 969

(emphasis in original).

57.    The Tribunal declared: (1) that IBL and the other respondents in the First

Arbitration "committed [fraud]," (2) that "[fraud] was the determinative factor for the Claimant

to enter into the Subordination Agreement," and (3) "that the Subordination Agreement is null

and void." *Id.* ¶ 970.

58.    The Tribunal also awarded costs and expenses associated with the First

Arbitration.  The Award provides that "arbitration and representation costs shall be apportioned

as follows: • 20% to be borne by the Claimant; • 80% to be borne jointly and severally by the

three Respondents." *Id.* ¶ 1027.  The Tribunal went on to order the following amounts to be paid

by the respondents, jointly and severally, including IBL:

> [T]he [] Tribunal hereby:  …
>
> (x) unanimously orders the three Respondents to jointly and severally pay to the Claimant the amount of USD 2,800,000.00 as participation to the Claimant's representation costs and other costs, plus legal interest of 9% *per annum* within 30 days from the issuance of the present Award until full payment;
>
> (xi) unanimously orders the three Respondents jointly and severally to pay to the Claimant the amount of USD 219,867.50 as participation to the Claimant's share of the LAMC arbitration costs;

*Id.* ¶ 1031.  The Tribunal also ordered that Iraq Telecom pay IBL 20% of its fees and costs, or

$253,994.00, plus £6,769.30, plus €585.50, all at an annual interest rate of 9%.  *Id.* ¶ 1031(viii).

59.    IBL is thus responsible for the payment of fees and costs of $3,019,867.50

to Iraq Telecom, minus an offset of about $260,000.  None of this amount has been paid by IBL

or any other respondent in the First Arbitration to date.

**V        The Second Arbitration**

60.     The First Arbitration originally included a demand for an award of money damages.  During the pendency of the First Arbitration, Iraq Telecom amended its request for relief and opted to pursue only declaratory relief.  The Award thus did not make any determination as to the monetary damages resulting from the fraudulent conduct.

61.     On December 13, 2021, Iraq Telecom commenced the Second Arbitration (Exhibit C hereto).  Iraq Telecom seeks minimum monetary damages of $97 million against IBL.  This is its pro rata share of the payments it should have received from Korek since July 2015, when IBL wrongfully invoked the fraudulent (and now invalidated) Subordination Agreement to block Iraq Telecom from receiving any further payments under the Iraq Telecom Shareholder Loan.

62.     From July 2015 through December 2021, Korek paid IBL $148,115,620 in interest, as required by the IBL Loan.  The IBL Loan required Korek to make interest payments based on an annual interest rate of 15.25% of the total outstanding balance when Korek defaulted.  When Korek defaulted, its total outstanding balance was $150 million, so its annual interest payments were $22,875,000.  Upon information and belief, Korek paid this full amount of interest each year from 2015 through 2021.  Because Korek defaulted in July 2015 with 47.5% of the year remaining, and Iraq Telecom is entitled to damages from the time of default, it is entitled to 47.5% of interest and fee payments for 2015.  These figures are summarized in the chart below:

| Year | Interest |
|------|----------|
| 2015 | $10,865,625 |
| 2016 | $22,875,000 |
| 2017 | $22,875,000 |

| 2018 | $22,875,000 |
|------|-------------|
| 2019 | $22,875,000 |
| 2020 | $22,875,000 |
| 2021 | $22,875,000 |
| **SUM** | $148,115,620 |

63.          Because the fraudulently obtained Subordination Agreement was void, the $285 million Iraq Telecom Shareholder Loan should have ranked *pari passu* with the $150 million IBL Loan.  So Korek should have distributed $148,115,620 between IBL and Iraq Telecom pro rata.  Korek owed a total of $435 million to these two companies ($285 million under the Iraq Telecom Shareholder Loan, $150 million under the IBL Loan), and it owed 65.52% of this total debt amount to Iraq Telecom.  Thus, Korek should have paid Iraq Telecom 65.52% of $148,115,620, or at least $97,041,271.55.  It follows that Iraq Telecom is entitled to at least $97 million in damages.

64.          Iraq Telecom is likely to succeed in the Second Arbitration because the Tribunal has already determined that IBL engaged in the commission of *dol* (meaning fraudulent misrepresentation).  Under Lebanese law, a party found to have committed *dol* must pay for the financial consequences stemming from it.  *See* Award ¶ 825 ("[P]ursuant to Article 122 COC, a claimant must demonstrate in order to be entitled to compensation that (1) the Respondents committed *dol*, (2) it suffered damages and (3) the existence of a causal link between the *dol* and the damages…").  Lebanese law also provides that IBL and the other respondents in the First Arbitration are jointly and severally liable for damages resulting from their fraud and IBL can thus be held responsible for the full amount of damages resulting from the fraud.  Now that the Subordination Agreement has been declared null and void, the IBL Loan can no longer be treated

as senior to Iraq Telecom's $285 million shareholder loan.  Instead, the IBL Loan must be treated as having always ranked *pari passu* with Iraq Telecom's shareholder loan, with any payments made by Korek to IBL under the IBL Loan split on a pro rata basis between Iraq Telecom and IBL, in proportion to the amounts of their respective loans to Korek.

## VI    Lebanon's Ongoing Financial Crisis

65.    Since 2019, Lebanon has been grappling with a financial and economic crisis that the World Bank describes as "likely to rank in the top 10, possibly top three, most severe crises episodes globally since the mid-nineteenth century."[7]  The crisis was fueled in part by Lebanese banks running what has been described as a Ponzi scheme—offering high annual interest rates to anyone who deposited dollars, which required continuous new dollar deposits to make good on the promise to repay initial depositors.[8]

66.    This practice was unsustainable, and in October 2019, Lebanon's banks imposed informal capital controls on financial outflows from Lebanon and there are *de facto* restrictions on outbound payments and transfers for current international transactions.[9]

67.    In June 2021, these controls were relaxed in part, but only to allow depositors to withdraw up to $400 a month in cash and an additional $400 in local currency at rates eight times the official exchange rate.[10]  Otherwise, there is no end in sight.

---

[7]  *See* Lebanon Economic Monitor, Spring 2021: Lebanon Sinking (to the Top 3), THE WORLD BANK, May 31, 2021, https://www.worldbank.org/en/country/lebanon/publication/lebanon-economic-monitor-spring-2021-lebanon-sinking-to-the-top-3.

[8]    *See* David Leonhardt & Sanam Yar, *Lebanon's Crisis*, N.Y. TIMES (Oct. 14, 2021), https://www.nytimes.com/2021/10/14/briefing/lebanon-financial-crisis-lira.html.

[9]    *See* 2021 Investment Climate Statements: Lebanon, U.S. DEP'T OF STATE, https://www.state.gov/reports/2021-investment-climate-statements/lebanon/.

[10]    *See, e.g.*, *Lebanon grants limited access to bank deposits amid crisis*, AP NEWS (June 8, 2021),                    https://apnews.com/article/middle-east-lebanon-business-9d5ab75172b40ff0eaae223f3b6aefa4.

68.        In fact, even while Lebanon's economy "continues to spiral and continues to face shortages of hard currency" and "[t]he country's inflation rate … is among the highest globally, exceeding Zimbabwe's," commercial banks have continued to reject government rescue plans and financial reforms.[11]

69.        Lebanese banks are widely reported to be insolvent.[12]   Banking and debt finance experts agree.[13]   And in its most recent country guide for Lebanon, the U.S. Commercial Service—a branch of the Department of Commerce—explained: "Lebanon's banks are insolvent….   Banks are no longer serving their core functions [of] making productive loans or allowing those with dollar deposits to withdraw them."[14]

---

[11]    Kareen Chehayeb, *UN rep slams Lebanon central bank chief over economic crisis*, AL JAZEERA (Nov. 12, 2021), https://www.aljazeera.com/economy/2021/11/12/un-rep-slams-lebanon-central-bank-chief-over-economic-crisis.

[12]    *See, e.g.*, Ben Hubbard & Liz Alderman, *As Lebanon Collapses, the Man With an Iron Grip on Its Finances Faces Questions*, N.Y. TIMES (Aug. 4, 2021), https://www.nytimes.com/2021/07/17/business/lebanon-riad-salameh.html ("[Lebanon's] banks are largely insolvent …."); *see also* Rickards, *supra* note 6, at 8 ("The central bank claims to have gross amounts of foreign exchange available, but the central bank is insolvent on a *net* basis once bad assets are written down against capital.   The commercial banks are also insolvent despite claims of having assets on deposit with the insolvent central bank.   This is all accounting smoke and mirrors.").

[13]    *See, e.g.*, Matt Smith & Mohammad Abbas Taqi, *After Blast, Lebanon's 'Uninvestable' Banks Face Sector Rebuild, Depositor Pain*, S&P GLOBAL (Aug. 12, 2020) ("'All Lebanon's banks are technically insolvent …' [Jaap Meijer, managing director of research at Dubai's Arqaam Capital] said."); Tom Arnold & Ellen Francis, *As Lebanon's banks struggle to raise capital, a Deadline Looms*, REUTERS (Feb. 15, 2021), https://www.reuters.com/article/us-lebanon-crisis-banks-insight/as-lebanons-banks-struggle-to-raise-capital-a-deadline-looms-idUSKBN2AF0JQ ("'[Lebanon's banks] are all insolvent,' said Mike Azar, a debt finance advisor and a former lecturer in international economics at John Hopkins School of Advanced International Studies.").

[14]    U.S. Commercial Serv., Dep't of Commerce, "Lebanon Country Commercial Guide 2021," at 29 (2021), https://lb.usembassy.gov/wp-content/uploads/sites/200/2021-Lebanon-Country-Commercial-Guide-Final.pdf.

70.         Earlier this year, correspondent banks, such as Wells Fargo and HSBC, began cutting back on their business relationships with the local Lebanese financial system.[15]

71.         IBL has not been spared from the economic crisis.  An exhaustive August 2020 Foundation for the Defense of Democracy report found that IBL has more than $1.9 billion in liabilities than assets.[16]

## VII      Mr. Barzani and IBL's Other Schemes Targeting Iraq Telecom

72.         Iraq Telecom has also learned that Mr. Barzani and IBL have engaged in a separate bribery scheme designed to expropriate Iraq Telecom's interest in Korek.

73.         In 2014, Iraq Telecom announced its intention to take majority control of Korek.  *See* Exhibit D ¶ 99.  A few months later, the Government of Iraq issued an order mandating that Korek unwind Iraq Telecom's ownership stake in Korek (the "**CMC  Decision**"). *Id.* ¶¶ 102, 104-05.  Iraq Telecom tried to comply with the CMC Decision, requesting that Korek and Barzani return some of the cash Iraq Telecom had invested in Korek.  *Id.* ¶¶ 119-20.  Mr. Barzani, writing on behalf of Korek, repeatedly stymied these efforts.  *Id.* ¶¶ 120-21.  In 2019, the Kurdistan Regional Government followed this directive and deregistered Iraq Telecom's shares in Korek, wiping out Iraq Telecom's entire investment (the "**Expropriation Decision**"). *Id.* ¶ 8.

74.         Iraq Telecom later learned that Mr. Barzani had, with IBL's assistance, bribed Government of Iraq officials to issue devastating decisions culminating with the Expropriation Decision.  Evidence, including several confidential informants, confirmed that Mr.

---

[15]    *See* Laila Bassam, et al., *Analysis: Lebanon's woes push it to fringes of global finance system*, Reuters (Apr. 8, 2021), https://www.reuters.com/article/us-lebanon-crisis-banks-analysis/analysis-lebanons-woes-push-it-to-fringes-of-global-finance-system-idUSKBN2BV27O.

[16]    Rickards, *supra* note 6, at 17.

Barzani ████████████████████████████████████████████████████████

████████████████ continued making bribes to these officials through 2017. *Id.* ¶¶ 127-28.

75.        In addition, in August 2014 and December 2016, Mr. Barzani's co-conspirators purchased two London properties for key responsible Government of Iraq officials with £830,000 and £1.5 million cash from two IBL accounts. *Id.* ¶¶ 137, 139; *see also* Exhibit F ¶¶ 60, 73. Both cash payments were wired from IBL accounts and the senior executive at IBL, Ghassan Rayes, signed nearly identical proof of funds letters for both candidates. Exhibit F ¶¶ 60, 73. Mr. Rayes was also the crucial IBL player in the IBL Loan fraud. Award ¶¶ 403, 426, 480, 901-04.

## VIII    Iraq Telecom's Prior Efforts To Secure Payment

76.        Iraq Telecom has exhausted efforts to secure its claims against Korek, Mr. Barzani, and IBL. Those proceedings show that Iraq Telecom's debtors will be unlikely to satisfy any judgment, and may have already dissipated assets to avoid execution.

77.        In connection with Iraq Telecom's claims arising in the Shareholder Loan Arbitration, Iraq Telecom requested that the Tribunal order Korek and Mr. Barzani to post a $100 million bond. A duly certified and authenticated copy of Iraq Telecom's request for preliminary relief in the Shareholder Loan Arbitration is attached hereto as Exhibit H.

78.        Korek and Mr. Barzani, respondents in the Shareholder Loan Arbitration ("**Respondents**"), opposed this request. A duly certified and authenticated copy of their response is attached hereto as Exhibit I. They opposed this request for preliminary relief primarily on the grounds that Korek's "debts significantly exceed its assets." Exhibit I ¶¶ 5.7, 7.1. Respondents argued that a security of this magnitude, "[i]f even potentially available,"

would make it impossible for Korek to pay for its "other business needs and activities." *Id.* ¶ 5.17.

79.        At the December 2, 2021 hearing before the tribunal, counsel for Respondents stated again that he did "not know whether at the moment my client [Mr. Barzani] has $100 million in cash available.  We can certainly look at the past financial statements, but of course the latest that we have are from 2018, something like three years ago, and so it's difficult for me and that's an unfortunate position…."  Exhibit E at 98:19-24.  He then repeated his objection to posting a $100 million bond: "*Even if we had that money*, to lock up that amount of capital for a prolonged period of time is very problematic." *Id.* at 99:8-10 (emphasis added).

80.        The Tribunal expressed skepticism about this argument.  Mr. Barzani had posted more than $150 million in collateral in connection with the IBL Loan.  So the Tribunal asked Mr. Barzani's counsel multiple times "where is that 150 million now?  Is it tied up with IBL?  Is it collateralised?  Where is it?". *Id.* at 101:3-7

81.        Counsel for Respondents at first ignored the question.  When pressed, he answered: "The reason I didn't address [this question] is because we're in the somewhat—and I accept unfortunate—situation of not having instructions on that money.  So you have the decision of the IBL Tribunal on that point.  I'm afraid I can't shed any more light than what is in that finding, and I accept that's a problem for us but I'm afraid that's the position that we're in." *Id.* at 101:8-14.

82.        This exchange strongly suggests dissipation.  $150 million in collateral that were originally posted to an IBL bank account in connection with the Scheme has simply disappeared, and Mr. Barzani's own attorneys do not know where it is.

83.         Unless immediate attachment is granted against IBL, Iraq Telecom will not be able to recover any of its damages.

## REQUEST FOR CONFIRMATION OF THE AWARD

84.         The Award was rendered in the First Arbitration in accordance with the parties' Subordination Agreement and is proper in all respects.

85.         The First Arbitration was conducted in English in Beirut, Lebanon in accordance with Section 5.2 of the Subordination Agreement.

86.         IBL was represented by counsel—Abousleiman & Partners—in the First Arbitration.

87.         The Award arose out of a legal relationship that is commercial in nature and is not entirely between citizens of the United States, and thus falls within the purview of New York Convention.  *See* 9 U.S.C. § 202.

88.         The Award was issued by a Tribunal seated in Lebanon, a country that is a signatory to the New York Convention.  *See* New York Convention, Art. I.

89.         The Award is final and binding within the meaning of the New York Convention and the FAA.  It is therefore binding on the parties and subject to recognition and enforcement in the United States pursuant to the New York Convention and the FAA.  The relevant arbitration provision in Section 5.2 of the Subordination Agreement specifically provides "[t]*he award shall be final and binding and the parties waive their rights to lodge an appeal against the award*."

90.         The FAA and the New York Convention make recognition and enforcement mandatory except where any of certain narrow defenses are proved.  *See* New York Convention, arts. III, V; 9 U.S.C. § 207 ("The court shall confirm the award unless it finds one of

the grounds for refusal or deferral of recognition or enforcement of the award specified in the [New York] Convention."); *see also Thai-Law Lignite (Thailand) Co., Ltd. v. Gov't of Lao People's Democratic Republic*, 864 F.3d 172, 179 (2d Cir. 2017) (rejecting objections to enforcement that did not "raise issues of jurisdiction or arbitrability"); *Leeward Const. Co. v. Am. Univ. of Antigua-Coll. of Med.*, No. 12 CIV. 6280 LAK, 2013 WL 1245549, at *1 (S.D.N.Y. Mar. 26, 2013) ("[C]onfirmation of international arbitration awards falling under the New York Convention is a 'favored policy' of the United States—a public interest that weighs here heavily ….") (quoting *Figueiredo Ferraz E Engharia de Projeta Ltda. v. Peru*, 665 F.3d 384, 389-90, 392 (2d Cir. 2011)), *aff'd*, 826 F.3d 634 (2d Cir. 2016).

91.        None of the defenses to the enforcement of an arbitral award are applicable here.  Courts in the United States have little discretion to refuse to confirm an award under the FAA.

92.        There are no grounds to correct or vacate the Award.  Accordingly, none of the grounds for refusal or deferral of the Award set forth in Article V of the New York Convention apply.

93.        The burden of proof is on the party defending against enforcement of the arbitral award under the New York Convention.  *See NAR S.P.A. - Industria Nastri Adesivi v. I.R. Indus.*, 5 F. Supp. 2d 203, 204 (S.D.N.Y. 1998) ("The[] grounds for refusal must be invoked and proved by the party opposing confirmation of the award, and are not applicable … when the motion is unopposed.").

94.        This Petition is timely because it is filed within three years after the issuance of the Award.  *See* 9 U.S.C. § 207.

95.       In light of the above, Iraq Telecom is thus entitled to (1) immediate confirmation, recognition, and enforcement of the Award pursuant to 9 U.S.C. § 207 and Article III of the New York Convention; (2) entry of declaratory judgment in favor of Iraq Telecom and against IBL consistent with the Award; and (3) a money judgment, including the interest and costs as provided therein accruing through the date of this Court's judgment.

## REQUEST FOR DECLARATORY RELIEF

96.       Iraq Telecom also is entitled to declaratory relief under the Declaratory Judgment Act ("**DJA**"), 28 U.S.C. §§ 2201-02.

97.       This Court has subject matter jurisdiction to award declaratory relief.

98.       It is well-settled that the New York Convention and the FAA apply to awards granting non-monetary relief.

99.       Iraq Telecom is entitled to a declaratory judgment, consistent with the Award, that IBL committed [fraud]," that "[fraud] was the determinative factor for the Claimant to enter into the Subordination Agreement," and "that the Subordination Agreement is null and void."

## REQUEST FOR AN *EX PARTE* ORDER OF ATTACHMENT

100.       As set forth more fully in Iraq Telecom's Memorandum of Law in Support of the Petition (the "**Memorandum**"), Iraq Telecom requests an *ex parte* order of attachment pursuant to FRCP 64 and CPLR § 7502(c), and in accordance with the rules governing attachments under CPLR Article 62.

101.       Section 7502(c) of the CPLR authorizes prejudgment attachment in aid of arbitration when, without such attachment, an arbitration award may be rendered ineffectual. *See* CPLR § 7502(c) ("The supreme court … may entertain an application for an order of attachment

… in connection with an arbitration that is pending … inside or outside this state, whether or not it is subject to the United Nations convention on the recognition and enforcement of foreign arbitral awards, but only upon the ground that the award to which the applicant may be entitled may be rendered ineffectual without such provisional relief.").

102.    Iraq Telecom seeks an order of attachment for up to $100 million, representing the minimum amount needed to protect the existing fee and cost award and the anticipated award in the Second Arbitration.

103.    Iraq Telecom has a cause of action against IBL for damages resulting from the fraud perpetrated by IBL.

104.    Iraq Telecom has commenced the Second Arbitration.

105.    Based on the foregoing facts, and for the reasons more fully detailed in the Memorandum, it is probable that Iraq Telecom will succeed in the Second Arbitration and obtain an award of money damages.

106.    Based on the foregoing facts, and for the reasons more fully detailed in the Memorandum, an *ex parte* attachment order is needed to prevent any award issued in favor of Iraq Telecom in the Second Arbitration from being rendered ineffectual.  Specifically, IBL's past conduct amply demonstrates that it will seek to frustrate efforts to collect the forthcoming arbitration award.  IBL denied the existence of the cash collateral and refused to provide Iraq Telecom with information regarding the existence and source of the cash collateral.  IBL also failed to utilize the collateral to satisfy the IBL Loan.  IBL is severely impacted by the ongoing economic crisis in Lebanon and is likely insolvent.  Moreover, IBL has a history, beyond the current underlying dispute, of defrauding Iraq Telecom.  Under these circumstances, an order of attachment is the only way to preserve the possibility of a recovery.

107.    IBL's counterclaim for costs and fees associated with the First Arbitration was dismissed. *See* Award ¶ 973. Iraq Telecom is unaware of any counterclaims that IBL has or may assert in the Second Arbitration.

108.    In addition, as discussed in the accompanying Memorandum, a temporary restraining order and preliminary injunction should be granted pending the issuance of an order of attachment because Iraq Telecom satisfies the three traditional criteria for the granting of temporary relief: (a) Iraq Telecom has a likelihood of success on the merits; (b) there is a danger of irreparable harm in the absence of temporary injunctive relief; and (c) the balance of equities favor granting the relief sought. Moreover, Iraq Telecom has shown that an award to which it may be entitled may be rendered ineffectual without the requested provisional relief, as required under CPLR § 7502(c).

109.    Iraq Telecom is proceeding by way of an *ex parte* order because notice to IBL is likely to defeat the purpose of the requested attachment. If advance notice is provided, IBL will have the opportunity to attempt to remove or dissipate assets before the application for an attachment order can be acted on by the Court and before temporary injunctive relief can be granted.

110.    There is considerable risk that IBL will act in such a manner because, as described above, it has already been found by the Tribunal to have engaged in fraudulent conduct and can be expected to take steps to remove its assets from this Court's reach before they can be levied upon.

111.    Iraq Telecom has not previously applied to the Court for the relief requested in this Petition.

**PRAYER FOR RELIEF**

WHEREFORE, Petitioner respectfully requests that:

1.      The Court issue an order recognizing and confirming the Award, as authorized by 9 U.S.C. § 207.

2.      The Court issue a declaratory judgment under the DJA, consistent with the Award, adjudging that IBL "committed [fraud]," that "[fraud] was the determinative factor for the Claimant to enter into the Subordination Agreement," and declaring "that the Subordination Agreement is null and void";

3.      The Court enter a money judgment in the amount of $3,019,867.50 corresponding to the full amount of the costs and expenses awarded in the First Arbitration, plus pre-judgment interest from the date of the Award of the Arbitral Tribunal until the date it enters judgment confirming the Award and post-judgment interest at the rate of 9%;

4.      That the Court grant the Petition for an attachment in aid of arbitration in its entirety and issue an *ex parte* order of attachment, on the terms set forth in the proposed order submitted herewith, attaching assets, accounts, or other property of IBL located in the United States valued at up to $100 million.

5.      The Court retain jurisdiction over this action, and, pursuant to Rule 69 of the Federal Rules of Civil Procedure, permit any discovery that may be proper to aid in the enforcement of the money judgment and the order of attachment;

6.      The Court award attorney's fees and costs in relation to the instant confirmation proceeding; and

7.      The Court grant any other monetary, injunctive or other relief that, in the interests of justice, it deems necessary and proper.

DATED:  December 14, 2021        Respectfully submitted,

QUINN EMANUEL URQUHART &
SULLIVAN, LLP

By:
      */s/Kevin S. Reed*
      Kevin S. Reed
      51 Madison Avenue, 22nd Floor
      New York, NY 10010
      212-849-7000 Main Office Number
      212-849-7100 FAX

      Kristin Tahler (*Pro hac vice to be filed*)
      865 S. Figueroa St., 10th Floor
      Los Angeles, California 90017
      213-443-3000 Main Office Number
      213-443-3100 FAX

      Alex Loomis (*Pro hac vice to be filed*)
      111 Huntington Ave, Suite 520
      Boston, MA 02199
      617-712-7100 Main Office Number
      617-712-7200 FAX

      *Counsel for Petitioner Iraq Telecom Limited*

## **VERIFICATION**

Pursuant to 28 U.S.C. § 1746, Kristin Tahler declares as follows:

I am a partner at Quinn Emanuel Urquhart & Sullivan, LLP, attorneys for Petitioner Iraq Telecom Limited. I have read the foregoing Petition to Confirm a Foreign Arbitration Award, and for an *Ex Parte* Order of Attachment in Aid of Arbitration and the exhibits thereto, and am informed and do believe that the allegations contained therein are true and accurate to the best of my knowledge information and belief.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 14th day of December, 2021, at Orlando, Florida.

_____
Kristin Tahler