UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IRAQ TELECOM LIMITED,

                              Petitioner,

        v.                                          Civil Action No. 21-cv-10940 (DLC)

IBL BANK S.A.L.,

                              Respondent.

**MEMORANDUM OF LAW OF RESPONDENT IBL BANK S.A.L. IN OPPOSITION TO
PETITIONER'S MOTION TO CONFIRM ATTACHMENT ORDER AND IN SUPPORT
OF CROSS-MOTION TO VACATE ATTACHMENT ORDER**

**SQUIRE PATTON BOGGS (US) LLP**
Gassan A. Baloul
Mitchell R. Berger
2550 M Street NW
Washington, DC 20037
Telephone: (202) 457-6000
Facsimile:  (202) 457-6315

Joseph S. Alonzo
1211 Avenue of the Americas, 26th Floor
New York, New York 10036
Telephone: (212) 872-9800
Facsimile:  (212) 872-9815

*Counsel for Respondent IBL Bank S.A.L.*

February 14, 2022

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ...........................................................................................................ii

PRELIMINARY STATEMENT ................................................................................................. 1

STATEMENT OF FACTS .......................................................................................................... 5

    The Parties ................................................................................................................................ 5

    Lebanon's Economic Crisis and Responsive Actions Taken by BdL and IBL ................. 6

    The Arbitration Proceedings Between the Parties and This Action ................................. 9

ARGUMENT .............................................................................................................................. 13

I.       LEGAL STANDARD.................................................................................................... 13

II.     IT HAS NOT ESTABLISHED A NEED FOR ATTACHMENT OR SHOWN
        THAT ANY AWARD MAY BE RENDERED INEFFECTUAL ABSENT
        ATTACHMENT. .......................................................................................................... 16

III.    CONFIRMING THE ATTACHMENT WOULD BE EXTRAORDINARILY
        DISRUPTIVE TO IBL'S CUSTOMERS AND THE BANKING INDUSTRY............ 19

IV.    IT CANNOT DEMONSTRATE LIKELIHOOD OF SUCCESS ON ITS $100
        MILLION CLAIM AGAINST IBL............................................................................... 21

V.     FUNDS HELD IN THE CORRESPONDENT ACCOUNTS FOR THE BENEFIT
        OF THIRD-PARTIES SHOULD NOT BE SUBJECT TO ATTACHMENT. ............... 22

VI.    CONFIRMING THE ATTACHMENT WOULD SIGNIFICANTLY HARM THE
        BANK AND ITS CUSTOMERS, REQUIRING A SIZABLE UNDERTAKING. ........ 24

CONCLUSION........................................................................................................................... 25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Ames v. Clifford*, 863 F. Supp. 175 (S.D.N.Y. 1994) ..................................................................... 19

*Bank of China, N.Y. Branch v. NBM L.L.C.*, 192 F. Supp. 2d 183 (S.D.N.Y. 2002) ................... 14

*Bollenbach v. Haynes*, No. 18-cv-997, 2018 U.S. Dist. LEXIS 239449
    (S.D.N.Y. May 29, 2018) ...................................................................................................... 17

*Buy This, Inc. v. MCI Worldcom Comc'ns, Inc.*, 178 F. Supp. 2d 380
    (S.D.N.Y. 2001) ................................................................................................ 13, 14, 16, 17

*Capital Ventures Int'l v. Republic of Argentina*, 443 F.3d 214 (2d Cir. 2006) .......... 13, 14, 15, 16

*Cargill Fin. Servs. Int'l, Inc. v. Bank Fin. & Credit Ltd.*, 70 A.D.3d 456, 896 N.Y.S.2d 317
    (1st Dep't 2010) ............................................................................................................ *passim*

*Elliott Assocs., L.P. v. Republic of Peru*, 948 F. Supp. 1203 (S.D.N.Y. 1996) ............................ 14

*Elsevier, Inc. v. Grossman*, 883 F. Supp. 2d 398 (S.D.N.Y. 2012) ............................................... 17

*Flame, S.A. v. Primera Maritime (Hellas) Ltd.*, 2010 U.S. Dist. LEXIS 9830 (S.D.N.Y. Feb. 2,
    2010)...................................................................................................................................... 15

*Fratelli Italiani, LLC v. Mironova,* 2019 U.S. Dist. LEXIS 127796
    (S.D.N.Y. Apr. 11, 2019) ........................................................................................ 13, 14, 15

*Herzi v. Ateliers de la Haute-Garonne*, No. 15-cv-7702, 2015 U.S. Dist. LEXIS 165258
    (S.D.N.Y. Oct. 13, 2015)................................................................................................ 1, 16, 17

*J.V.W. Inv., Ltd. v. Kelleher*, 41 A.D.3d 233, 837 N.Y.S.2d 650 (1st Dep't 2007)...................... 19

*Morganthal v. Avion Resources Ltd.*, 849 N.Y.S.2d 223 (1st Dep't 2007) ................................... 16

*MyPart Software, Ltd. v Fluent Trade Tech. Ltd.*, No. 650316/2017, 2017 N.Y. Misc. LEXIS
    4587 (N.Y. Sup. Ct., N.Y. County 2017).................................................................................. 24

*Nat'l Audubon Soc., Inc. v. Sonopia Corp.*, 2009 U.S. Dist. LEXIS 17094 (S.D.N.Y. Mar. 6,
    2009)...................................................................................................................................... 14

*Rechnitz v. Kutner*, No. 20-cv-1607, 2020 U.S. Dist. LEXIS 100092
    (E.D.N.Y. June 8, 2020).............................................................................................................. 15

*Shipping Corp. of India Ltd. v. Jaldhi Overseas PTE Ltd.*, 585 F.3d 58
(2d Cir. 2009) ........................................................................................... 2, 3, 11, 22

*Shiu v. New Peking Taste Inc.*, No. 11-cv-1175, 2013 U.S. Dist. LEXIS 115671
(E.D.N.Y. Mar. 14, 2013) .................................................................................. 14, 15

*Sigmoil Resources, N.V. v. Pan Ocean Oil Corp.*, 234 A.D.2d 103, 650 N.Y.S.2d 726
(1st Dep't 1996) ......................................................................................................... 2, 19

*Skyline Steel, LLC v. PilePro, LLC*, No. 13-CV-8171, 2015 U.S. Dist. LEXIS 114038
(S.D.N.Y. Aug. 27, 2015) .............................................................................. 14, 16, 17

*VisionChina Media Inc. v. S'holder Representative Servs., LLC*, 109 A.D.3d 49
(1st Dep't 2013) ........................................................................................................... 17

## Statutes

28 U.S.C. § 1782 ................................................................................................................. 10

## Rules

Courthouse Procedures, Procedure III [Ex Parte Applications][C] ............................................ 24

Fed. R. Civ. P. 64 ................................................................................................................. 13

N.Y. CPLR § 6201 ............................................................................................................... 18

N.Y. CPLR § 6212(a) ........................................................................................................... 14

N.Y. CPLR § 6223 .......................................................................................................... 15, 16

N.Y. CPLR § 7502(c) ........................................................................................................... 15

## Other Authorities

4A West's McKinney's Forms Civil Practice Law and Rules § 11:6 [d] ..................................... 24

Siegel, NY Prac, § 317 [5th ed.] ........................................................................................... 16

## PRELIMINARY STATEMENT

The fundamental premises on which Iraq Telecom ("IT"), acting *ex parte* and under seal, obtained an order attaching all funds held in the U.S. correspondent bank accounts ("Correspondent Accounts") of IBL Bank S.A.L. ("IBL")[1] are legally and factually unsound, and cannot support continuation of the "drastic remedy"[2] of prejudgment attachment.  Most critically, the Attachment Order has the overreaching and improper effect of freezing funds "held for the benefit of third-party clients of [IBL] who used the [correspondent] accounts to transact foreign business in U.S. currency" and "[t]hus, the wholesale attachment of all funds in the accounts … interfered with innocent third parties' access to their money."[3]

As this Court well knows, "[i]n 2019, Lebanon began to experience a political and economic crisis", resulting in "restrictions that included weekly caps on withdrawals from dollar-denominated accounts and limits on transfers from Lebanese bank accounts to overseas accounts."[4] To ameliorate that crisis, Lebanon's central bank mandated that Lebanese commercial banks like IBL maintain U.S. dollars in overseas correspondent bank accounts for the benefit of their clients without any encumbrance.[5]  Ignoring or misunderstanding the unique, and government-mandated, role of U.S. correspondent bank accounts of Lebanese banks, IT's Attachment Order undermines a key element of the crisis-management strategy put in place by Lebanon's central bank for the benefit of Lebanese depositors.

---

[1] Sealed Order Granting *Ex Parte* Attachment ("Attachment Order") (ECF 69).

[2] *Herzi v. Ateliers de la Haute-Garonne*, No. 15-cv-7702, 2015 U.S. Dist. LEXIS 165258, at *5-*6 (S.D.N.Y. Oct. 13, 2015) (citations omitted).

[3] *Cargill Fin. Servs. Int'l, Inc. v. Bank Fin. & Credit Ltd.*, 70 A.D.3d 456, 456, 896 N.Y.S.2d 317, 318 (1st Dep't 2010).

[4] *Daou v. BLC Bank S.A.L., et al.*, No. 20-cv-4438 (DLC), Order at 4 (Apr. 9, 2021).

[5] *See* Declaration of Karim Habib ("Habib Decl."), ¶¶ 8, 23-37; Declaration of Randa Abousleiman ("Abousleiman Decl."), ¶¶ 24-31.

This Court already has started ameliorating the damage IT has caused by modifying the *ex parte* Attachment Order to free up—on a going-forward basis from February 4, 2022—all Electronic Funds Transfers ("EFTs") for IBL's customers in accordance with *Shipping Corp. of India Ltd. v. Jaldhi Overseas PTE Ltd.*, 585 F.3d 58, 70 (2d Cir. 2009).[6]  Respectfully, however, far more is required to safeguard not only the rights of IBL's customers, but also the crisis-management strategy of Lebanon's central bank, which requires Lebanese banks to hold unencumbered client funds in dollars at U.S. correspondent banks.  To do so, the Attachment Order should be vacated in its entirety, so that IBL's U.S. Correspondent Accounts can resume the function mandated by Lebanon's central bank.

Independent of the uniquely damaging aspect of the Attachment Order on IBL's clients and Lebanon's crisis-management measures, the Attachment Order shuts out IBL from the international banking system—an impact of attachment that this Court has rejected in another case.[7]  As this Court held, a pre-judgment attachment cannot be allowed to "shut down [the foreign bank's] ability to operate in New York [through] a correspondent bank".[8]  This Court further recognized that:

- "[T]he Appellate Division has reasoned that the effect of an attachment on third parties' access to the relevant funds is a relevant consideration." *Owens* Tr. at 40:4-7 (citing *Cargill Fin. Servs. Int'l, Inc. v. Bank Fin. & Credit Ltd.*, 70 A.D.3d 456, 456, 896 N.Y.S.2d 317, 318 (1st Dep't 2010)).

- "New York courts caution that an attachment proceeding must be conducted with great care, that great care must be taken to avoid impeding the role of correspondent accounts in the facilitation of international banking transactions."  *Id.* at 40:8-12 (citing *Sigmoil Resources, N.V. v. Pan Ocean Oil Corp.*, 234 A.D.2d 103, 104, 650 N.Y.S.2d 726, 727 (1st Dep't 1996)).

---

[6] Order Modifying Attachment Order (ECF 86).
[7] *Owens v. Turkiye Halk Bankasi A.S.*, 20-cv-02648-DLC (S.D.N.Y.).
[8] *Id.*, Hr'g Tr. (ECF 51) (hereinafter "*Owens* Tr.") at 37:9-12 (Sept. 10, 2020).

- "[T]he Second Circuit has noted that an attachment's impact on the efficiency and certainty of the New York banking industry is a relevant consideration." *Id.* at 40:13-17 (citing *Jaldhi*, 585 F.3d at 62).

- An attachment motion turns in part on "the impact of an attachment on the interests of third parties and the broader New York banking industry." *Id.* at 41:10-12.

- A motion to attach a foreign bank's correspondent accounts "seeks to interfere and prevent [the foreign bank] from having a correspondent banking relationship in New York. . . . It would shut [the foreign bank] out of U.S. dollar transactions on behalf of the bank and all of it[s] clients. It would essentially destroy its ability to participate in the international banking community. <u>That threat is as strong today as it will be at the time of judgment. And therefore, there is certainly no need today to issue an attachment</u>." *Id.* at 42:21-43:4 (emphasis added).

- Attachment of a foreign bank's correspondent accounts "would be extraordinarily disruptive to third parties and their access to their money and their reliance on the certainty that the New York financial system tries to provide to the entire international banking community." *Owens* Tr. at 43:7-10.

All of these considerations apply with equal force here. The Attachment Order: shuts IBL out of the U.S./international banking system; impairs rights of innocent third parties; and needlessly imposes today a form of leverage over IBL that will exist in fully equal measure should IT prevail on its underlying claim, because IBL cannot withdraw from the U.S. banking system without imploding its business. As IT itself alleges, IBL operates in a largely dollarized environment, and the majority of IBL's banking business is denominated in dollars. IBL and its customers are today, and will remain, highly dependent on access to the U.S. and international banking system—access that IBL and its customers obtain through the Correspondent Accounts.

Still further, the Attachment Order also should be vacated because IT cannot meet its burden to demonstrate a likelihood of success on the merits of its underlying claim to enforce an arbitration award. The first arbitration between the parties, held in Lebanon, resulted in a Final Award declaring null and void a Subordination Agreement among IT, IBL, and other parties on the grounds of "*dol*," or fraud. That Final Award is now the subject of an annulment action filed

by IBL in the courts of Lebanon.  Under Lebanese law, the enforcement of the Final Award is suspended pending the annulment action.

Meanwhile, IT has filed a second arbitration proceeding against IBL, seeking $97 million in damages.  But that claim largely is based on IT's assertion that IBL is jointly and severally liable for all alleged damages to IT arising out of the Subordination Agreement.  Lebanese law, which governs the Subordination Agreement, provides for joint and several liability only in specific circumstances, which IT has not shown.  Indeed, IT sought a ruling in the first arbitration that IBL and the other parties to the arbitration were jointly and severally liable for IT's damages, but the arbitral panel explicitly declined to include such a determination in the Final Award.  For these reasons, IT cannot demonstrate a likelihood that it will be awarded $100 million in damages against IBL in the first and/or the second arbitrations.

Even if IT had some plausible claim for damages against IBL, the Bank has ample assets in Lebanon—the place where the Arbitration Award was rendered—to satisfy any damages award—without disrupting IBL's access to the U.S. banking system, impairing the rights of its customers, and undermining Lebanese central bank policies.  Further, IT has not plausibly alleged, and could not plausibly allege, that IBL has concealed or is about to conceal or remove assets from this jurisdiction to avoid a potential judgment.

While, for the foregoing reasons, the Attachment Order should be vacated, should the Court determine to leave it in place, IT should be required to post a far more significant undertaking, proportionate to the severe harm that the Attachment Order has had and will continue to have on IBL and its customers while it remains in place.

## STATEMENT OF FACTS

### The Parties

Petitioner IT is a private company incorporated under the laws of the Dubai International Financial Centre.  Verified Petition ¶ 14.  IT was established as a joint venture company between a Kuwaiti logistics company, Agility Public Warehousing Company, and a French telecommunications corporation, Orange S.A.  *Id.* ¶¶ 14, 33.  IT is a shareholder in Korek Telecom Company ("Korek"), an Iraqi telecommunications company.  *Id.* ¶ 33.

IBL is a bank established in Lebanon in 1961 (originally under the name Development Bank).  Habib Decl. ¶ 4.  IBL is a joint stock company registered in Lebanon, with its headquarters in Beirut.  *Id.*, ¶ 5.  IBL operates as a commercial and retail bank, with 21 branches in Lebanon, one branch in Cyprus, and one branch in Iraq.  *Id.* ¶¶ 5-6.  IBL, together with its affiliate entities, employs 342 people.  *Id.* ¶ 6.  IBL's most recent audited financial statements show that IBL has approximately 7.4 trillion Lebanese pounds in total assets, equivalent to approximately $4.9 billion in U.S. dollars at the official exchange rate.  *Id.* ¶ 9.  Like all commercial banks in Lebanon, IBL is regulated by Lebanon's central bank, the Banque du Liban ("BdL").  *Id.* ¶ 8; Abousleiman Decl. ¶ 24.

As IT acknowledges, IBL, like many if not all Lebanese banks, is particularly dependent on its relationships with U.S.-based banks.  Habib Decl. ¶ 10; *see* Verified Petition ¶ 19.  This is because the Lebanese economy has been dollarized since at least the 1990s, and many transactions in Lebanon, including transactions facilitated by IBL, are conducted in U.S. dollars.  Habib Decl. ¶ 10; *see* Verified Petition ¶ 19.  IBL's loans are predominantly in U.S. dollars, and IBL maintains well over half of its customer accounts in U.S. dollars.  Habib Decl. ¶¶ 10-11; *see* Verified Petition ¶¶ 19-20.  Nonetheless, and unsurprisingly given that IBL is a Lebanese bank operating primarily in Lebanon, the majority of IBL's assets are located in Lebanon.  Habib Decl. ¶ 12.

In order to gain access to the international banking system, and to facilitate EFTs and other transactions for its customers, IBL maintains correspondent banking relationships with banks in various countries.  Declaration of Nakhlé Khoneisser ("Khoneisser Decl."), ¶ 4.  In the U.S., IBL maintains U.S. dollar-denominated correspondent accounts with JPMorgan Chase Bank NA, Citibank NA, and Bank of New York Mellon, and a Canadian dollar-denominated correspondent account with Bank of New York Mellon, all in New York (collectively, the "Correspondent Accounts").  *Id.* ¶ 5.  IBL has no assets in the United States other than the four Correspondent Accounts.  *Id.* ¶ 6.

IBL's customers rely heavily on IBL's ability to facilitate cross-border transactions in U.S. dollars—both before and, in particular, following the onset of the crisis.  *Id.* ¶ 13.  Accordingly, IBL's business model depends heavily on the continuous use of, and the ability to process EFTs through, the Correspondent Accounts.  *Id.*  IBL uses, and relies on, the Correspondent Accounts to facilitate U.S. dollar-denominated (and Canadian dollar-denominated) EFTs and other banking services and transactions for IBL's customers.  *Id.* ¶ 5.  On a monthly basis, IBL processes approximately 800 transactions through the Correspondent Accounts for its customers, with a total dollar volume of approximately $18.8 million.  *Id.* ¶¶ 9-11.  The majority of these transactions are small amounts, less than $10,000 in value, and the purpose listed on many of these transfers indicates that the payments are to help family members pay rent or mortgage expenses, utilities, and other daily living expenses.  *Id.* ¶ 12.

### Lebanon's Economic Crisis and Responsive Actions Taken by BdL and IBL

Since 2019, Lebanon has been affected by an ongoing economic and liquidity crisis, which has been exacerbated by the COVID-19 pandemic and the explosion at the port of Beirut in 2020. The UN recently estimated that over three-quarters of Lebanon's population lives below the poverty line, with 36% of the Lebanese population living in extreme poverty.  Habib Decl. ¶ 15.

World Bank data indicates that in 2020, remittances from Lebanese citizens living abroad were equivalent to almost one-fifth of Lebanon's gross domestic product.  *Id.* ¶ 14.  Starting in October 2019, Lebanese banks recognized the signs of a banking panic and began restricting cash withdrawals by their customers.  *Id.* ¶ 16.  BdL then imposed regulations on the manner in which banks could restrict customer withdrawals.  *Id.*

IBL is in full compliance with BdL's regulations and applicable banking laws, including those related to the crisis.  *Id.* ¶ 17.  By way of example, BdL issued a circular on August 26, 2020, requiring Lebanese banks to increase their equity by 20% and to adopt provisions for losses of 45% of the face value of Lebanese sovereign debt denominated in foreign currencies ("Eurobonds") and of 1.89% of foreign-currency deposits placed by the banks at BdL.  *Id.* ¶ 21. IBL has fully complied with the 20% increase in equity requirement, and has provisioned for losses of 89.5% on Eurobonds and 24% on foreign-currency deposits at BdL—a far more conservative approach than is required by the circular.  *Id.* ¶ 22.

Lebanese lawmakers are continuing to negotiate legislation and other measures to address the economic crisis.  *Id.* ¶ 18.  In the meantime, IBL is well-positioned for success once the crisis ends.  According to a recent report from a Lebanese consulting firm, IBL ranks at or near the top of the Lebanese banking sector with respect to total assets, capital adequacy ratio, average asset-to-cost ratio, and allowances for expected credit losses.  *Id.* ¶ 19.

In response to the crisis, and consistent with Lebanese law, Lebanese banks have imposed broad restrictions on customer withdrawals of U.S. dollars above specified monthly limits.  Habib Decl. ¶ 24.  However, these restrictions generally do not apply to "fresh money," which is defined as funds deposited with a Lebanese bank in cash or via international funds transfer after April 9, 2020.  *Id.* ¶¶ 24-25; Abousleiman Decl. ¶ 27.

BdL has issued a number of circulars relating to "fresh money" that are relevant to this action.  Abousleiman Decl. ¶ 25.  These circulars each require IBL and other Lebanese banks to maintain funds in their correspondent accounts for the benefit of their customers.  As detailed below, the funds in IBL's Correspondent Accounts are on deposit for the benefit of IBL's customers, and BdL formally mandates that IBL hold those funds free of any encumbrance.

BDL Basic Circular No. 150 waives BdL's mandatory minimum reserve requirements on "fresh money" if the banks agree not to restrict a customer's use, withdrawal, or transfer of the customer's "fresh money."  Abousleiman Decl. ¶ 27.  Basic Circular No. 150 also requires that banks maintain their customers' "fresh-money" funds either in cash or in offshore correspondent accounts, and that banks process any transfers of "fresh-money" funds through their correspondent accounts.  *Id.*; Habib Decl. ¶ 25.  The banks must maintain these funds free of restrictions.  Habib Decl. ¶ 27.  Given that the Correspondent Accounts are IBL's only U.S. dollar-denominated correspondent accounts, these requirements, taken together, mean that IBL must maintain funds representing its customers' fresh-money funds on deposit in the Correspondent Accounts, without restriction, and must facilitate any transactions for its customers concerning those fresh-money funds through the Correspondent Accounts.  Abousleiman Decl. ¶¶ 27-28; Habib Decl. ¶¶ 25-29.  As of January 31, 2022, IBL had approximately **$8.5 million** in "fresh-money" customer funds in the Correspondent Accounts to which Basic Circular No. 150 applies.  Habib Decl. ¶ 28.

BdL's Basic Circular No. 158, as amended, provides an exemption from the general crisis-limits on withdrawals of U.S. dollars from Lebanese banks.  Specifically, it permits customers to opt into a program by which they can make limited withdrawals of U.S. dollars from their deposits on a monthly basis.  Abousleiman Decl. ¶ 29; Habib Decl. ¶ 30.  As with Basic Circular No. 150, banks are required to maintain liquid funds sufficient to make the payments required under the

circular, and must process these transactions through their correspondent accounts. Habib Decl. ¶¶ 30-32. As of January 31, 2022, IBL remains obligated to make payments of approximately $12.24 million to its customers under Basic Circular No. 158. *Id.* ¶ 33. Therefore, pursuant to BdL's requirements, IBL must maintain **$12.24 million** in "fresh-money" funds, free of any restrictions or commitments, on deposit in the Correspondent Accounts and must use the Correspondent Accounts to facilitate any transfers of disbursed funds to or from IBL customers. *Id.* ¶ 34.

Additionally, BdL's Basic Circular No. 154, issued on August 27, 2020, requires Lebanese banks to maintain in their correspondent accounts deposits equal to at least three percent of their customers' total foreign-currency deposits, based on their account balances on July 31, 2020, free of any restrictions or commitments. Habib Decl. ¶ 35; Abousleiman Decl. ¶ 31. BdL has approved IBL's plan to achieve compliance with this requirement, pursuant to which IBL must maintain, and ultimately increase, the amounts of foreign currency, including U.S. dollars, that IBL currently holds in its correspondent accounts. Habib Decl. ¶ 36. IBL thus is required by BdL to maintain all funds in the Correspondent Accounts free of any restrictions or commitments. Habib Decl. ¶¶ 36-37.

### The Arbitration Proceedings Between the Parties and This Action

In 2018, IT brought arbitral proceedings (the "First Arbitration") against IBL, Korek, and a holding company, International Holdings Limited ("IH") (collectively, "Arbitration Respondents"), seeking to have declared null and void a subordination agreement entered into by IT, IBL, Korek, and IH (the "Subordination Agreement"). Verified Petition ¶¶ 3, 5; Abousleiman Decl. ¶ 6. Pursuant to the Subordination Agreement, IT and IH agreed to subordinate the obligations and liabilities of Korek and IH to IT under a loan concluded on July 27, 2011, to the obligations of Korek to IBL under a loan that was concluded on December 21, 2011. Abousleiman

Decl. ¶ 6.  IT also sought a declaration that it was entitled to compensation from the Arbitration

Respondents on a joint and several basis for damages caused to IT arising from its entry in the

Subordination Agreement.  *Id.*  The Subordination Agreement provides that it is governed by the

laws of Lebanon, and that any disputes arising out of the Subordination Agreement are to be settled

by arbitration in Beirut.  *Id.* ¶ 7.

On September 21, 2021, the arbitral tribunal issued a "Final Award" in the First Arbitration.

*Id.* ¶ 8.  The Final Award, among other things:

- dismissed Arbitration Respondents' request to exclude certain evidence obtained by IT pursuant to 28 U.S.C. § 1782 discovery proceedings in this district, and declared that that evidence did form part of the record;

- declared (on a <u>majority</u>, rather than unanimous, basis) that the Subordination Agreement is null and void;

- <u>declared inadmissible</u> IT's request for an order that it was entitled to compensation from Arbitration Respondents on a joint and several basis for damages caused to IT based on its entry into the Subordination Agreement;

- ordered IT to pay IBL approximately $260,000 in arbitration expenses, and to pay Korek and IH approximately $187,000 in arbitration expenses; and

- ordered Arbitration Respondents to pay IT approximately $3 million in arbitration expenses on a joint and several basis.

*Id.*  On November 23, 2021, IT obtained a Lebanese court decision giving the Final Award

executory effect.  *Id.* ¶ 9.  IT then commenced a second arbitration ("Second Arbitration") against

IBL in Lebanon, seeking a minimum of $97 million in damages from IBL based on IT's alleged

damages in connection with its entry into the Subordination Agreement.  *Id.* ¶ 10.

On January 14, 2022, IBL filed an annulment action in Lebanese court to annul, or set

aside, the Final Award from the First Arbitration.  *Id.* ¶ 11.  IBL seeks annulment of the Final

Award on multiple grounds, including that (1) the arbitral tribunal violated public policy by

improperly relying on banking records obtained through 28 U.S.C. § 1782 discovery, and in doing

so, breaching Lebanese bank secrecy laws; and the president of the arbitral tribunal failed to disclose information regarding his connection with Orange S.A., one of the two companies that owns IT. *Id.* ¶ 17. Pursuant to Article 820 of the Lebanese Code of Civil Procedure, the Final Award is unenforceable under Lebanese law during the pendency of IBL's annulment action. *Id.* ¶ 18. If the Lebanese court grants IBL's request for annulment, the Final Award will be null and void in its entirety. *Id.* ¶ 19.

IT filed this action under seal seeking confirmation of the Final Award from the First Arbitration and an *ex parte* order of attachment in aid of the Second Arbitration, attaching up to $100 million of IBL's assets in the United States. Verified Petition at pp. 1, 32. This Court initially denied IT's request for an attachment, in a sealed order dated December 22, 2021, in part because IT's attachment motion did not address the implications of *Jaldhi*, 585 F.3d at 70 ("New York State does not permit attachment of EFTs that are in the possession of an intermediary bank."). After IT filed a renewed motion for attachment, the Court issued the Attachment Order on January 19, 2022.

In response to the Attachment Order, IBL's correspondent banks effectively cut off IBL's access to the U.S. banking system and prevented IBL from processing most dollar-denominated transactions, because they treated the Attachment Order as freezing all transfers into or out of the Correspondent Accounts. Khoneisser Decl. ¶ 14. This severely undermined IBL's ability to function as a bank, in a country already suffering a financial crisis and widespread economic hardship. *Id.* Dollar-denominated transactions are so critical to IBL's business operations that IBL's inability to freely process transactions to and through the Correspondent Accounts has created enormous business disruption, strained IBL's client relationships, and harmed IBL's reputation in the industry. *Id.* ¶ 15. Even the modified attachment, with exceptions for inward and

outward transfers, severely impairs IBL's ability to process transactions for its customers by freezing funds that are deposited in the Correspondent Accounts for the benefit of IBL's customers, pursuant to the BdL circulars discussed above.  *Id.*

As of closing on February 1, 2022, the balance in the Correspondent Accounts is as follows:

- JPMorgan Chase Bank NA: $10,845,102.29

- Citibank NA: $13,306,188.73

- Bank of New York Mellon:

    o US-Dollar Account: $18,187,691.18

    o Canadian Dollar Account: CAD 338,095.00

*Id.* ¶ 16.

Customers of other banks have continued attempting to send funds transfers to IBL customers ("inward transfers") through the Correspondent Accounts.  *Id.* ¶ 18.  After the Attachment Order was implemented, the correspondent banks blocked these transfers and froze the funds in the Correspondent Accounts.  Between January 24, 2022 and IBL's most recent accounting, approximately $4,492,186.51 relating to these transfers has been frozen in the Correspondent Accounts, as follows:

- Inward transfers frozen in the JPMorgan Chase Bank NA account: $1,570,627.65

- Inward transfers frozen in the Citibank NA account: $1,393,781.31

- Inward transfers frozen in the Bank of New York Mellon accounts: $1,527,777.55

*Id.* ¶¶ 17-18.  These figures are almost certainly understated, because additional inward transfers were blocked as IBL's correspondent banks attempted to implement the modified attachment order.  *Id.* ¶ 18.  These funds reflect inward transfers for the benefit of IBL customers, and, accordingly, are not IBL's proprietary funds, but are for the benefit of IBL's customers.

After IBL received notice of the Attachment Order, it appeared in this action and sought a modification of the Attachment Order to permit the processing of EFTs through the Correspondent Accounts.  This Court granted IBL's request and issued the Order Modifying Attachment Order, which provided that "no attachment or levy shall be made on any funds transferred to, from, or through the IBL Accounts after the entry of this Order as part of an Electronic Funds Transfer for the ultimate benefit of a third party other than [IBL]."  ECF 86 at 3.  The Court also ordered that "all funds in the IBL Accounts as of the date of this Order shall remain attached and levied pursuant to this Court's [Attachment Order] pending further order of the Court . . . ."  *Id.*

IT now moves to confirm the Attachment Order—and, indeed, to <u>expand</u> it to include "all of IBL's property located within this district."  Pet'r's Mem. Law in Supp. Mot. to Confirm ("IT Brief") (ECF 33) at 1.  IBL cross-moves to vacate the Attachment Order.

## ARGUMENT

IT's motion to confirm the Modified Order should be denied, and IBL's cross-motion to vacate the Modified Order should be granted, because IT has not met, and could not meet, the high standard for a prejudgment attachment under New York law.  *See Capital Ventures Int'l v. Republic of Argentina*, 443 F.3d 214, 218-19 (2d Cir. 2006) ("Attachment is available in a federal court . . . 'under the circumstances and in the manner provided by the law of the state in which the district court is held.'") (quoting Fed. R. Civ. P. 64).

## I.   LEGAL STANDARD

"Attachment is an extraordinary remedy.  Unsurprisingly, courts are leery of granting such harsh relief. . . .  [C]ourts should issue [an order of attachment] only upon a showing that *drastic action* is required for security purposes."  *Fratelli Italiani, LLC v. Mironova,* 2019 U.S. Dist. LEXIS 127796, *21 (S.D.N.Y. Apr. 11, 2019) (cleaned up) (emphasis in original); *accord Buy This, Inc. v. MCI Worldcom Comc'ns, Inc.*, 178 F. Supp. 2d 380, 383 (S.D.N.Y. 2001)

("attachment should [be] issue[d] only upon a showing that *drastic action* is required for security purposes.") (emphasis in original); *Bank of China, N.Y. Branch v. NBM L.L.C.*, 192 F. Supp. 2d 183, 188 (S.D.N.Y. 2002) (same); *Elliott Assocs., L.P. v. Republic of Peru*, 948 F. Supp. 1203, 1211 (S.D.N.Y. 1996) (same). Accordingly, as this Court has recognized, "an attachment is considered a harsh remedy, and the statute is strictly construed in favor of those against whom it may be employed." *Owens* Tr. at 38:16-19 (citation omitted).[9] *See also Nat'l Audubon Soc., Inc. v. Sonopia Corp.*, 2009 U.S. Dist. LEXIS 17094, at *6 (S.D.N.Y. Mar. 6, 2009) (party seeking an attachment "bears a heavy burden in attempting to establish its right to an attachment here, because 'New York attachment statutes are construed strictly against those who seek to invoke the remedy.'") (quoting *Buy This*, 178 F. Supp. 2d at 383) (other citations omitted); *Skyline Steel, LLC v. PilePro, LLC*, No. 13-CV-8171, 2015 U.S. Dist. LEXIS 114038, at *5 (S.D.N.Y. Aug. 27, 2015) (same) (citations omitted).

IT fails to satisfy multiple material elements of the test required to confirm the *ex parte* Attachment Order, which requires IT to establish:

- "that there is a cause of action,"

- "that it is probable that [IT] will succeed on the merits,"

- "that one or more grounds for attachment provided in Section 6201 exist,"

- "and that the amount demanded from the defendant exceeds all counterclaims known to the plaintiff."

*Capital Ventures*, 443 F.3d at 219 (quoting N.Y. CPLR § 6212(a)); *see, e.g., Fratelli Italiani*, 2019 U.S. Dist. LEXIS 127796, at *20; *Shiu v. New Peking Taste Inc.*, No. 11-cv-1175, 2013 U.S. Dist.

---

[9] As in *Owens*, attachment is not needed in aid of jurisdiction. *See Owens* Tr. 42:7-14 ("I don't believe that the plaintiff has shown a necessity for an attachment. The bank is here, it's litigating this motion, it has a due process argument to present, and it has assured me that if it does not succeed on that due process argument, that it will continue to present itself to the jurisdiction of this court, and see this litigation through to the conclusion of the merits.").

LEXIS 115671, at *33-34 (E.D.N.Y. Mar. 14, 2013); *Flame, S.A. v. Primera Maritime (Hellas) Ltd.*, 2010 U.S. Dist. LEXIS 9830, at *9 (S.D.N.Y. Feb. 2, 2010).

"Where, as here, a petitioner is seeking an attachment in aid of arbitration, the third ground"—that is, the requirement that IT show that grounds for attachment exist—"is governed by CPLR Section 7502 rather than CPLR Section 6201." *Rechnitz v. Kutner*, No. 20-cv-1607, 2020 U.S. Dist. LEXIS 100092, *16 (E.D.N.Y. June 8, 2020) (citation omitted). Under Section 7502, a court may consider an attachment in aid of arbitration "only upon the ground that the award to which the applicant may be entitled may be rendered ineffectual without such provisional relief." *Id.* (citing C.P.L.R. § 7502(c)).

"Where a plaintiff obtains an order of attachment, the defendant can move to vacate or modify the order, and its motion <u>will be granted</u> unless the plaintiff can establish also 'the need for continuing the levy.'" *Capital Ventures*, 443 F.3d at 219 (quoting N.Y. CPLR § 6223) (emphasis added); *see* CPLR § 6223(a) ("If, after the defendant has appeared in the action, the court determines that the attachment is unnecessary to the security of the plaintiff, it shall vacate the order of attachment."). A defendant also "may challenge the existence of a statutory ground for attachment and the plaintiff's likelihood of success in moving to vacate or modify." *Capital Ventures*, 443 F.3d at 219.

"The burden of proof in a motion for attachment is on the moving party. It is a high burden. Specifically, a party seeking an order of attachment must show a probability of success akin to that required to obtain injunctive relief. When evaluating a motion for attachment, 'statutory factors are strictly construed in favor of those against whom attachment is sought, and attachment may be denied even where all four prerequisites have been met.'" *Fratelli Italiani*, 2019 U.S. Dist. LEXIS 127796, at *20 (citations and internal quotation marks omitted). Importantly, the burden of proof remains with

IT for both IT's motion to confirm and IBL's cross-motion to vacate.  This is because on a motion to vacate or modify an existing attachment order, the party seeking to maintain the attachment—here, IT—"shall have the burden of establishing grounds for the attachment, the need for continuing the levy and probability that he will succeed on the merits."  CPLR § 6223(b).

"Even if the plaintiff makes out a case for attachment under CPLR 6201, its granting is still discretionary with the court. . .  [I]f the judge should perceive from the papers that the plaintiff does not need an attachment, either for jurisdiction or security, discretion is appropriately exercised against it even though a CPLR 6201 showing has been made."  Siegel, NY Prac, § 317 [5th ed.]. *See Skyline Steel, LLC v. PilePro, LLC*, 2015 U.S. Dist. LEXIS 114038, at *6 ("[E]ven where the statutory requirements for attachment are met, a court may nevertheless deny a writ of attachment where the movant has not established a need for the writ.").  As this Court recognized in *Owens*:

> Determination of whether to grant an attachment under the CPLR is discretionary upon a proper showing.  [*Morgenthau Avion Resources Ltd.*, 849 N.Y.S.2d 223, 229 (1st Dep't 2007)].  In exercising that discretion, a court must be guided by the purposes of prejudgment attachment.  Those purposes of course, again, to obtain jurisdiction and to secure a judgment. *Capital Ventures*, 443 F.3d at 221.

> Thus, if jurisdiction over the defendant can be secured without attaching property, and there is no reason to believe that the defendant will not satisfy any judgment entered against the defendant, an order [of] attachment should be withheld. *Ibid*. at 222.

*Owens* Tr. at 39:2-12.

## II.   IT HAS NOT ESTABLISHED A NEED FOR ATTACHMENT OR SHOWN THAT ANY AWARD MAY BE RENDERED INEFFECTUAL ABSENT ATTACHMENT.

The Attachment Order should be vacated because IT has not demonstrated a need for the drastic remedy of attachment.  "[W]here, as here, an order of attachment is sought pursuant to § 6201(1), the [petitioner] must show that the attachment is needed for jurisdictional or security purposes."  *Herzi v. Ateliers de la Haute-Garonne*, No. 15-cv-7702, 2015 U.S. Dist. LEXIS 165258, at *2 (S.D.N.Y. Oct. 13, 2015) (citation omitted); *see Buy This*, 178 F. Supp. 2d at 383

("attachment should [be] issue[d] only upon a showing that *drastic action* is required for security purposes.") (emphasis in original) (citations omitted).   Even where a party has "clearly established" for purposes of attachment that they have a cause of action, that it is probable that they will succeed on the merits, and that the amount demanded exceeds all known counterclaims—which IT has not done and cannot do here—the party still must demonstrate "that attachment is necessary for security purposes—that is, whether there exists a real threat to [Petitioner's] ability to enforce a judgment against [Respondent] . . . , so as to justify the drastic remedy of pre-judgment attachment."  *Herzi*, 2015 U.S. Dist. LEXIS 165258, at *5-6 (alterations in original, citations and internal quotation marks omitted); *Skyline Steel,* 2015 U.S. Dist. LEXIS 114038, at *6 ("[E]ven where the statutory requirements for attachment are met, a court may nevertheless deny a writ of attachment where the movant has not established a need for the writ.) (citations omitted); *Elsevier, Inc. v. Grossman*, 883 F. Supp. 2d 398, 399 (S.D.N.Y. 2012) ("A court may exercise its discretion not to issue an attachment if it concludes that an attachment is not necessary 'to . . . provide security for potential judgments.'") (citation omitted).   "In sum, while attachment may be convenient in eventually enforcing a potential judgment, '[t]here must be more than a showing that the attachment would, in essence, be 'helpful.'"  *Bollenbach v. Haynes*, No. 18-cv-997, 2018 U.S. Dist. LEXIS 239449, at *6 (S.D.N.Y. May 29, 2018) (quoting *VisionChina Media Inc. v. S'holder Representative Servs., LLC*, 109 A.D.3d 49, 61 (1st Dep't 2013)) (alteration in original).

Here, IT has not shown, and could not show, that it has a need for the drastic remedy of pre-judgment attachment of the Correspondent Accounts.  As IT acknowledges, IBL operates in a largely dollarized environment, and therefore IBL is highly dependent on access to U.S. dollar transactions and the U.S. banking system to process transactions for its customers.  Habib Decl. ¶ 10; *see* Verified Petition ¶ 19.  The Correspondent Accounts are IBL's only means of obtaining

that access for its customers.  Further, as explained above, IBL is required by its regulator, BdL, to maintain its customers' "fresh-money" U.S. dollars on deposit in the Correspondent Accounts, and to process all transactions involving such "fresh-money" through the Correspondent Accounts.

In short, IBL needs use of its Correspondent Accounts and the funds therein to provide banking services to its customers, and will continue to need the Correspondent Accounts in the future.  Accordingly, the threat imposed by attachment of the Correspondent Accounts "is as strong today as it will be at the time of judgment.  And therefore, there is certainly no need today to issue an attachment."  *Owens* Tr. at 43:2-4.

IT argues that an attachment is needed because "IBL, as a foreign bank, almost certainly keeps most of its assets outside the United States," IT Brief at 20.  IBL is indeed a foreign bank, based in Lebanon, and therefore unsurprisingly keeps most of its assets in Lebanon, outside the United States.  This cannot be sufficient grounds for attachment, or attachment would be available against <u>any</u> foreign defendant.  That IT has chosen to forum-shop in this venue, rather than in Lebanon, where IBL is based and where the Subordination Agreement calls for disputes to be resolved, cannot justify an attachment here.

Moreover, IT has not shown, and could not show, that IBL "with intent to defraud [its] creditors or frustrate the enforcement of a judgment that might be rendered in [IT's] favor, has assigned, disposed of, encumbered or secreted property, or removed it from the state or is about to do any of these acts[,]" as required under CPLR § 6201(3).  IT states that "evidence suggests that IBL and its co-conspirators may have already dissipated $155 million," IT Brief at 3, but there is no such evidence.  <u>At most</u>, IT alleges that IT has been unsuccessful in obtaining information from <u>Sirwan Saber Mustafa</u> about <u>his</u> assets in a separate arbitration, to which IBL is not a party.  *See* IT Brief at 11-13.  There has been no finding, in the First Arbitration or elsewhere, that IBL

conspired with Mr. Mustafa, and there is no plausible allegation that IBL has acted with Mr. Mustafa to dissipate assets.

IT also suggests that attachment is needed because IBL is purportedly "insolvent". To the contrary, IBL is in a strong position relative to other Lebanese banks. Habib Decl. ¶¶ 19-20. IBL has increased its equity as required by BdL and has made provisions for loss of value of its assets that may be impacted by the financial crisis, well beyond the provisions required by BdL. *Id.* ¶¶ 21-22. None of the conditions under which a Lebanese bank is considered to be in cessation of payments is applicable to IBL. Abousleiman Decl. ¶ 32, Habib Decl. ¶ 20. Moreover, even if IBL were "insolvent," which it is not, IT's attempt to secure IBL's assets by attachment here would "merely give[] [IT] an unwarranted priority over [IBL's] other creditors, which 'is simply not the intended purpose of CPLR 6201 . . . .'" *J.V.W. Inv., Ltd. v. Kelleher*, 41 A.D.3d 233, 234, 837 N.Y.S.2d 650, 651 (1st Dep't 2007) (quoting *Ames v. Clifford*, 863 F. Supp. 175, 178 (S.D.N.Y. 1994)).

IT cannot meet its burden of showing a need to continue the Attachment Order. Therefore, the Attachment Order must be vacated.

## III.    CONFIRMING THE ATTACHMENT WOULD BE EXTRAORDINARILY DISRUPTIVE TO IBL'S CUSTOMERS AND THE BANKING INDUSTRY.

New York courts have recognized that, "[i]f New York permits correspondent bank accounts to be regularly subject to attachment . . . the entire system of correspondent banking, in which New York banks play an important role, will be disrupted." *Sigmoil Res., N.V. v. Pan Ocean Oil Corp.*, 234 A.D.2d 103, 104 (1st Dep't 1996) (internal quotation marks and citation omitted). For this reason, "[e]ven if [petitioner] established a statutory basis for attachment of" a correspondent bank account—as IT has sought, but <u>failed</u>, to do here—this Court may use its discretion to deny attachment of the account, "given the nature of correspondent banking and its

importance in international transactions." *Cargill Fin. Servs. Int'l, Inc. v. Bank Fin. & Credit Ltd.*, 70 A.D.3d 456, 456 (1st Dep't 2010).

In *Owens*, this Court recognized "that if I issued an attachment [of a foreign bank's correspondent accounts], it would be extraordinarily disruptive to third parties and their access to their money and their reliance on the certainty that the New York financial system tries to provide to the entire international banking community." Owens Tr. at 43:6-10.  The Attachment Order issued in this action has indeed proven extraordinarily disruptive to IBL and its customers' access to their funds.  As noted above, approximately $4.5 million relating to inward transfers from third-parties, directed through the Correspondent Accounts for the benefit of IBL's customers, has been frozen in the Correspondent Accounts following the Attachment Order.  Khoneisser Decl. ¶¶ 17-18.  Additionally, the Attachment Order has frozen approximately $8.5 million of "fresh-money" funds that IBL has placed in the Correspondent Accounts for the benefit of its customers pursuant to BdL Basic Circular No. 150, and more than $12 million that IBL has placed in the Correspondent Accounts for its customers pursuant to BdL Basic Circular No. 158.  Habib Decl. ¶¶ 25-34.  Additionally, pursuant to BdL Basic Circular No. 154, all of the funds in IBL's Correspondent Accounts are required to be maintained free of restrictions, and IBL's plan for achieving full compliance with that circular requires IBL to <u>increase</u> its holdings in the Correspondent Accounts in the future.  *Id.* ¶¶ 35-37.

While the Court has modified the Attachment Order to permit the processing of EFTs through the Correspondent Accounts, IT seeks to restrain, and thus essentially preclude IBL's use of, IBL's only U.S. correspondent bank accounts.  IT also seeks to restrain funds in the Correspondent Accounts that are held for the benefit of IBL's customers.  This Court should not permit an attachment that would be so disruptive to IBL's customers and that would undermine

confidence in the stability of the New York banking system.  The Court should vacate the Attachment Order.

## IV.   IT CANNOT DEMONSTRATE LIKELIHOOD OF SUCCESS ON ITS $100 MILLION CLAIM AGAINST IBL.

Separate from IT's inability to demonstrate a need for the drastic remedy of attachment, and the significant harm that the attachment has already caused to IBL and its customers, the Attachment Order, which levies up to $100 million of IBL's assets, should be vacated because IT cannot demonstrate that it is likely to obtain a judgment against IBL for $100 million, for several reasons.

IT's argument that it is likely to succeed in the Second Arbitration is based on the premise that it already has succeeded in the First Arbitration.  But, as noted above, IBL has filed an action to annul the Final Award from the First Arbitration on multiple grounds, including that the president of the tribunal failed to disclose his ties to Orange, one of the companies that owns IT, and that the tribunal violated public policy.  Abousleiman Decl. ¶¶ 11-19.  IBL's annulment action suspends enforcement of the Final Award, and if the annulment action is successful, the Final Award will be null and void.  *Id.* ¶¶ 16-19.  Accordingly, the Final Award cannot demonstrate IT's ultimate likelihood of success on its claims.

IT's claim in the Second Arbitration also relies on the premise that "[u]nder Lebanese law, IBL and the other respondents in the First Arbitration are jointly and severally liable for damages . . . and the full amount of damages can be recovered from IBL."  IT Brief at 21.  But this is wrong for at least two reasons.  First, IT sought a declaration in the First Arbitration that IBL and the other Arbitration Respondents were jointly and severally liable for IT's damages, but the tribunal declined to make such a ruling in the Final Award.  Abousleiman Decl. ¶¶ 6, 8, 23.  Second, Lebanese law—specifically, Article 137 of the Lebanese Code of Obligations and Contracts—

provides that when an injury is caused by multiple persons, joint and several liability is presumed only where (i) those persons acted in concert; (ii) it is <u>impossible</u> to determine the proportion of damages attributable to each of those persons.  Abousleiman Decl. ¶ 22.  IT has made neither showing, either here, in the arbitrations, or anywhere else.

As such, even if IT could meet its burden of showing that the Final Award from the First Arbitration will remain valid, IT could not show that it is likely to recover anywhere near $100 million from IBL, thus requiring vacatur (or, at the very least, severe modification) of the Attachment Order.

## V.   FUNDS HELD IN THE CORRESPONDENT ACCOUNTS FOR THE BENEFIT OF THIRD-PARTIES SHOULD NOT BE SUBJECT TO ATTACHMENT.

As set forth above, IBL maintains funds on deposit for the benefit of its customers, and in accordance with the directives of its regulator, BdL.  These funds should not be subject to attachment because third-parties have an overriding interest in them, and attachment would significantly impair the customers' ability to access the funds.  Accordingly, while, for the reasons set forth above, the Attachment Order should be vacated in its entirety, the Court should <u>at minimum</u> modify the Attachment Order to make clear that the levy does not apply to funds held in the Correspondent Accounts for the benefit of IBL's customers, as follows:

First, nearly $4.5 million currently held in the Correspondent Accounts represents inward transfers to IBL customers that were frozen subsequent to the Attachment Order.  Permitting the ongoing attachment of these funds would be inconsistent with this Court's modifying order, as well as the rule from *Jaldhi* that "New York State does not permit attachment of EFTs that are in the possession of an intermediary bank."  585 F.3d at 70.  These funds should be freed from attachment so that the EFTs can be processed to the beneficiary customers.

Second, funds maintained in the Correspondent Accounts for the benefit of IBL customers pursuant to BdL Basic Circular No. 150 and Basic Circular No. 158 also should not be subject to attachment.  The approximately $8.5 million in "fresh-money" maintained in the Correspondent Accounts pursuant to Basic Circular No. 150 represents customers' funds, and must be maintained in the Correspondent Accounts to facilitate transactions through the Correspondent Accounts for IBL's customers.  Similarly, approximately $12.24 million is kept in the Correspondent Accounts to make monthly disbursements to eligible customers under Basic Circular No. 158, and BdL requires that these funds be maintained in, and the transactions be processed through, the Correspondent Accounts.

Attachment of these funds in the Correspondent Accounts should not be permitted because it "would be extraordinarily disruptive to third parties and their access to their money and their reliance on the certainty that the New York financial system tries to provide to the entire international banking community," *Owens* Tr. at 43:6-10.  *See also Cargill*, 70 A.D.3d at 456, 896 N.Y.S. 2d at 318 (affirming denial of attachment of correspondent accounts where "[t]he evidence showed that a substantial part of the funds therein was held for the benefit of third-party clients of defendant who used the accounts to transact foreign business in U.S. currency" and "[t]hus, the wholesale attachment of all funds in the accounts would have interfered with innocent third parties' access to their money.").

Continued attachment of these funds would severely impair third-party customers' access to their fresh-money funds in a time of crisis.  Therefore, at minimum, the Attachment Order should be modified to make clear that these funds, totaling approximately $25.24 million, are not subject to levy.

## VI.   CONFIRMING THE ATTACHMENT WOULD SIGNIFICANTLY HARM THE BANK AND ITS CUSTOMERS, REQUIRING A SIZABLE UNDERTAKING.

For the reasons set forth above, IT has not shown, and could not show, that the Attachment Order should be confirmed.  Continued attachment of the Correspondent Accounts could have devastating effects on IBL's business and its customers, as it would continue to cut IBL off from funds in its only U.S. correspondent banks, including funds held for the benefit of IBL's customers.

IT has posted security of $100,000, just <u>one-tenth of one percent</u> of the $100 million levied under the Attachment Order.  Should the Court confirm the Attachment Order, IT should be required to post an undertaking in the amount that is "rationally related to the potential damages in the event the attachment is found to have been unwarranted" and that is "sufficient to pay [IBL's] damages, including attorney's fees, in the event that [IT] was found not entitled to an attachment."  *MyPart Software, Ltd. v Fluent Trade Tech. Ltd.*, No. 650316/2017, 2017 N.Y. Misc. LEXIS 4587, at *5 (N.Y. Sup. Ct., N.Y. County 2017) (citations omitted).  "Commentaries and court procedures suggest that an undertaking on an attachment should generally be set in the amount of five to ten percent of the amount restrained."  *Id.* (citing Courthouse Procedures, Procedure III [Ex Parte Applications][C]; 4A West's McKinney's Forms Civil Practice Law and Rules § 11:6 [d].)).  Accordingly, if this Court were to confirm the Attachment Order (which it should not), IT should be required to post an undertaking of at least $10 million (10 percent of the $100 million levy).  Indeed, under the unique circumstances presented here, in which IT seeks to restrain IBL's Correspondent Accounts, it would be appropriate for the Court to require an undertaking equal to the full amount of the levy.

## <u>CONCLUSION</u>

For the reasons set forth above, IT's motion to confirm the Attachment Order should be denied in its entirety, IBL's cross-motion should be granted, and the Attachment Order should be vacated.

Dated: February 14, 2022                Respectfully submitted,

**SQUIRE PATTON BOGGS (US) LLP**

<u>/s/ *Gassan A. Baloul*</u>
Gassan A. Baloul
gassan.baloul@squirepb.com
Mitchell R. Berger
mitchell.berger@squirepb.com
2550 M Street NW
Washington, DC 20037
Telephone: (202) 457-6000
Facsimile:  (202) 457-6315

Joseph S. Alonzo
joseph.alonzo@squirepb.com
1211 Avenue of the Americas, 26th Floor
New York, New York 10036
Telephone: (212) 872-9800
Facsimile:  (212) 872-9815

*Counsel for Respondent IBL Bank S.A.L.*