UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IRAQ TELECOM LIMITED,

Petitioner,

-v-

IBL BANK S.A.L.

Respondent.

21cv10940 (DLC)

OPINION AND ORDER

APPEARANCES:

For petitioner Iraq Telecom Ltd.:
Kevin Samuel Reed
Quinn Emanuel Urquhart & Sullivan LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010

Kristin Tahler
Quinn Emanuel Urquhart & Sullivan LLP
865 S. Figueroa Street, Ste 10th Floor
Los Angeles, CA 90017

Alexander Hale Loomis
Quinn Emanuel Urquhart & Sullivan LLP
111 Huntington Ave, Suite 520
Boston, MA 02199

For respondent IBL Bank S.A.L.:
Mitchell Rand Berger
Joseph Stewart Alonzo
Gassan Adnan Baloul
Squire Patton Boggs (US) LLP
1211 Avenue of the Americas, Ste 26th Floor
New York, NY 10036

DENISE COTE, District Judge:

Iraq Telecom Ltd. ("Iraq Telecom") seeks confirmation of an attachment of $42 million held in the New York-based correspondent bank accounts of Intercontinental Bank of Lebanon S.A.L. ("IBL"), a Lebanese bank.  For the following reasons, an attachment of $3 million is granted.

## Background

Iraq Telecom is a joint venture between Agility Public Warehousing Company KSCP ("Agility"), a Kuwaiti logistics company, and Orange S.A. ("Orange"), a French telecommunications corporation.  It is a significant but minority shareholder in Korek Telecom Company LLC ("Korek"), a telecommunications company in Iraq.  Iraq Telecom holds a 44% stake in International Holdings Limited ("IHL"), a United Arab Emirates holding company which is the sole shareholder of Korek.  The remainder of IHL's shares are held by Korek International (Management) Ltd. ("CS Ltd."), a holding company in the Cayman Islands.  Through CS Ltd., Sirwan Saber Mustafa -- also known as Barzani -- is IHL's largest shareholder and Chairman of the Board, as well as Korek's co-founder and managing director.

Iraq Telecom wears a second hat as well, as an unsecured creditor of Korek.  In March 2011, Korek, IHL, Iraq Telecom, Barzani, and CS Ltd. entered into a Shareholders' Agreement

providing that Korek's repayment of shareholder loans would be prioritized pari passu (the "Shareholder Agreement").[1] In July 2011, Iraq Telecom lent Korek $285 million through a transaction with IHL (the "Iraq Telecom Loan"). It is this loan that brings Iraq Telecom before this Court.

In late 2011, Korek sought a second loan on an urgent basis to pay a licensing fee owed to the Iraqi government. Barzani arranged for IBL to provide a $150 million loan to Korek (the "IBL Loan"). IBL, a joint stock company registered in Lebanon, is a commercial and retail bank with twenty-one branches in Lebanon, one in Cyprus, and one in Iraq. In writing, Barzani described the IBL Loan to Iraq Telecom as "unsecured."

To extend the loan, IBL required that the Iraq Telecom Loan be subordinated to the IBL Loan. Iraq Telecom agreed to do so and on December 14, 2011, a Subordination Agreement was executed by Iraq Telecom, IBL, Korek, and IHL. Under the Subordination Agreement, Korek could not make payments on the Iraq Telecom Loan as long as the IBL Loan was in default. Iraq Telecom was advised that Barzani would be personally guaranteeing the IBL Loan, and Barzani is named as the Guarantor to the Borrower, Korek, in the executed term loan agreement. The Subordination Agreement is governed by the law of Lebanon

[1] Pari passu means "[p]roportionally; at an equal pace; without preference." Black's Law Dictionary (11th ed. 2019).

and requires any dispute among the parties to be resolved through an arbitration in Beirut, Lebanon.  The IBL Loan issued on December 21, 2011, and carried an annual interest rate of 13.25%, which increased to 15.25% upon default.[2]

In 2015, Korek defaulted on the IBL Loan.  Thereafter, IBL demanded both full repayment and, invoking the Subordination Agreement, that Korek cease repaying the Iraq Telecom Loan. Iraq Telecom eventually learned that the IBL Loan was not an unsecured loan.  In 2017, Iraq Telecom discovered that in 2011 Barzani had put up $155 million in cash collateral for the IBL Loan in an IBL account held in his name.

Iraq Telecom takes the position that it has been defrauded by Barzani and IBL in connection with the Subordination Agreement through the following scheme.  Barzani and IBL misrepresented the nature of the IBL Loan:  despite informing Iraq Telecom in 2011 that it was unsecured loan, it was a fully collateralized loan.  Because of this deception, Iraq Telecom agreed to the IBL Loan that carried an exorbitant interest rate and agreed to the Subordination Agreement.  Because of the Subordination Agreement, after Korek's default on the IBL Loan,

---

[2] In the arbitration proceeding brought by Iraq Telecom against IBL, Korek, and IHL, described below, Iraq Telecom asserted that the 13.25% interest rate was "far in excess of what prevailing market practices could justify for a fully cash collateralised loan" and that, as of 2017, an appropriate market rate for a fully collateralized loan would have been "around 4.1%."

Korek no longer made payments to Iraq Telecom on the Iraq Telecom Loan.  Finally, IBL secretly paid Barzani most of the money it received from Korek as interest payments on the IBL Loan.  Iraq Telecom asserts that this deprived it of receiving in pari passu its just share of all loan repayments by Korek to its shareholders under the March 2011 Shareholder Agreement.

In June 2018, Iraq Telecom brought an arbitration proceeding in Lebanon against IBL, Korek, and IHL.[3]  During the arbitration, Iraq Telecom withdrew its request for damages and sought only declaratory relief.  As explained in the arbitration award, Iraq Telecom did so

> in order to eliminate any argument regarding double-recovery issues with parallel and subsequent proceedings, and also to narrow the focus of [the] arbitration to the critical issue:  the invalidity of the Subordination Agreement and its entitlement to damages (in principle) flowing directly or indirectly from entry into the Subordination Agreement.

On September 21, 2021, Iraq Telecom won an arbitration award of attorney's fees in the amount of $3 million jointly and severally against IBL, Korek, and IHL (the "Award").[4]  The arbitrators agreed that Iraq Telecom had been defrauded.

---

[3] The arbitration was held before the Lebanese Arbitration Center of the Chamber of Commerce, Industry and Agriculture of Beirut and Mount Lebanon.

[4] On January 14, 2022, IBL initiated an exequatur proceeding in a Lebanese court seeking to annul the Award.

The Award finds that (1) the parties understood the Subordination Agreement and the IBL Loan agreement to be part of the same overall transaction; (2) representations that the IBL Loan was not fully collateralized were key to inducing Iraq Telecom into subordinating its loan and approving Korek's entry into the IBL Loan; (3) IBL "clearly and knowingly participated in the deception of" Iraq Telecom by fraudulently concealing the existence of the cash collateral; and (4) Barzani's knowledge of that deceit should be imputed to both Korek and IHL.

The Award explains that

> each of the three Respondents actively participated in the commission of dol [fraud].  Indeed, had any one of the Respondents disclosed to [Iraq Telecom] the existence of the cash collateral, [Iraq Telecom] would not have entered into the Subordination Agreement.  Therefore, for the maneuver to succeed, it required the participation of all three Respondents. . . .  As for [IBL], the Arbitral Tribunal points out that the latter denied the existence of the cash collateral . . . and fraudulently concealed its existence.

The Award adds that

> [I]t appears obvious that [IBL and Korek] did not wait until . . . the day after the signing of the Subordination Agreement, to start discussions on the cash collateral, the significant amount of which, [U.S. Dollar] 155 million, was transferred . . . the day before the IBL Loan Agreement was executed. [Barzani] and [IBL] must have agreed on the provision of the cash collateral far in advance (even prior to the date of execution of the Subordination Agreement) given the large sum of money involved. . . . [T]he Respondents' plan [was] carefully orchestrated in order to conceal the fact that [Barzani] was in reality providing a shareholder loan and to prioritise [Barzani's] creditor-rights over [Iraq Telecom's],

> notwithstanding [Barzani] agreeing to the contrary in the [Shareholder Agreement]. This scheme cannot be disputed given the fact that [Barzani] earned a 12.75% p.a. deposit rate, which equates to around LIBOR plus 12% p.a., that being more than 96% of the total interest expense paid by [Korek] to [IBL] was paid to [Barzani].

Having found that under Lebanese law IBL had participated in a scheme with Korek and IHL to commit dol,[5] or fraud, a majority of the tribunal declared that the Subordination Agreement was null and void.

On December 13, 2021, Iraq Telecom initiated a second arbitration in Lebanon against IBL seeking damages resulting from the fraud (the "Second Arbitration"). In the Second Arbitration, Iraq Telecom seeks at least $97 million of the $148 million in interest payments that Korek has paid to IBL since 2015.[6]

Iraq Telecom also commenced a separate arbitration on April 23, 2021, against Korek, CS Ltd., and Barzani in connection with an alleged bribery scheme by Barzani to influence the Government of Iraq to order the expropriation of Iraq Telecom's indirectly-

[5] According to the Award, under Lebanese Law, liability for dol as codified in Articles 202, 208, 209, and 233 of the Lebanese Code of Obligations and Contracts may include both fraudulent acts with intent to deceive a contractual counterparty and fraudulent concealment (réticence dolosive) where a party is under a duty to disclose a material fact.

[6] The demand of at least $97 million in damages is calculated at a rate of 65.52% of the $148 million in payments that Korek made to IBL since July 2015.

held shares in Korek. In that arbitration, which is pending, Iraq Telecom asserts that an IBL executive involved in the Subordination Agreement fraud also conspired with Barzani in furtherance of the expropriation scheme.

On December 21, Iraq Telecom filed in this Court a sealed petition for confirmation of the Award and moved for an ex parte order of attachment of all of IBL's property within the district. That motion was denied with leave to renew on December 22. The Order of denial required Iraq Telecom to identify deposits owned by IBL in New York and currently in the possession of a New York bank, and to address the implications of Shipping Corp. of India v. Jaldhi Overseas Pte Ltd., 585 F.3d 58, 70 (2d Cir. 2009) ("Jaldhi").

Iraq Telecom renewed its motion on December 29. In its Memorandum of Law, Iraq Telecom argued that

> Iraq Telecom does not seek to attach [electronic fund transfers ("EFTs")] passing through a New York intermediary bank on their way to an account owned by IBL. It seeks to attach specific bank accounts that belong to IBL . . . . The [New York bank] garnishees are thus not intermediary banks, with respect to IBL, but rather IBL's own banks holding IBL's own property in IBL's name. Neither [Jaldhi] nor New York law bars attachment of a defendant's own bank accounts. . . . In any event, this Court can clarify in its proposed order that the proposed attachment would not extend to EFTs.

(citation omitted). On January 3, 2022, the Court ordered Iraq Telecom to submit a revised proposed order of attachment that

"identifies the specific funds it seeks to attach by identifying the account numbers and banks." Iraq Telecom filed that revised order on January 6.

On January 19, an ex parte Order of Attachment of up to $100 million on four identified accounts held by IBL at three New York correspondent banks was entered. The January 19 Order also required Iraq Telecom to post an undertaking in the amount of $100,000 within fourteen days. Proof of the undertaking was filed on February 2. This action was unsealed on January 28.

As of February 1, the following funds were attached pursuant to the January 19 Order, amounting in total to roughly $42 million. The amounts attached were: JPMorgan Chase Bank NA: $10,845,102.29; Citibank NA: $13,306,188.73; Bank of New York Mellon: $18,187,691.18 and CAD 338,095.00.[7]

IBL contends that approximately $4.5 million of the attached funds represents inward transfers, or midstream EFTs. On January 28, IBL filed a letter motion seeking to modify the Attachment Order to exclude EFTs going forward. With consent of Iraq Telecom, that request was granted on February 4. The modified attachment order reads:

> [N]o attachment levy shall be made on any funds transferred to, from, or through the IBL Accounts after the entry of this Order as part of an Electric Funds Transfer for the ultimate benefit of a third

[7] CAD refers to Canadian dollars.

party other than [IBL], a branch of [IBL], or person acting on [IBL's] behalf.

On January 31, Iraq Telecom moved to confirm the January 19 ex parte Order of Attachment and the attachment of $100 million, and to expand the scope of the Order to include all of IBL's property within this district. On February 14, IBL opposed the motion and cross-moved to vacate the Order of Attachment. Iraq Telecom filed a reply on its own motion and opposed IBL's cross-motion on February 28. These motions became fully submitted on March 14, when IBL filed its reply in support of its motion to vacate the attachment.

Oral argument was held on March 16. At its conclusion, the Court vacated the January 19 attachment as to any amount greater than $3 million.[8] A schedule was set for IBL to oppose the petition to confirm the Award.

## Discussion

Iraq Telecom has moved to confirm the Order of Attachment and to expand the attachment. IBL has opposed the motion and cross-moved to vacate the attachment. After the legal standards governing these applications are set out, the motions to confirm and vacate will be addressed. Finally, Iraq Telecom's application for an expanded attachment will be addressed.

[8] The attachment was vacated in its entirety as to Citibank NA and JPMorgan Chase.

I.   Legal Standard

A. Attachment in New York

Attachment is available in a federal court "under the circumstances and in the manner provided by the law of the state in which the district court is held." Cap. Ventures Int'l v. Republic of Argentina, 443 F.3d 214, 219 (2d Cir. 2006) ("Capital Ventures I") (quoting Fed. R. Civ. P. 64).  "Under New York law, an attachment bars any sale, assignment or transfer of, or any interference with the property attached." Cap. Ventures Int'l v. Republic of Argentina, 652 F.3d 266, 270 ("Capital Ventures II") (2d Cir. 2011) (quoting N.Y. C.P.L.R. § 6124(b)).  "Attachment is a harsh remedy, and is construed narrowly in favor of the party against whom the remedy is invoked." VisionChina Media Inc. v. S'holder Representative Servs., LLC, 967 N.Y.S.2d 338, 345 (1st Dep't 2013) (citation omitted); see also J.V.W. Inv. Ltd. v. Kelleher, 837 N.Y.S.2d 650, 651 (1st Dep't 2007) ("J.V.W") (attachment is a "drastic provisional remedy").  Because of the effects of an attachment on property rights, due process rights attach. Connecticut v. Doehr, 501 U.S. 1, 12 (1991).

The statutory purpose of the attachment remedy in New York is two-fold: "to obtain quasi in rem jurisdiction over the property of non-resident defendants and provide security for potential judgments." Capital Ventures I, 443 F.3d at 221.  The

grounds for an attachment are set out in § 6201 of the New York Civil Practice Law and Rules ("N.Y. C.P.L.R."). As pertinent here, § 6201 provides:

> An order of attachment may be granted in any action . . . where the plaintiff has demanded and would be entitled . . . to a money judgment against one or more defendants, when:
>
> 1. the defendant . . . is a foreign corporation not qualified to do business in the state; or
>
> 3. the defendant, with intent to defraud his creditors or frustrate the enforcement of a judgment that might be rendered in plaintiff's favor, has assigned, disposed of, encumbered or secreted property, or removed it from the state or is about to do any of these acts.

N.Y. C.P.L.R. § 6201(1), (3). Section 6201(1) thus allows "attachments against nonresidents when appropriate to secure the judgment, even when unnecessary to secure jurisdiction." <u>ITC Entm't, Ltd. v. Nelson Film Partners</u>, 714 F.2d 217, 220 (2d Cir. 1983). An attachment pursuant to § 6201(3) requires a showing of an intent to defraud or frustrate. <u>Halse v. Hussain</u>, 147 N.Y.S.3d 148, 150 (3d Dep't 2021).

Beyond showing that there is at least one ground for an attachment as identified in § 6201, a plaintiff seeking an order of attachment in New York must also show, pursuant to § 6212(a), that "there is a cause of action," that "it is probable that the plaintiff will succeed on the merits," and that "the amount demanded from the defendant exceeds all counterclaims known to

the plaintiff." Capital Ventures I, 443 F.3d at 219 (quoting N.Y. C.P.L.R. § 6212(a)).

Section 6223 governs motions to vacate or modify orders of attachment. "Under N.Y. C.P.L.R. 6223(b), a plaintiff faced with a motion to vacate or modify an attachment must show that it still meets the [statutory] requirements and must also show the need for continuing the levy." Capital Ventures II, 652 F.3d at 272-73. On a motion to vacate, the plaintiff bears the burden of proof to "establish[] the grounds for the attachment, the need for continuing the levy and the probability that he will succeed on the merits." N.Y. C.P.L.R. § 6223(b); see also Halse, 147 N.Y.S.3d at 150. Pursuant to § 6223(a), if "the court determines that the attachment is unnecessary to the security of the plaintiff, it shall vacate the order of attachment." N.Y. C.P.L.R. § 6223(a).

B. Attachment in Aid of Arbitration

When the attachment sought is in aid of arbitration, § 7502(c) applies, and not the statutory grounds provided in § 6201. Section 7502(c) authorizes attachment as a provisional remedy

> in connection with an arbitration that is pending or that is to be commenced inside or outside this state . . . but only upon the ground that the award to which the applicant may be entitled may be rendered ineffectual without such provisional relief. The provisions of articles 62 and 63 of this chapter shall apply to the application . . . except that the sole

> ground for the granting of the remedy shall be as stated above.

N.Y. C.P.L.R. § 7502(c) (emphasis added). Accordingly, "the standards generally applicable to attachments pursuant to CPLR 6201(3), such as sinister maneuvers or fraudulent conduct, are not required to be shown in an application pursuant to CPLR 7502(c)." Cty. Natwest Sec. Corp. USA v. Jesup, Josephthal & Co., 579 N.Y.S.2d 376, 377 (1st Dep't 1992) ("Cty. Natwest").

The requirement that the applicant demonstrate that an arbitration award may be rendered ineffectual without an attachment is an "indispensable" but not the exclusive showing an applicant must make. SG Cowen Sec. Corp. v. Messih, 224 F.3d 79, 83 (2d Cir. 2000) ("Messih"). While § 7502(c) supersedes § 6201, the considerations of § 6212 continue to apply to applications for attachment under § 7502(c). Id.; see also Founders Ins. Co. v. Everest Nat. Ins. Co., 839 N.Y.S.2d 474, 475 (1st Dep't 2007).

In sum, to secure an order of attachment in aid of arbitration, or to defeat a motion to vacate an attachment procured in aid of arbitration, the applicant must demonstrate a cause of action, a likelihood of success on the merits in the arbitration, that the amount of the claim exceeds any meritorious counterclaim, and that the arbitral award may be rendered ineffectual in the absence of an attachment. In

addition, a court may weigh any other considerations relevant to an application for equitable relief, including whether the harm done to the party subject to the attachment "would be substantial and irreparable." Messih, 224 F.3d at 84.  A prejudgment deprivation of property through attachment presents a risk of an "erroneous deprivation" and may not occur without due process.  Doehr, 501 U.S. at 13.

    1.    Likelihood of Success on the Merits

"The likelihood of success is . . . measured in terms of the likelihood of success in arbitration." Messih, 224 F.3d at 84.  Ordinarily, success on the merits in arbitration "cannot be predicted with the confidence a court would have in predicting the merits of a dispute awaiting litigation in court." Id. This is because an "arbitration is frequently marked by great flexibility in procedure, choice of law, legal and equitable analysis, evidence, and remedy." Id.

In contrast, where a final arbitration award has issued and a court is asked to confirm the award, "[t]he confirmation of an arbitration award is a summary proceeding." Beijing Shougang Mining Inv. Co. v. Mongolia, 11 F.4th 144, 160 (2d Cir. 2021) (citation omitted).  "Only a barely colorable justification for the outcome reached by the arbitrators is necessary to confirm

the award." D.H. Blair & Co. v. Gottdiener, 462 F.3d 95, 110 (2d Cir. 2006) (citation omitted).

A district court's ability to reject a foreign arbitration award in particular is "strictly limited." Yusuf Ahmed Alghanim & Sons v. Toys "R" Us, Inc., 126 F.3d 15, 19 (2d Cir. 1997). The recognition and enforcement of foreign arbitral awards is governed by the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "New York Convention," or the "Convention"), as implemented by the Federal Arbitration Act, 9 U.S.C. § 201, et seq. Article III of the New York Convention directs that each signatory nation, which includes both Lebanon and the United States, "shall recognize arbitral awards as binding and enforce them in accordance with the rules of procedure of the territory where the award is relied upon." Convention art. III.

> Under the New York Convention, the country in which the award is made is said to have primary jurisdiction over the arbitration award. The Convention specifically contemplates that the state in which, or under the law of which, [an] award is made, will be free to set aside or modify an award in accordance with its domestic arbitral law and its full panoply of express and implied grounds for relief. . . . All other signatory States are secondary jurisdictions, in which parties can only contest whether that State should enforce the arbitral award. Courts in countries of secondary jurisdiction may refuse enforcement only on the limited grounds specified in Article V of the New York Convention.

CBF Industria de Gusa S/A v. AMCI Holdings, Inc., 850 F.3d 58, 71 (2d Cir. 2017) (citation omitted). In a secondary jurisdiction, "[g]iven the strong public policy in favor of international arbitration, the party seeking to avoid summary confirmance of an arbitral award has the heavy burden of proving that one of the seven defenses" enumerated in Article V applies. VRG Linhas Aereas S.A. v. MatlinPatterson Glob. Opportunities Partners II L.P., 717 F.3d 322, 325 (2d Cir. 2013) ("VRG") (citation omitted). Article V(1)(e) provides, however, that a court may refuse to recognize or enforce a final arbitral award if "[t]he award has not yet become binding on the parties, or has been set aside or suspended by a competent authority of the country in which, or under the law of which, that award was made." Convention art. V(1)(e).

Provisions of the New York Convention "anticipate the possibility of a party seeking confirmation in one country even though nullification proceedings are underway in another." Compania de Inversiones Mercantiles, S.A. v. Grupo Cementos de Chihuahua S.A.B. de C.V., 970 F.3d 1269, 1299 (10th Cir. 2020), cert. denied, 141 S. Ct. 2793 (2021) ("CIMSA"). Article VI of the Convention states:

> If an application for the setting aside or suspension of the award has been made to a competent authority referred to in article V(1)(e), the authority before which the award is sought to be relied upon may, if it considers it proper, adjourn the decision on the

> enforcement of the award and may also, on the application of the party claiming enforcement of the award, order the other party to give suitable security.

Convention art. VI (emphasis added).

The Convention therefore does not require a party seeking enforcement of an award in a secondary jurisdiction -- here, the United States -- to await the conclusion of all appeals of the award that may be pursued in the primary jurisdiction -- here, Lebanon. See Thai-Lao Lignite (Thailand) Co. v. Gov't of Lao People's Democratic Republic, 864 F.3d 172, 176 (2d Cir. 2017). The Tenth Circuit has observed that "American judges hold -- virtually unanimously -- that under the New York Convention an arbitration award becomes binding when no further recourse may be had to another arbitral tribunal (that is, an appeals tribunal)" and that "a court maintains the discretion to enforce an arbitral award even when nullification proceedings are occurring in the country where the award was rendered." CIMSA, 970 F.3d at 1298 (citation and emphasis omitted) (collecting cases); see also Karaha Bodas Co., LLC v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara, 335 F.3d 357, 367 (5th Cir. 2003).

2. Rendered Ineffectual

Where the ground for attachment is to secure payment, the applicant must demonstrate "an identifiable risk that the

defendant will not be able to satisfy the judgment." VisionChina Media, 967 N.Y.S.2d at 345–46; see also Halse, 147 N.Y.S.3d at 152. "The risk should be real, whether it is a defendant's financial position or past and present conduct . . . the defendant's history of paying creditors, or a defendant's stated or indicated intent to dispose of assets." VisionChina Media, 967 N.Y.S.2d at 346. In other words, "[t]here must be more than a showing that the attachment would, in essence, be 'helpful.'" Id. (citation omitted). The Appellate Division has held that "demonstrating the possibility, if not the likelihood, that absent the attachment being requested, the ultimate arbitration award would be severely compromised" will satisfy the petitioner's burden under § 7502(c). Cty. Natwest, 579 N.Y.S.2d at 377; see also Qwil PBC v. Landow, 119 N.Y.S.3d 116, 117, leave to appeal dismissed in part, denied in part, 35 N.Y.3d 1061 (1st Dep't 2020) (citation omitted).

Courts have found, pursuant to § 7502(c), that pending or final arbitration awards may be rendered ineffectual absent attachment where the plaintiff shows that the respondent is potentially insolvent, has deliberately liquidated or transferred assets, is a shell company without appreciable assets, has historically failed to pay creditors, or has stated an intent to remove assets from the jurisdiction. See Shah v. Com. Bank Ob'Edinennyi Investitsionnyi Bank, No. 09 CV 6121(HB),

2010 WL 743043, at *3 (S.D.N.Y. Mar. 4, 2010) (collecting cases).  In Shah, the district court declined to issue an attachment in aid of arbitration when the applicant argued that the attachment was necessary because the object of the attachment petition had challenged the effort to enforce a prior judgment.  The court reasoned that that effort was "not the same" as evidence that this arbitration award would "be 'rendered ineffectual' without the attachment."  Id.  By contrast, in Sivault Sys., Inc. v. Wondernet, Ltd., No. 05 CIV.0890(RWS), 2005 WL 681457 at *4 (S.D.N.Y. Mar. 25, 2005), the district court granted an attachment in aid of arbitration where the respondent held no other U.S. assets, had a negative net worth, and had borrowed money secured by all of its assets. And recently, in Port Auth. of New York & New Jersey v. Weiss & Hiller, P.C., 94 N.Y.S.3d 245, 245-46 (1st Dep't 2019), the Appellate Division affirmed a TRO freezing escrow funds pursuant to N.Y. C.P.L.R. § 7502(c) where the defendant was threatened with insolvency.

    3.  Discretion

    In the context of an application for an attachment under § 6201(1), whether to grant a motion for an order of attachment "rests within the discretion of the court."  VisionChina Media, 967 N.Y.S.2d at 345.  A court's discretion must be guided, however, by the purposes of the attachment remedy.  Capital

Ventures I, 443 F.3d at 221.  Thus, where a "statutory ground

for attachment exists [under § 6201] and both need and

likelihood of success are established," a district court's

"discretion does not permit denial of the remedy for some other

reason, at least absent extraordinary circumstances and perhaps

even then."  Id. at 222.

In Capital Ventures I, the Second Circuit reversed a

district court's denial of a motion for an order of attachment.

The petitioner sought an attachment on a reversionary interest

in collateral securing certain bonds issued by Argentina.  The

court found that the applicant, which had a senior lien on the

property, had both satisfied the requirements of §§ 6201(1) and

6212 and demonstrated a continuing need for attachment pursuant

to § 6223.  Id. at 223.  The court observed that to the extent a

district court exercises discretion, it is limited to weighing

the evidence and balancing competing considerations with respect

to each requirement of the attachment order.  Id.  A court

abuses its discretion if it "applies legal standards incorrectly

or relies upon clearly erroneous findings of fact, or proceeds

on the basis of an erroneous view of the applicable law."  Id.

at 222 (citation omitted).[9]

---

[9] Capital Ventures I observed that even though the statutory
standard for vacating an order of attachment "varies slightly
from the standard for granting the order in the first instance,"

Capital Ventures I did not reach the question of whether New York law allows discretionary denial of an otherwise appropriate attachment based on public policy. It observed, however, that "[w]e can conceive, perhaps, of a situation in which an order of attachment might be against the public interest for some reason not addressed in the CPLR." Id. at 223.

In a succeeding opinion addressing another iteration of the Capital Ventures litigation, the Second Circuit again had no occasion to decide which "extraordinary circumstances" might allow a court to exercise its discretion as a matter of public policy and deny a § 6201 attachment even though a petitioner had met all statutory requirements. Capital Ventures II, 652 F.3d at 273. In deciding that no extraordinary circumstances were present, it observed that "it is inevitable that attachments will have consequences for third parties, and sometimes even third parties who themselves share an interest in the relevant assets." Id. In Capital Ventures II, the private third-parties were other bondholders, and the consequences of the attachment were "not dire" for them since they would get no less than what they had originally bargained for. Id. Similarly, the consequences for the public interests -- there, the country of

a court's discretion is also limited when addressing applications to vacate an attachment. 443 F.3d at 223 n.6.

Argentina -- were not extraordinary, as it had not shown that the attachment would "have a substantial effect on its finances or its ability to access the capital markets."  Id.

The New York Appellate Division has upheld a denial of a motion for an attachment for reasons beyond finding that the plaintiff had failed to meet the statutory requirements.  In Cargill Fin. Servs. Int'l, Inc. v. Bank Fin. & Credit Ltd., 896 N.Y.S.2d 317 (1st Dep't 2010), the Appellate Division upheld the lower court's decision to deny the plaintiff's broad request to restrain all funds in the defendant bank's New York correspondent accounts on the basis that

> a substantial part of the funds therein was held for the benefit of third-party clients of defendant who used the accounts to transact foreign business in U.S. currency.  Thus, the wholesale attachment of all funds in the accounts would have interfered with innocent third parties' access to their money.  As such, it was within the court's discretion to deny plaintiff's attachment application.

Id. at 317.  The Court reached this result without finding that a foreign bank's customers had a property interest in the funds held in the New York correspondent account.  It rested its decision instead on "[t]he nature of correspondent banking and its importance in international transactions."  Id.

In J.V.W., the Appellate Division vacated the trial court's "retroactive attachment" granted to continue an attachment previously entered by a federal court, finding that there was no

need to secure the defendant's assets where personal jurisdiction was not at issue and a liquidator was already securing the defendant's assets in connection with a parallel bankruptcy in the Bahamas. 837 N.Y.S.2d at 651. The Appellate Division held that "[u]nder these circumstances, the attachment merely gives plaintiffs an unwarranted priority over [the defendants'] other creditors, which is simply not the intended purpose of CPLR 6201." Id. (citation omitted).

4. Posting of a Bond

If an attachment is granted, the plaintiff must post an "undertaking, in a total amount fixed by the court, but not less than five hundred dollars" that shall be paid to the defendant "if it is finally decided that the plaintiff was not entitled to an attachment of the defendant's property." N.Y. C.P.L.R. § 6212(b). "The fixing of the amount of an undertaking is a matter within the sound discretion of the [trial court]." Olympic Ice Cream Co. v. Sussman, 54 N.Y.S.3d 690, 692 (2d Dep't 2017). The amount of the undertaking, however, "must not be based upon speculation and must be rationally related to the damages the defendants might suffer if the court later determines that the relief to which the undertaking relates should not have been granted." Congregation Erech Shai Bais Yosef, Inc. v. Werzberger, 138 N.Y.S.3d 542, 546 (2d Dep't 2020) (citation omitted).

C. Attachable Property, EFTs and Correspondent Banks

The question of whether a given property interest is attachable is governed by state law. See Jaldhi, 585 F.3d at 70. "Any debt or property against which a money judgment may be enforced . . . is subject to attachment." N.Y. C.P.L.R. § 6202. "It is beyond cavil that attachment will only lie against the property of the debtor, and that the right to attach the property is only the same as the defendant's own interest in it." Doe v. JPMorgan Chase Bank, N.A., 899 F.3d 152, 157 (2d Cir. 2018). In general, "[u]nder New York law, the party who possesses property is presumed to be the party who owns it. When a party holds funds in a bank account, possession is established, and the presumption of ownership follows." Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara, 313 F.3d 70, 86 (2d Cir. 2002) (citation omitted).

An EFT is "nothing other than an instruction to transfer funds from one account to another." Calderon-Cardona v. Bank of New York Mellon, 770 F.3d 993, 996 n.1 (2d Cir. 2014) (citation omitted). "EFTs function as a chained series of debits and credits between the originator, the originator's bank, any intermediary banks, the beneficiary's bank, and the beneficiary." Doe, 899 F.3d at 156 (citation omitted). EFTs "are a unique type of transaction to which ordinary rules do not necessarily apply." Id. (citation omitted).

"Whether or not midstream EFTs may be attached or seized depends upon the nature and wording of the statute pursuant to which attachment and seizure is sought." Calderon-Cardona, 770 F.3d at 1001 (citation omitted). The Second Circuit has held that under Article 4 of the New York Uniform Commercial Code, which governs EFTs in New York banks,

> the only entity with a property interest in an EFT while it is midstream is the entity immediately preceding the bank "holding" the EFT in the transaction chain. In the context of a blocked transaction, this means that the only entity with a property interest in the stopped EFT is the entity that passed the EFT on to the bank where it presently rests.

Id. at 1002.

Correspondent bank accounts facilitate international financial transactions.

> A correspondent bank account is a domestic bank account held by a foreign bank, similar to a personal checking account used for deposits, payments and transfers of funds. Correspondent accounts facilitate the flow of money worldwide, often for transactions that otherwise have no other connection to New York, or indeed the United States.

Licci ex rel. Licci v. Lebanese Canadian Bank, SAL, 732 F.3d 161, 165 n.3 (2d Cir. 2013) (citation omitted). Under New York law, the customers of a foreign bank generally have no property interest in a correspondent account that the bank maintains in the United States. See Sigmoil Res., N.V. v. Pan Ocean Oil Corp. (Nigeria), 650 N.Y.S.2d 726, 727 (1st Dep't 1996). The

New York Appellate Division has held that "[n]either the originator who initiates payment nor the beneficiary who receives it holds title to the funds in the account at the correspondent bank," and that a "funds transfer is complete at the moment the receiving bank receives the credit message, not when the beneficiary acquires the funds." Id.

New York courts have emphasized the dangers of attaching correspondent accounts in an effort to restrain the assets of a foreign bank's customer. In Sigmoil, the Appellate Division observed that

> Great care must be taken to avoid impeding the role of correspondent accounts in the facilitation of international transactions. . . . If New York permits correspondent bank accounts to be regularly subject to attachment after a credit has been made by a foreign bank to its local customers, the entire system of correspondent banking, in which New York banks play an important role, will be disrupted.

Id. (citation omitted). "To hold otherwise would be at the cost of diminution in confidence in the system of correspondent banking that is invaluable to international financial transactions." Id. (citation omitted).

II. Application

Pursuant to the Order of January 19, Iraq Telecom attached approximately $42 million in IBL correspondent bank accounts held in three New York banks. As described below, Iraq Telecom has shown that it succeeded in its first arbitration against IBL

and is entitled to an attachment of the $3 million in attorney's fees awarded in that arbitration. It has failed to show, however, that it is likely to succeed in recovering from IBL the $97 million it seeks in its pending arbitration. It has shown a likelihood of success in receiving an award of at most roughly $5.92 million.[10] Iraq Telecom has carried its burden to show that the Award will be ineffectual without an attachment since IBL appears to be insolvent. It has also shown that it has a cause of action and the award it has received exceeds the amount of any IBL counterclaim.

Finally, there are extraordinary circumstances here that must be weighed in considering this attachment petition. They include the impact on IBL's creditors, including its account holders, the impact on the Lebanese economy of the collapse of one of its more viable financial institutions, and the broader effect on New York banks from an attachment of funds in correspondent bank accounts.

[10] Iraq Telecom alleges that in the scheme executed by IBL and Barzani, IBL funneled 96% of Korek's interest payments on the IBL Loan to Barzani. In the Second Arbitration, Iraq Telecom demands in pari passu its share of those interest payments made by Korek since July 2015, which totals about $148 million. IBL allegedly retained 4% of the $148 million, or about $5.92 million.

A. Likelihood of Success on the Merits

1. Confirmation of the $3 Million Final Award

Iraq Telecom has demonstrated that it is likely to succeed on its request to confirm the $3 million Award. The Award was entered on September 21, 2021 and is subject to immediate confirmation in this district pursuant to the New York Convention. A briefing schedule has been set on the petition for confirmation of the Award.

IBL has commenced an annulment action in Lebanon and contends that that filing "suspends enforcement" of the Award under Lebanese law. It does not do so in this country. Pursuant to the Convention, to which both Lebanon and the United States have agreed, the Award is entitled to confirmation and enforcement.

If it were necessary to predict the outcome of the annulment action, and it is not, IBL has not shown that it is likely to succeed. IBL presses two arguments in the annulment action. Its first is that the evidence of the 2011 Barzani deposit of $155 million in an IBL bank account, which Iraq Telecom obtained through a 28 U.S.C. § 1782 petition in this district, was wrongly admitted in the arbitration. See In re Iraq Telecom Ltd., No. 18MC458(LGS)(OTW), 2019 WL 3798059 (S.D.N.Y. Aug. 13, 2019). IBL challenged the admissibility of this evidence before the arbitration panel and has not shown

that a Lebanese court will conclude that the panel was without authority to receive this evidence.

The second ground for annulment advanced by IBL is a purported conflict by a member of the arbitration panel. The member had disclosed the relationship giving rise to the claimed conflict and IBL waived the conflict. IBL has not shown that it will succeed in vacating the Award on this ground either.

2. Confirmation of the $97 Million Demand

Iraq Telecom has failed to show that it is likely to receive an award of $97 million against IBL in its pending arbitration. The Award describes in detail a scheme among Barzani, entities he controls, and IBL to deprive Korek's minority shareholder -- Iraq Telecom -- of its right to repayment of its loan to Korek in pari passu. As a result of that scheme, Iraq Telecom was deprived of $97 million. This sum represents interest payments paid to IBL that should have gone to Iraq Telecom. According to the Award, however, all but roughly $5.92 million flowed through IBL to Barzani. Therefore, should the panel assigned to the pending arbitration adopt in full the findings set out in the Award, it is entirely conceivable that it would limit any future award against IBL to the roughly $5.92 million that it retained.

Arbitrators are permitted to render decisions that weigh many factors beyond those that create a verdict in a court of

law. See Messih, 224 F.3d at 84. Because of arbitrators' latitude and the disparity in the extent to which participants in the fraud profited from it, Iraq Telecom has failed to show that it will succeed in obtaining an award of $97 million against IBL.

Iraq Telecom argues that it is likely to establish joint and several liability in the Second Arbitration brought against IBL. It points out that joint and several liability is established under Lebanese law if defendants have acted in concert or if it is impossible to determine the proportion of damages attributable to each defendant.[11] Iraq Telecom has shown that it is likely to demonstrate in the Second Arbitration that IBL acted in concert with Barzani to defraud Iraq Telecom. Despite that showing, however, it has not succeeded in showing that it is likely to obtain an award of $97 million against IBL alone or jointly and severally against IBL and others. As

---

[11] IBL has submitted a declaration of Randa Abousleiman, one of IBL's attorneys in the arbitration. Abousleiman asserts that to impose joint and several liability, Article 137 of the Lebanese Code of Obligations and Contracts requires a showing that

> (i) those persons acted in concert;
>
> (ii) it is impossible to determine the proportion of damages attributable to each of those persons.

According to the Award, to the extent Article 127 applies, a plaintiff need show only one of these elements.

described in the Award, IBL retained only a small portion of the damages Iraq Telecom seeks.

Iraq Telecom next argues that the amount of the damages award that it is likely to obtain through the Second Arbitration is "irrelevant" and cites to Shah for the proposition that likelihood of success on the merits may be found even if "the amount is far from certain." 2010 WL 743043, at *2. The Shah court found that the applicant had demonstrated that the amount sought through the attachment -- to reimburse it for the costs of enforcing an arbitration award -- was "far from frivolous." Id. It nonetheless declined to issue an attachment because the petitioner had not demonstrated that the potential award from the arbitration would be rendered ineffectual without the attachment. Id. at *3. Shah therefore offers little guidance on the issue of uncertainty in the amount that will be awarded in an arbitration.

In this case, Iraq Telecom has not shown that it is likely to receive an award of more than $5.92 million in damages through the pending arbitration. Iraq Telecom declined to seek from the first arbitration panel a determination of what the amount awarded in damages against IBL should be. This Court will not presume, even in light of the detailed findings of fraud in the Award, that the Second Arbitration panel will assess against IBL the full amount of damages that Iraq Telecom

identifies here but declined to request in the first arbitration.

B. Ineffectiveness

Iraq Telecom has shown that any arbitration award may be rendered ineffectual without a prejudgment attachment of IBL assets. This includes the Award of $3 million.

Iraq Telecom has shown that IBL is likely insolvent. For evidence of IBL's financial condition, Iraq Telecom principally relies on the 2021 Lebanon Country Commercial Guide of the U.S. Commercial Service (the "DOC Guide"),[12] which is a publication issued by a section of the U.S. Department of Commerce's International Trade Administration; a 2020 research report of a Washington, D.C.-based think tank the Foundation for Defense of Democracy ("FDD Report"); and news articles.[13] The DOC Guide and news articles, from publications such as the New York Times,[14] Al

---

[12] U.S. Commercial Serv., Dep't of Commerce, Lebanon Country Commercial Guide 2021, at 29-30 (2021), https://lb.usembassy.gov/wp-content/uploads/sites/200/2021-Lebanon-Country-Commercial-Guide-Final.pdf.

[13] James Rickards, Crisis in Lebanon: Anatomy of a Financial Collapse 17-19, 53-54, Foundation for Defense of Democracy (Aug. 2020), https://www.fdd.org/wp-content/uploads/2020/08/fdd-monograph-crisis-in-lebanon.pdf.

[14] David Leonhardt & Sanam Yar, Lebanon's Crisis, N.Y. Times (Oct. 14, 2021), https://www.nytimes.com/2021/10/14/briefing/lebanon-financial-crisis-lira.html; Ben Hubbard & Liz Alderman, As Lebanon Collapses, the Man With an Iron Grip on Its Finances Faces Questions, N.Y. Times (Aug. 4, 2021),

Jazeera,[15] and Reuters,[16] report generally on the economic crisis in Lebanon that began in 2019.  That crisis is described below.  The FDD Report, titled Anatomy of a Financial Collapse, was published in August 2020 and reports that once the true exchange rate is applied to IBL's assets, liabilities, and shareholder equity as of December 31, 2018, the bank was insolvent.  The FDD Report nonetheless opines that IBL is one of five "viable" banks in Lebanon, and that a reorganization of the Lebanese economy via a merger of failing banks into those viable banks is one way out of its crisis.

Iraq Telecom also relies on an independent audit of the consolidated financial statements of IBL and its subsidiaries as of December 31, 2019.[17]  The audited statements show that IBL had just over $6 billion in assets and $5.6 billion in liabilities when Lebanon's official exchange rate is applied.  The auditors'

---

https://www.nytimes.com/2021/07/17/business/lebanon-riad-salameh.html.

[15] Kareen Chehayeb, UN Rep Slams Lebanon Central Bank Chief Over Economic Crisis, Al Jazeera (Nov. 12, 2021), https://www.aljazeera.com/economy/2021/11/12/un-rep-lamslebanon-central-bank-chief-over-economic-crisis.

[16] Tom Arnold & Ellen Francis, As Lebanon's Banks Struggle to Raise Capital, a Deadline Looms, Reuters (Feb. 15, 2021), https://www.reuters.com/article/uslebanon-crisis-banks-insight/as-lebanons-banks-struggle-to-raise-capital-a-deadline-loomsidUSKBN2AF0JQ.

[17] The audit was conducted by Deloitte & Touche and DFK Fiduciaire du Moyen Orient.

preliminary notes, however, disclaim the auditors' opinion as "uncertain" due to the many crises that have affected the Lebanese economy.  The disclaimer also states that the financial statements contained in its audit report do not adequately disclose "a material uncertainty . . . that may cast significant doubt on [IBL's] ability to continue as a going concern."

IBL argues that, whatever its precise financial condition, it is "in a strong position relative to other Lebanese banks." IBL relies on the Declaration of Karim Habib, a Director of IBL. According to Habib, Banque du Liban ("BdL"), Lebanon's central bank, does not consider IBL a "delinquent" bank, and IBL ranks highly in the Lebanese banking sector on metrics such as total assets, capital adequacy ratio, average asset-to-cost ratio, and allowances for expected credit losses.  IBL also asserts that its solvency should be assessed by whether it is meeting its "obligations in the ordinary course of business as they accrue," which it is.  U.S. Pipe & Foundry Co. v. City of Hornell, 263 N.Y.S. 89, 89 (Sup. Ct. 1933); see also Soc'y Milion Athena v. Nat'l Bank of Greece, 9 N.Y.S.2d 177 (Sup. Ct. 1938).

In any event, IBL argues that Iraq Telecom no longer needs any attachment to enforce the Award because Lebanese courts are functioning, despite Lebanon's financial crisis, and Iraq Telecom can enforce any judgment against IBL in Lebanon.  And, Iraq Telecom has already obtained an attachment of IBL's

property in Lebanon to enforce the Award. Pursuant to a Lebanese court order of March 10, 2022, IBL's money held by BdL, all assets in IBL's Beirut headquarters, and IBL's shares in five Lebanese companies and six real estate holdings have been attached to secure a $2.832 million judgment against IBL.

IBL further explains that under Lebanese law a judgment-debtor "located in Lebanon" is entitled to pay a debt in Lebanese pounds ("LBP"). Due to BdL controls, all bank checks issued in Lebanon are payable only in LBP or in "non-fresh" U.S. Dollars ("USD") that cannot be wired out of the country.[18] The rate of exchange would be at Lebanon's official exchange rate, which is currently approximately 1,500 LBP to $1. Therefore, IBL asserts that it would be entitled to pay the Award in Lebanon in an amount calculated at the official exchange rate in Lebanon. If IBL does as it has outlined it is entitled to do, Iraq Telecom could rightly argue that this would deprive Iraq Telecom of the full benefit of the Award.[19]

Thus, the existence of the Lebanese attachment does not alter the conclusion that an arbitration award received against

[18] As further described below, "fresh money" is defined by the Lebanese central bank as funds denominated in foreign currency that have been deposited at a Lebanese bank in cash, or via international funds transfer, after April 9, 2020.

[19] Iraq Telecom has offered evidence that the international exchange rate as of August 2020 was 4,000 LBP to 1 USD, and may now be as high as 20,000 LBP to 1 USD.

IBL may be ineffective without the attachment of the IBL assets in New York. Of course, should Iraq Telecom succeed in recovering funds pursuant to the Lebanese attachment order, any attachment in this district will be reduced by that sum.[20]

Finally, IBL argues that even if it were deemed to be insolvent or close to insolvency, Iraq Telecom does not need any attachment since IBL will always be here: it needs its New York correspondent bank accounts to conduct financial transactions for the benefit of its customers. Therefore, according to IBL, the attachment does nothing more than give a priority of recovery to Iraq Telecom without any showing that Iraq Telecom is entitled to that priority. This last issue is addressed below, in the context of the extraordinary circumstances presented by the attachment petition. Generally, however, the fact that the party subject to the attachment cannot readily move its property out of the jurisdiction does not weigh against an attachment that is otherwise properly made.

C. Cause of Action and Amount of Counterclaims

Iraq Telecom has shown that it has a cause of action to enforce the Award and any award entered in the Second Arbitration. It has also shown an entitlement to damages in an

[20] At oral argument, IBL represented that it was taking steps, due to the attachment in Lebanon of all of its assets, to pay Iraq Telecom the full Award amount as soon as possible.

amount significantly greater than any counterclaims that IBL could assert. Other than a single counterclaim for the indemnification of damages dismissed by the arbitration panel in the Award, IBL has not asserted any claim against Iraq Telecom.[21]

D. Extraordinary Circumstances

Due to the extraordinary circumstances described below, Iraq Telecom has not shown an entitlement to an attachment in an amount greater than $3 million. As already explained, Iraq Telecom has not shown a likelihood of success in obtaining an award greater than $8.92 million through arbitration proceedings. But for the extraordinary circumstances that exist here, an attachment of $8.92 million would be entered.

Any sizeable attachment of IBL correspondent bank accounts runs the not inconsiderable risk of forcing IBL, which appears to be insolvent, into liquidation. Given the severity of the Lebanese economic crisis and IBL's role as one of Lebanon's more stable banks, an IBL liquidation could have calamitous implications for the Lebanese economy and for IBL's other creditors, including its depositors. Indeed, the funds held in IBL's correspondent accounts are primarily for the benefit of its depositors. Iraq Telecom has not shown that it has priority

[21] In the first arbitration, IBL brought a counterclaim against Iraq Telecom for defamation and libel under Lebanese law. Because the arbitrators found IBL liable for fraud, the panel dismissed the counterclaim.

in recovering from IBL over those depositors. Finally, an attachment of funds in a correspondent bank account in New York in the circumstances presented here may have a deleterious effect on the international banking system and New York's role as a linchpin in that system.

1. The Economic Crisis in Lebanon

Lebanon has been in a financial crisis since at least 2019, following a series of economic shocks and a bank panic. The World Bank describes Lebanon's economy as "likely to rank in the top 10, possibly top three, most severe crises episodes globally since the mid-nineteenth century."[22]

Lebanon ties the value of the LBP to the USD. In order for Lebanese banks to store the amount of USD necessary to maintain the stability of LBP, the country relied for decades on a steady stream of foreign investment. As foreign investment slowed, Lebanese banks began offering high returns on deposits in USD to attract new USD deposits -- which could be to be used to pay earlier depositors.[23] This effort collapsed in 2019, and a bank

[22] Lebanon Economic Monitor, Spring 2021: Lebanon Sinking (to the Top 3) at xi, The World Bank, May 31, 2021, https://documents1.worldbank.org/curated/en/394741622469174252/pdf/Lebanon-Economic-Monitor-Lebanon-Sinking-to-the-Top-3.pdf.

[23] The New York Times and other news reporting identify the 2011 war in Syria and the growing power in Lebanon of Hezbollah, which has been designated by the United States as a Foreign Terrorist Organization, as turning points that deterred the foreign investment in Lebanon.

panic ensued. In November 2019, Lebanon imposed strict restrictions on international transfers of money and cash withdrawals of foreign currency, including limiting withdrawals of funds denominated in a foreign currency above threshold amounts. The crisis has only deepened as a result of the COVID-19 pandemic.

Surveying the state of the crisis as of August 2020, the FDD Report recommended merging the fourteen most important banks into the five remaining "viable" banks in Lebanon. IBL is one of those viable banks.[24]

In light of IBL's perilous economic condition, the attachment poses a not insignificant risk of forcing IBL -- already likely insolvent -- into failure. Because of IBL's role in the Lebanese economy, such a failure has the potential to impact the economy of the entire nation. These severe repercussions militate against granting Iraq Telecom's request to confirm (much less to expand) the attachment.

2. Lebanese Central Bank Regulations

Lebanese central bank regulations magnify the impact on IBL of the attachment of its correspondent bank accounts. As described below, the "fresh money" dollars in IBL's New York

[24] In addition to its relative financial health, the FDD Report identifies as one of the reasons that IBL may survive the crisis the fact that it is "relatively clean with regard to allegations of exposure to Hezbollah."

correspondent accounts constitute nearly all of IBL's liquid
fresh dollars globally.  With the attachment effected pursuant
to the January 19 Order, IBL has faced extreme difficulty in
processing U.S. dollar transactions for its customers.

The $42 million in funds currently attached in IBL's New
York correspondent accounts fall into four categories.  One
category is comprised of $4.5 million in EFTs, or inward
transfers that were frozen midstream upon service of the January
19 Order of Attachment on the New York correspondent banks.[25]

The other three categories relate to Lebanese commercial
and retail bank regulations issued by BdL in order to mitigate
Lebanon's liquidity crisis.  Since October 2019, BdL has issued
a series of regulations requiring banks to maintain foreign
currency offshore.

On April 9, 2020, BdL issued Basic Circular No. 150 ("BdL
150"), as amended on May 11, 2020 and February 25, 2021,
exempting Lebanese banks from mandatory minimum reserve
requirements on certain "fresh money" funds.  "Fresh money" is
defined as segregated USD funds deposited in a Lebanese bank
after April 9, 2020.  BdL 150 requires Lebanese banks to

---

[25] Iraq Telecom contends that IBL has not produced evidence
showing that $4.5 million are in fact midstream EFTs.  Iraq
Telecom has agreed that, upon that showing, it is willing to
release those funds "in the spirit of compromise."

maintain and process "fresh money" funds in offshore correspondent accounts, and not to encumber those funds or otherwise restrict a customer's use, withdrawal, or transfer of those funds.  IBL asserts that $8.5 million in "fresh money" held pursuant to BdL 150 has been frozen as of February 1, 2022. But for the attachment, these funds would have been available to fund transfers ordered by an IBL client of their deposited fresh money.[26]

On August 27, 2020, BdL issued Basic Circular No. 154 ("BdL 154"), requiring Lebanese banks to maintain at least 3% of their total foreign currency deposits as of July 31, 2020 in reserve and without encumbrance in their offshore correspondent accounts.  These funds provide liquidity for foreign currency transactions.  IBL has not yet met the 3% liquidity requirement, but BdL has approved IBL's plan to achieve compliance.  That plan requires IBL to maintain the funds that IBL currently holds in the correspondent accounts and increase those deposits.  IBL asserts that $17.36 million was held in its correspondent accounts pursuant to BdL 154 and has now been frozen.

---

[26] Proceeds of inward EFT transfers to IBL clients are credited to clients' accounts, and the funds are held in the correspondent accounts for the benefit of the clients and in order to facilitate further transactions at the clients' instructions.

Finally, on June 8, 2021, BdL issued Basic Circular No. 158, as amended on August 5 and September 29 ("BdL 158"), which provided an additional exemption from withdrawal restrictions to certain eligible customers. BdL 158 permits eligible customers to make gradual withdrawals of USD from a special sub-account established by the bank for that purpose. The bank is in turn required to maintain half of the liquidity necessary to service these withdrawals in USD in offshore correspondent accounts. IBL asserts that $12.24 million held pursuant to BdL 158 has been frozen.

Accordingly, two of the four categories of funds held in IBL's New York correspondent accounts include funds held in compliance with "fresh money" regulations (BdL 150 and BdL 158); one of the four represents funds held pursuant to liquidity requirements (BdL 154); and one consists of funds related to EFTs. The continued attachment of $42 million will cause IBL to fall out of compliance with crisis management regulations imposed by BdL.

3. Impact on IBL Depositors

The attachment has already interfered with the access of IBL's depositors to their funds. IBL holds no USD-denominated correspondent banking accounts outside of Lebanon other than those that are attached through the Order of January 19. To facilitate customer transactions in USD, the funds held in IBL's

New York correspondent accounts must be accessed. As a result of the January 19 attachment, IBL has resorted to converting non-USD funds held in its European correspondent accounts into USD in order to execute EFTs in USD for its customers. In six weeks, it has depleted roughly 70% of those non-USD currency deposits. According to a March 12, 2022 report commissioned by IBL from PKF Chartouni ("PKF Report"),[27] less than 0.06%, or roughly $10,000, held in IBL's New York correspondent bank accounts is proprietary to IBL.[28]

In sum, almost all of the funds held in the attached New York correspondent accounts are held for the benefit of IBL's clients. The attachment of those funds impairs the ability of IBL customers to participate in international financial transactions in USD. The General Counsel of BdL, Boutros Kanaan, who submitted a declaration in this action, opines that attachment may have adverse consequences on the efforts BdL has taken to preserve depositors' access to fresh funds and on

[27] PKF Chartouni is an international accounting and business advisory firm. The PKF Report cautions that the "agreed upon procedures" under which it did its examination "did not constitute a full audit in accordance with International Standards on Auditing" and therefore that its report does not constitute an audit opinion.

[28] The PFK Report classified three types of funds -- interest on the accounts, interest on overnight liquidity management transactions, and fees and operating expenses -- as proprietary funds.

Lebanon's sovereign interest in protecting its banking system during a time of extreme financial stress in Lebanon. After describing BdL 150, 154, and 158, Kanaan reports:

> The attachment of funds standing to the credit of Banks operating in Lebanon in overseas correspondent accounts may have adverse consequences on critical elements of BdL's emergency measures and policies, as set forth above, aimed at preserving depositors' unrestricted accessibility to and right to dispose of their fresh funds and safeguarding Lebanon's sovereign interest in preserving the soundness of its banking system and depositors' rights. In particular, an attachment order may give priority to the asserted rights of a private party, in the present case the Petitioner [Iraq Telecom], over the interests of the depositors in Lebanese banks and Lebanon's sovereign interests as embodied in the measures and regulations discussed above.

For its part, Iraq Telecom has made no showing that in the event IBL should fail it would have a superior right in any liquidation to IBL's assets. It has not shown, for instance, that it would have a superior right to IBL's depositors.

IBL cannot continue indefinitely to provide the international banking services in USD on which its depositors rely without access to the attached correspondent accounts. Under the circumstances shown here, this Court will not further burden those innocent third parties.

4. New York Correspondent Banks

The international banking system relies on freely accessible correspondent banking services provided by multinational financial institutions based in New York,

including the three banks affected by the January 19 Order.
International transfers of USD must be made through a U.S.
correspondent account.  In other words, all USD transactions
must clear through a U.S. bank account.  It is entirely proper
to consider whether an attachment on the scale at issue here
will undermine confidence in New York's financial institutions
and be perceived as weakening the protections offered by New
York law for property and banking services.

Iraq Telecom argues that this is a rare case, and that an
attachment here of as much as $97 million will not undermine
confidence in the functioning of the international financial
system or correspondent bank accounts in New York.  It points
out, accurately, that most decisions discussing the importance
of correspondent banking relationships have done so in cases
where the bank itself is not the debtor.  Here, the arbitration
panel found that IBL had engaged in fraud.  Moreover, an
attachment is only being sought because there is reason to
believe the debtor bank is insolvent.  Together, these two facts
make it unlikely that there will be a repetition of a similar
attachment request.  Finally, Iraq Telecom points out that the
N.Y. C.P.L.R. contains exemptions from attachment, and
corresponding bank accounts are not among those statutory
exemptions.  See, e.g., N.Y. C.P.L.R. §§ 5201, 5205, 6202.

These arguments might have more force if Iraq Telecom had an arbitration award of $97 million which it was seeking to confirm and enforce.  But even then, it would have to address the question of why it should be given priority over the other creditors of IBL, including its depositors, and in a manner that might trigger a bank's collapse and have profound repercussions for a nation's economy.  In any event, any such application should be supported by expert testimony on New York's correspondent banking system to allay a court's concern that unintended damage will not be done to that system by the attachment.

    5.   The Principal Wrongdoer

    Finally, the principal wrongdoer in, and beneficiary of, the scheme perpetrated against Iraq Telecom is not IBL but Barzani.  While Iraq Telecom cannot be faulted for pursing the assets of a more accessible malefactor instead of those of a more culpable co-conspirator, it is nonetheless worth observing that Iraq Telecom may have other avenues to make itself whole. Attachments should not be lightly imposed, and the unpredictable effect of maintaining the attachment on IBL in these circumstances counsels restraint.

    E.   Assets Subject to Attachment

    As explained above, Iraq Telecom has shown that it is likely to obtain confirmation of the $3 million Award and up to

$5.92 million in the Second Arbitration.  Due to extraordinary circumstances, however, the Order of Attachment has been modified to attach $3 million.

F.    Bond

In the event the attachment is confirmed, IBL has requested that the bond be increased above the $100,000 undertaking posted by Iraq Telecom as security pursuant to the January 19 Order. It requests a bond in the amount of 10% of any attachment. IBL's request is granted in part.  A bond of $100,000 is sufficient for the attachment of the Award amount of $3 million. If Iraq Telecom succeeds in showing a right to a larger attachment, it will be required to post a bond of 10% of that increased amount.

G.    Expansion of Attachment

Iraq Telecom seeks to expand the January 19 Order of Attachment to all property owned by IBL in this district.  For the reasons explained, this request is denied.  If Iraq Telecom wishes to make an application at a later time to attach newly discovered property, it must identify that property with particularity and demonstrate a reason to believe that the property is in fact proprietary to IBL.

## Conclusion

Iraq Telecom's motion to confirm the January 19 Attachment Order is granted to the extent of $3 million.  IBL's cross-

motion to vacate the same Order is granted in part. Iraq Telecom's motion to expand the January 19 Order is denied.

Dated: New York, New York
March 16, 2022

DENISE COTE
United States District Judge