UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------- X
                                       :
 IRAQ TELECOM LIMITED,                 :
                                       :
                       Petitioner,     :        21cv10940 (DLC)
                                       :
            -v-                        :        OPINION AND ORDER
                                       :
 IBL BANK S.A.L.                       :
                                       :
                       Respondent.     :
                                       :
-------------------------------------- X

APPEARANCES:

For petitioner Iraq Telecom Ltd.:
Kevin Samuel Reed
Quinn Emanuel Urquhart & Sullivan LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010

Kristin Tahler
Quinn Emanuel Urquhart & Sullivan LLP
865 S. Figueroa Street, Ste 10th Floor
Los Angeles, CA 90017

Alexander Hale Loomis
Quinn Emanuel Urquhart & Sullivan LLP
111 Huntington Ave, Suite 520
Boston, MA 02199

For respondent IBL Bank S.A.L.:
Mitchell Rand Berger
Joseph Stewart Alonzo
Gassan Adnan Baloul
Squire Patton Boggs (US) LLP
1211 Avenue of the Americas, Ste 26th Floor
New York, NY 10036

DENISE COTE, District Judge:

Iraq Telecom Ltd. ("Iraq Telecom") has petitioned to confirm a foreign arbitration award (the "Award") in the amount of $3 million against Intercontinental Bank of Lebanon S.A.L. ("IBL").  IBL opposes the petition and, in the alternative, seeks a stay of any confirmation pending the resolution of its annulment action in Lebanon.  For the following reasons, the Award is confirmed.

## Background

The events underlying this action are described in an Opinion of March 16, 2022, which is incorporated by reference. Iraq Telecom Limited v. IBL Bank S.A.L., No. 21CV10940 (DLC), 2022 WL 827094 (S.D.N.Y. Mar. 16, 2022) ("Iraq Telecom").  In brief, Iraq Telecom, a joint venture between a Kuwaiti company, Agility Public Warehousing Company KSCP, and a French company, Orange S.A., is an indirect minority shareholder in Korek Telecom Company LLC ("Korek"), a telecommunications company in Iraq.  Iraq Telecom holds a 44% stake in International Holdings Limited ("IHL"), a United Arab Emirates-based holding company and the sole shareholder of Korek.  The remainder of IHL's shares are owned by a separate holding company based in the Cayman Islands, Korek International (Management) Ltd. ("CS Ltd.").  Through CS Ltd., Sirwan Saber Mustafa, also known as

Barzani, is IHL's largest shareholder.  Barzani also serves as
IHL's Chairman of the Board and is Korek's largest indirect
shareholder, co-founder, and managing director.  A March 2011
shareholder agreement between Korek, IHL, Iraq Telecom, Barzani,
and CS Ltd. provided that Korek's repayment of shareholder loans
would be prioritized proportionally, or in pari passu.

In July 2011, Iraq Telecom loaned Korek $285 million (the
"Iraq Telecom Loan").  In late 2011, Korek urgently sought
additional funds to pay a licensing fee owed to the Iraqi
government.  Barzani arranged for IBL to provide a $150 million
loan at an elevated 13.25% interest rate to Korek (the "IBL
Loan").  Iraq Telecom was advised that the loan was unsecured
and that Barzani would be personally guaranteeing the IBL Loan.

In order to extend the IBL Loan, IBL required Iraq Telecom
to subordinate its earlier loan.  Iraq Telecom agreed to do so
and on December 14, 2011 executed a Subordination Agreement with
IBL, Korek, and IHL.  The Subordination Agreement provided that
if the IBL Loan was in default, Korek would cease making
payments on the Iraq Telecom Loan and the interest rate on the
IBL Loan would rise to 15.25%.  The Subordination Agreement is
governed by the law of Lebanon and requires any dispute among
the parties to be resolved through binding arbitration in
Beirut, Lebanon.  The Subordination Agreement also provides that
any arbitration award "shall be final and binding and the

3

parties waive their rights to lodge an appeal against the award" and "may be enforced in any court having jurisdiction over such dispute."

Korek defaulted on the IBL Loan in 2015.  IBL demanded both full repayment and that, pursuant to the Subordination Agreement, Korek cease repaying the Iraq Telecom Loan.  Korek complied with the latter condition in July 2015.  In 2017, Iraq Telecom discovered that the IBL Loan had in fact been secured by $155 million in cash collateral transferred by Barzani in 2011 to an IBL account held in his name.  Iraq Telecom alleges that IBL then participated in a scheme with Korek, IHL, and Barzani to kick back 96% of the interest Korek paid on the IBL Loan to Barzani.  Iraq Telecom maintains that the scheme defrauded it of its share of Korek's shareholder loan repayments under the March 2011 shareholder agreement.

In 2018, Iraq Telecom brought an arbitration proceeding before the Lebanese Arbitration Center of the Chamber of Commerce, Industry and Agriculture of Beirut and Mount Lebanon against IBL, Korek, and IHL.  During the arbitration, Iraq Telecom withdrew its request for damages and sought only declaratory relief and attorneys' fees and costs.  The arbitration tribunal (the "Tribunal") held a four-day evidentiary hearing on February 1-4, 2021.

On September 21, 2021, Iraq Telecom won an Award of attorney's fees and costs in the amount of approximately $3 million jointly and severally against IBL, Korek, and IHL.  In the 245-page Award, the Tribunal concluded that Iraq Telecom had been defrauded and that IBL had participated in the scheme to deceive Iraq Telecom by fraudulently concealing the existence of Barzani's posting of collateral at IBL.  A majority of the Tribunal found that Iraq Telecom would not have entered the Subordination Agreement but for the fraud and declared the Agreement null and void.  After an offset, the Award to Iraq Telecom amounted to about $2,759,867.50 in U.S. Dollars ("USD") plus interest.[1]  On November 23, 2021, Iraq Telecom obtained a Lebanese court decision giving executory effect to the Award.

On December 13, Iraq Telecom initiated a second arbitration in Lebanon against IBL seeking damages resulting from the fraud in the amount of at least $97 million.[2]  On December 21, Iraq

---

[1] The Tribunal held IBL, Korek, and IHL jointly and severally liable for $2.8 million in attorney's fees plus annual interest of 9% accruing from the date of issuance of the Award.  The Tribunal also held the three respondents liable for $219,867.50, an 80% share of the total costs of the arbitration.  Iraq Telecom was ordered to pay the respondents a 20% share of costs, which approximated $260,000 in USD.  When that offset is subtracted from the total award, the sum of Iraq Telecom's net Award at the time it was entered was $2,759,867.50 plus interest.

[2] Iraq Telecom's demand of at least $97 million in damages is calculated at a rate of 65.52% of the $148 million in payments that Korek made to IBL since July 2015.

Telecom filed in this Court a sealed petition for confirmation of the Award and moved for an _ex parte_ order of attachment of all of IBL's property within the district.  The petition to confirm the Award sought

> (1) immediate confirmation, recognition, and enforcement of the Award . . . ; (2) entry of declaratory judgment in favor of Iraq Telecom and against IBL consistent with the Award; and (3) a money judgment, including the interest and costs as provided therein accruing through the date of this Court's judgment.

The motion for an attachment was denied with leave to renew on December 22.  Iraq Telecom renewed its motion on December 29.  On January 19, 2022, this Court entered an _ex parte_ Order of Attachment attaching up to $100 million in four identified accounts held by IBL at three New York correspondent banks.  This action was unsealed on January 28.  Approximately $42 million of IBL's funds held in four New York correspondent bank accounts were attached pursuant to the January 19 Attachment Order.

On January 28, IBL filed a letter motion to modify the Attachment Order in order to exclude electronic fund transfers ("EFTs") going forward.  With consent of Iraq Telecom, that request was granted on February 4.

On January 31, Iraq Telecom moved to confirm the January 19 Attachment Order and the attachment of $100 million, and to

expand the scope of the Order.  IBL opposed the motion and
cross-moved to vacate the Order of Attachment on February 14.

Oral argument on the motion to confirm and cross-motion to
vacate the attachment was held on March 16.  There, IBL
represented that because of an attachment recently obtained by
Iraq Telecom in Lebanon (described below), it was taking steps
to pay Iraq Telecom in Lebanon the full amount of the Award in
USD.  Iraq Telecom represented that it does not have a bank
account in Lebanon to receive payment and even if it opened one,
due to Lebanese capital controls it would be unable to move the
proceeds of IBL's payment out of Lebanon.  At the conclusion of
oral argument, the Court vacated the January 19 attachment as to
any amount greater than $3 million and set a schedule for IBL to
oppose the petition to confirm the Award.

Meanwhile, the parties were also active in Lebanon.  On
January 14 -- roughly four months after the issuance of the
Award and almost two months after a Lebanese court gave
executory effect to the Award -- IBL initiated an exequatur
proceeding in a Lebanese court seeking to annul the Award.  For
its part, Iraq Telecom acted to secure the Award in Lebanon by
obtaining an attachment on March 10 from a Lebanese court of
IBL's property in Lebanon (the "Lebanese Attachment").  The
Lebanese Attachment attaches up to the amount of $2.832 million
of IBL's money held by Lebanon's central bank, Banque du Liban

("BdL"); in assets in IBL's Beirut headquarters; and in value from IBL's shares in five Lebanese companies and six real estate holdings.

On March 21, IBL attempted to pay Iraq Telecom roughly $3 million in Lebanon through a "tender and deposit" ("T&D") procedure, pursuant to the Lebanese Code of Civil Procedure, art. 822 et seq. A T&D is an offer to pay a debt and discharges the debt if the creditor accepts the payment or if, upon application by the debtor, a court renders a judgment that the T&D was adequate performance on the debt. A creditor may reject the payment by recording its rejection on the T&D notification slip or by writing to the notary public within 48 hours of service. Under the extraordinary circumstances that currently prevail in Lebanon, banker's checks denominated in foreign currency cannot be readily liquidated into cash at face value by the recipient. See Iraq Telecom, 2022 WL 827094, at *14, *16-17.

Using the T&D process, on March 21, IBL issued a check drawn on IBL's account with BdL and payable to Iraq Telecom for the approximate sum of $3.1 million and deposited it with a notary public. In a notification letter to Iraq Telecom, IBL requested that Iraq Telecom

> appear before the Notary Public to receive the
> deposited cheque, or to appoint an attorney to
> represent you in the amount awarded to you by virtue

of the . . . [Award] dated 21/09/2021, thereby
discharging ourselves of any right or claim in this
regard.  We further warn you of the consequences of
taking any juridical actions against the bank under
penalty of being considered as abusively exercising
your right to sue.

On the same day, IBL requested that the Beirut Execution Bureau
of the Lebanese courts acknowledge the check "in settlement of
the amounts specified in the arbitral award" and lift the
Lebanese Attachment.  The Bureau issued a certificate
acknowledging that the check had been deposited with the notary
public.  Upon receiving notice of the deposit on March 23, Iraq
Telecom recorded its refusal to accept the check on the
notification slip and in a separate letter to IBL demanded
payment by international bank transfer.

On March 25, IBL opposed the petition before this Court to
confirm the Award principally by requesting a stay of
confirmation proceedings until the conclusion of its annulment
proceeding in Lebanon.  The petition became fully submitted on
April 1.

On April 6, the Second Circuit Court of Appeals heard oral
argument on Iraq Telecom's interlocutory appeal from this
Court's decision denying a stay of its March 16 Order vacating
all but $3 million of the January 19 Attachment.  The Court of
Appeals reserved decision, and today the parties jointly
requested the entry of an order denying the stay application on

consent on condition that IBL's New York correspondent banks prevent withdrawals that would drop the combined balance in the IBL accounts below $28 million.

## Discussion

Iraq Telecom seeks to confirm the Award pursuant to the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "New York Convention," or the "Convention"), as implemented by the Federal Arbitration Act ("FAA"), 9 U.S.C. § 201 et seq., and seeks a declaratory judgment as well under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202.  IBL principally requests a stay because a Lebanese court has the power to set aside the Award and may do so.

I.  Confirmation of the Award

"The confirmation of an arbitration award is a summary proceeding that merely makes what is already a final arbitration award a judgment of the court."  Beijing Shougang Mining Inv. Co. v. Mongolia, 11 F.4th 144, 160 (2d Cir. 2021) ("Beijing") (citation omitted).  "The review of arbitration awards is very limited in order to avoid undermining the twin goals of arbitration, namely, settling disputes efficiently and avoiding long and expensive litigation."  Id. (citation omitted).  "Only a barely colorable justification for the outcome reached by the arbitrators is necessary to confirm the award."  D.H. Blair &

Co. v. Gottdiener, 462 F.3d 95, 110 (2d Cir. 2006) (citation
omitted).

A district court's ability to reject a foreign arbitration
award in particular is "strictly limited."  Yusuf Ahmed Alghanim
& Sons v. Toys "R" Us, Inc., 126 F.3d 15, 19 (2d Cir. 1997).
The recognition and enforcement of foreign arbitral awards is
governed by the New York Convention as implemented by the FAA,
which provides that:

> Within three years after an arbitral award falling
> under the Convention is made, any party to the
> arbitration may apply to any court having jurisdiction
> under this chapter for an order confirming the award
> as against any other party to the arbitration.  The
> court shall confirm the award unless it finds one of
> the grounds for refusal or deferral of recognition or
> enforcement of the award specified in the said
> Convention.

9 U.S.C. § 207.

Article V of the Convention lists seven grounds for refusal
or deferral.  Of relevance here is Article V(1)(e), which
permits refusal to recognize or enforce an arbitral award if
"[t]he award has not yet become binding on the parties, or has
been set aside or suspended by a competent authority of the
country in which, or under the law of which, that award was
made."  Convention art. V(1)(e).

Article III of the Convention directs that each signatory
nation, which includes both Lebanon and the United States,
"shall recognize arbitral awards as binding and enforce them in

11

accordance with the rules of procedure of the territory where the award is relied upon." Id. art. III.

> Under the New York Convention, the country in which
> the award is made is said to have <u>primary</u> jurisdiction
> over the arbitration award.  The Convention
> specifically contemplates that the state in which, or
> under the law of which, [an] award is made, will be
> free to set aside or modify an award in accordance
> with its domestic arbitral law and its full panoply of
> express and implied grounds for relief. . . .  All
> other signatory States are <u>secondary</u> jurisdictions, in
> which parties can only contest whether that State
> should enforce the arbitral award.  Courts in
> countries of secondary jurisdiction may refuse
> enforcement only on the limited grounds specified in
> Article V of the New York Convention.

<u>CBF Industria de Gusa S/A v. AMCI Holdings, Inc.</u>, 850 F.3d 58, 71 (2d Cir. 2017) (citation omitted).  In a secondary jurisdiction, "[g]iven the strong public policy in favor of international arbitration, the party seeking to avoid summary confirmance of an arbitral award has the heavy burden of proving that one of the seven defenses" enumerated in Article V applies. <u>VRG Linhas Aereas S.A. v. MatlinPatterson Glob. Opportunities Partners II L.P.</u>, 717 F.3d 322, 325 (2d Cir. 2013) (citation omitted).

Provisions of the New York Convention "anticipate the possibility of a party seeking confirmation in one country even though nullification proceedings are underway in another." <u>Compania de Inversiones Mercantiles, S.A. v. Grupo Cementos de Chihuahua S.A.B. de C.V.</u>, 970 F.3d 1269, 1299 (10th Cir. 2020),

cert. denied, 141 S. Ct. 2793 (2021) ("CIMSA").  Article VI of

the Convention states:

> If an application for the setting aside or suspension
> of the award has been made to a competent authority
> referred to in article V(1)(e), the authority before
> which the award is sought to be relied upon may, if it
> considers it proper, adjourn the decision on the
> enforcement of the award and may also, on the
> application of the party claiming enforcement of the
> award, order the other party to give suitable
> security.

Convention art. VI (emphasis added).

The Convention therefore does not require a party seeking

enforcement of an award in a secondary jurisdiction -- here, the

United States -- to await the conclusion of all challenges to

the award that may be pursued in the primary jurisdiction --

here, Lebanon.  See Thai-Lao Lignite (Thailand) Co. v. Gov't of

Lao People's Democratic Republic, 864 F.3d 172, 176 (2d Cir.

2017).  The Tenth Circuit has observed that "American judges

hold -- virtually unanimously -- that under the New York

Convention an arbitration award becomes binding when no further

recourse may be had to another arbitral tribunal (that is, an

appeals tribunal)" and that "a court maintains the discretion to

enforce an arbitral award even when nullification proceedings

are occurring in the country where the award was rendered."

CIMSA, 970 F.3d at 1298 (citation and emphasis omitted)

(collecting cases); see also Karaha Bodas Co., LLC v. Perusahaan

Pertambangan Minyak Dan Gas Bumi Negara, 335 F.3d 357, 367 (5th Cir. 2003).

A.   Confirmation of the Award

Iraq Telecom's petition to confirm the Award is granted. IBL does not suggest that the Convention, or any provision of U.S. law interpreting and enforcing the Convention, prevents confirmation.  Instead, relying on Article V of the Convention, IBL requests that this Court exercise its discretion to refuse to confirm the Award.

Relying on Article V(1)(e), IBL argues that the Court should refuse to confirm the Award because its annulment action has had the effect of rendering the Award nonbinding on the parties under Lebanese law in the country of primary jurisdiction.  None of the provisions of Article V(1)(e) support IBL's request.

Article V(1)(e) sets out three circumstances in which a court may refuse to confirm an award.  The first is when an award is not yet binding on the parties.  This does not apply here.  The Subordination Agreement makes the Award final; it is not subject to an appeal.  The Award is thus binding on the parties and is immediately enforceable despite the pendency of the annulment action in Lebanon.  See CIMSA, 970 F.3d at 1298.

The second and third circumstances are when an award has been set aside or suspended "by a competent authority" in the

14

primary jurisdiction.  No court in Lebanon has taken either of these actions to date.  Indeed, Iraq Telecom was able to obtain an attachment of IBL assets in Lebanon to secure its rights under the Award.

Finally, to the extent that it is appropriate to consider the existence of the annulment action in connection with the standards set out in Article V, the Court declines to refuse to confirm the Award because of the pendency of that action.  IBL has failed to demonstrate a likelihood of success in the annulment action.  It has identified two grounds for vacating the Award and neither appears to be meritorious.  See Iraq Telecom, 2022 WL 827094, at *11-12.

B.  Stay of Confirmation

Relying on Article VI of the Convention, IBL requests that the Court exercise its discretion and stay a decision on confirmation of the Award pending a decision in Lebanon on its annulment action.  This application for a stay is denied.

Article VI permits courts to adjourn a decision to enforce a foreign arbitral award pending the resolution of proceedings in the originating country to set aside or suspend an award.  It states in its entirety:

> If an application for the setting aside or suspension
> of the award has been made to a competent authority
> referred to in article V(1)(e), the authority before
> which the award is sought to be relied upon may, if it
> considers it proper, adjourn the decision on the

enforcement of the award and may also, on the
application of the party claiming enforcement of the
award, order the other party to give suitable
security.

Convention art. VI.

The Court of Appeals has recommended that a district court

contemplating adjournment pursuant to Article VI consider

several factors in order to "take into account the inherent

tension between competing concerns." Europcar Italia, S.p.A. v.

Maiellano Tours, Inc., 156 F.3d 310, 317 (2d Cir. 1998)

("Europcar").  On one hand, because adjournment "impedes the

goals of arbitration . . . [a] stay of confirmation should not

be lightly granted lest it encourage abusive tactics by the

party that lost in arbitration." Id.  On the other hand, "where

a parallel proceeding is ongoing in the originating country and

there is a possibility that the award will be set aside, a

district court may be acting improvidently by enforcing the

award prior to the completion of the foreign proceedings." Id.

The nonexclusive factors guiding a district court's

exercise of discretion are:

> (1) the general objectives of arbitration -- the
> expeditious resolution of disputes and the avoidance
> of protracted and expensive litigation;
>
> (2) the status of the foreign proceedings and the
> estimated time for those proceedings to be resolved;
>
> (3) whether the award sought to be enforced will
> receive greater scrutiny in the foreign proceedings
> under a less deferential standard of review;

16

(4) the characteristics of the foreign proceedings including (i) whether they were brought to enforce an award (which would tend to weigh in favor of a stay) or to set the award aside (which would tend to weigh in favor of enforcement); (ii) whether they were initiated before the underlying enforcement proceeding so as to raise concerns of international comity; (iii) whether they were initiated by the party now seeking to enforce the award in federal court; and (iv) whether they were initiated under circumstances indicating an intent to hinder or delay resolution of the dispute;

(5) a balance of the possible hardships to each of the parties, keeping in mind that if enforcement is postponed under Article VI of the Convention, the party seeking enforcement may receive "suitable security" and that, under Article V of the Convention, an award should not be enforced if it is set aside or suspended in the originating country . . . ; and

(6) any other circumstances that could tend to shift the balance in favor of or against adjournment.

Id. at 317-18.  "Because the primary goal of the Convention is to facilitate the recognition and enforcement of arbitral awards, the first and second factors on the list should weigh more heavily in the district court's determination."  Id. at 318.

IBL principally argues that a stay is warranted because it has filed the annulment action in Lebanon and has now offered to pay Iraq Telecom the $3 million Award in Lebanon.[3]  The balance

---

[3] IBL contends that it has offered to pay Iraq Telecom in Lebanon even though, pursuant to Article 820 of the Lebanese Code of Civil Procedure, the Award is unenforceable in Lebanon during the pendency of the annulment action.  A translation of Article 820 provided by IBL reads, "[i]f the arbitral award is not an urgent execution on minute, the appeal delay shall suspend its

of factors identified in Europcar weigh against a stay of these proceedings to await the outcome of the annulment action.

The Award was entered after three years of proceedings before the Tribunal and is supported by the Tribunal's lengthy, detailed findings of fact and law.  The twin goals of arbitration, "settling disputes efficiently and avoiding long and expensive litigation," favor expeditious execution of the Award.  Beijing, 11 F.4th at 160 (citation omitted).  Further delays to await the resolution of the annulment action, which is in its earliest stage, would only protract this long-running and contentious dispute.  IBL has not provided any reliable estimate, or even any estimate, of how long its action to set aside the Award may take.  Thus, the first and second factors weigh in favor of immediate confirmation.

The fourth factor also counsels against a delay in confirmation.  IBL has not acted with alacrity to challenge the Award in Lebanon.  IBL waited to commence its action to set aside the Award for roughly four months after the Award was issued and for almost two months after Iraq Telecom obtained executory effect for the Award from a Lebanese court.  Moreover, the weakness of its arguments in the annulment action reinforce

---

execution as it shall be suspended through the appeal law submitted within the delay."

the impression that IBL is simply seeking to delay the inevitable confirmation.

The balance of hardships also weighs against IBL's request. Iraq Telecom has acted diligently in the United States and Lebanon to enforce the Award.  Because of Lebanese capital controls, it will have difficulty obtaining effective payment of the Award within Lebanon and must rely on the Convention's procedures for confirmation and enforcement outside Lebanon. See Iraq Telecom, 2022 WL 827094, at *14.  And because of IBL's precarious financial condition, there is a genuine question of whether IBL will honor its obligations under the Award.  Id. at *13-14.  IBL, on the other hand, has not identified any hardship that it will encounter.

Only the third Europcar factor supports a delay in confirmation, and then only slightly.  As the primary jurisdiction, a Lebanese court in an annulment action may be able to rely on a broader range of grounds to vacate the Award than the seven defenses contained in the Convention.  The parties dispute whether that is so.  Even on the assumption that a Lebanese court will have more leeway to vacate the Award, IBL has not shown that that additional authority will be of benefit to it.  IBL has not shown that it is likely to succeed on either

19

of the two grounds on which it relies in its annulment

proceeding.

The balance of the <u>Europcar</u> factors weigh strongly against

a stay, and IBL has identified no other factors that warrant a

stay.  Accordingly, Iraq Telecom has met its burden of showing

an entitlement to immediate confirmation of the Award.

C.   Declaratory Relief

Iraq Telecom has petitioned for a declaratory judgment

adopting the findings of the Tribunal in the Award that IBL

committed fraud, that the fraud "was the determinative factor

for the Claimant to enter into the Subordination Agreement," and

"that the Subordination Agreement is null and void."  Iraq

Telecom's request is granted.

"The Declaratory Judgment Act gives a district court the

discretion to 'declare the legal rights and other legal

relations of any interested party seeking such declaration.'"

<u>Chevron Corp. v. Naranjo</u>, 667 F.3d 232, 244 (2d Cir. 2012)

(quoting 28 U.S.C. § 2201(a)).  The Declaratory Judgment Act is

"procedural only," "does not create an independent cause of

action," and relies on a "valid legal predicate."  <u>Id.</u> at 244-45

(citation omitted).

The legal predicate in this case is the New York

Convention, under which a district court's review of a foreign

arbitration is limited to enforcement and recognition.  "It is

20

well-settled that the New York Convention applies to awards
granting non-monetary relief (e.g., declaratory or injunctive
relief)."  Gary B. Born, International Commercial Arbitration
3747 (3d ed. 2020).  The Award in its "Dispositive Section"
declared that "all three Respondents," which includes IBL,
"committed [fraud] inducing [Iraq Telecom] to enter the
Subordination Agreement" and declared "at its majority[] that
the Subordination Agreement is null and void."  Confirmation of
the Award compels recognition of the declaratory relief granted
by the Tribunal to Iraq Telecom.

IBL opposes the request for declaratory relief.  It argues
that declaratory relief may not be granted because this Court
has engaged in no fact-finding and held no evidentiary
proceedings, and there is no legal basis to issue declaratory
relief "beyond confirming the Final Award itself."  IBL
misunderstands the nature of a court's role in confirmation
proceedings.  It was the Tribunal's task to conduct the
evidentiary proceedings and to describe the award it would make
based on the parties' requests and the proceedings it held.
Here, the Tribunal made a monetary award and a declaratory
award.  Under the terms of the Subordination Agreement, both
provisions in the Award are final and entitled to confirmation.
IBL has not shown a basis to deny declaratory relief when the

Tribunal expressly entered the declarations in its final Award in Iraq Telecom's favor.

### Conclusion

Iraq Telecom's petition to confirm the September 21, 2021 Award and for declaratory relief is granted.  Pursuant to an accompanying scheduling Order, the parties shall submit by April 14, 2022 a proposed judgment.  The proposed judgment shall reflect an award in favor of Iraq Telecom in the sums described in the Award, subject to an offset as described in the Award, both of which amounts have accrued at a 9% interest rate since September 21, 2021.  The proposed judgment shall also declare that IBL fraudulently induced Iraq Telecom to enter into the Subordination Agreement and that the Subordination Agreement is null and void.

Dated:   New York, New York
         April 8, 2022

_____
DENISE COTE
United States District Judge