22-540-cv

*Iraq Telecom Ltd. v. IBL Bank S.A.L.*

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: Aug 05 2022

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term 2021

(Argued:      June 9, 2022      Decided:      August 5, 2022)

Docket No. 22-540-cv

IRAQ TELECOM LIMITED,

*Petitioner-Appellant,*

*v.*

IBL BANK S.A.L.,

*Respondent-Appellee.**

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

Before:

CHIN, BIANCO, and NARDINI, *Circuit Judges.*

---

\* The Clerk of Court is respectfully directed to amend the caption as set forth above.

CERTIFIED COPY ISSUED ON 08/05/2022

Appeal from an order of the United States District Court for the Southern District of New York (Cote, *J.*) reducing an order of attachment in aid of arbitration. The district court had initially granted an *ex parte* order in favor of petitioner-appellant, an Iraqi cell phone company, attaching up to $100 million of the assets of respondent-appellee, a Lebanese bank. Thereafter, the district court exercised its discretion and reduced the amount of the attachment to $3 million in part because of concerns the attachment would have an adverse impact on the Lebanese economy. The Iraqi cell phone company appeals.

AFFIRMED IN PART, VACATED IN PART, AND REMANDED.

————————————————

DEREK L. SHAFFER (Kevin S. Reed, William B. Adams, Alex H. Loomis, and Kristin N. Tahler, *on the brief*), Quinn Emanuel Urquhart & Sullivan, LLP, Washington, DC, New York, NY, Boston, MA, *and* Los Angeles, CA, *for Petitioner-Appellant.*

MITCHELL R. BERGER (Gassan A. Baloul, *on the brief*), Squire Patton Boggs (US) LLP, Washington, DC, *for Respondent-Appellee.*

————————————————

CHIN, *Circuit Judge*:

In this case, the district court granted an *ex parte* order of attachment of $100 million in favor of petitioner-appellant Iraq Telecom Limited ("Telecom"),

an Iraqi cell phone company, against the assets of respondent-appellee IBL Bank

S.A.L. ("IBL"), a Lebanese bank.  Telecom had prevailed in an arbitration against

IBL and two other entities and was pursuing a second (and still pending)

arbitration against IBL, and the attachment was in aid of arbitration.  Thereafter,

IBL appeared in the proceedings and opposed the attachment, and the district

court vacated the attachment in part, reducing it to $3 million.  In reviewing

whether Telecom had satisfied the statutory requirements for attachment, the

district court found that Telecom had established that it was likely to succeed on

the merits in a pending arbitration only to the extent of $8.92 million.  The district

court then exercised its discretion and held that extraordinary circumstances,

including the impact of the attachment on the Lebanese economy, dictated

further reduction of the attachment to $3 million.

On appeal, Telecom argues that (1) it established a probability of

success in the pending arbitration and was therefore entitled to an attachment of

$100 million and (2) the district court lacked authority to consider extraordinary

circumstances in reducing the attachment.  For the reasons set forth below, we

affirm in part, vacate in part, and remand.

*BACKGROUND*

**I.** *The Facts*

This case arises out of a scheme to defraud a lender.  Telecom is a telecommunications company that owns 44 percent of an entity called International Holdings Limited ("IHL"), which in turn owns 100 percent of Korek Telecom Company LLC ("Korek"), an Iraqi company providing cell phone services in Iraq.  The other 56 percent of IHL is owned by another entity, Korek International (Management) Ltd., which is controlled by an individual named Sirwan Saber Mustafa, also known as Barzani.

In 2011, Telecom lent $285 million to Korek through a transaction with IHL.  IBL then lent $150 million to Korek.  Barzani described that loan to Telecom as unsecured, and Telecom agreed to subordinate its loan to the IBL loan through a subordination agreement executed on December 14, 2011.  In 2015, Korek defaulted on the IBL loan.  IBL invoked the subordination agreement and, accordingly, Korek stopped repaying the Telecom loan and instead paid IBL approximately $148 million in interest.  Later, Telecom discovered that the IBL loan was not unsecured and that IBL had secretly paid to Barzani the interest it received from Korek.  Apparently, IBL and Barzani had devised a scheme to defraud Telecom into subordinating its loan, to their mutual benefit.

- 4 -

II.    *The Arbitrations*

In June 2018, Telecom brought an arbitration proceeding against IBL, Korek, and IHL in Lebanon before the Lebanese Arbitration Center of the Chamber of Commerce, Industry and Agriculture of Beirut and Mount Lebanon (the "First Arbitration").  Although Telecom originally sought a damages award in the First Arbitration, it withdrew its request for damages and sought only declaratory relief "to eliminate any argument regarding double-recovery issues" in other proceedings.  App'x at 130 ¶ 368.

On September 21, 2021, Telecom won an arbitration award of $3 million in attorney's fees jointly and severally against IBL, Korek, and IHL.  The arbitrators found, among other things, that (1) IBL "clearly and knowingly participated in the deception" of Telecom, *id.* at 289 ¶ 954, and that IBL's conduct "confirmed its engagement in *dol*"[1] at the time it entered into the subordination agreement, *id.* at 294 ¶ 969; (2) IBL, Korek, and IHL "actively participated in the

---

[1]    "*Dol*" is a French word and a Lebanese legal term meaning "fraud."  App'x at 265-67.  Lebanon follows a civil law system influenced by France, and the "most notable" Lebanese legal code is the French-language Code of Obligations and Contracts.  Firas El Samad, *The Lebanese Legal System and Research*, GLOBALEX (Nov.-Dec. 2008), https://www.nyulawglobal.org/globalex/Lebanon.html.  Articles 202, 208, 209, and 233 of the Code of Obligations and Contracts govern *dol*.  App'x at 265.  To summarize those articles, and as the parties agree, *dol* involves fraud or fraudulent concealment intended to deceive or mislead.

commission of *dol*," *id*. at 293 ¶ 967; and (3) the subordination agreement was

"null and void," *id*. at 294 ¶ 970, 307 ¶ 1031(vi).  It also found that IBL paid to

Barzani 96 percent of the interest payments it received from Korek.  *Id*. at 289

¶ 953.

On December 13, 2021, Telecom brought a second arbitration against

IBL seeking $97 million in damages resulting from the fraud (the "Second

Arbitration").  The Second Arbitration is pending.

## III.   *Proceedings Below*

On December 21, 2021, Telecom filed in the district court a sealed

petition for confirmation of the First Arbitration award and a motion for an order

of attachment of all of IBL's property located in the Southern District of New

York.  On January 19, 2022, the district court entered the *ex parte* order of

attachment of up to $100 million held in four accounts.  About $42 million was

attached from IBL's correspondent accounts at JP Morgan Chase Bank, Citibank,

and Bank of New York Mellon.

On January 31, 2022, Telecom moved to confirm the *ex parte*

attachment of $100 million and to expand the scope of the attachment to include

all of IBL's property located in the Southern District of New York.  *Id.* at 16, 22,

- 6 -

24.  IBL opposed the motion and cross-moved to vacate the attachment.  *Id.* at

871.  The district court held oral argument on March 16 and filed a forty-nine-

page opinion vacating the attachment in part that same day.

The district court found that Telecom had shown a probability of

success on the merits as to the $3 million in costs and fees awarded in the First

Arbitration and as to $5.92 million of the amount at issue in the Second

Arbitration.

As to the Second Arbitration, the district court found that Telecom

was likely to establish that Barzani and IBL acted in concert to defraud Telecom.

It further found that the parties agreed that, under Lebanese law, joint and

several liability is established if defendants have acted in concert.  Nevertheless,

it concluded that Telecom failed to show that it was likely to receive an

arbitration award of $97 million because all but $5.92 million of the interest

payments owed to Telecom flowed through IBL to Barzani.  To reach the figure

of $5.92 million, the district court calculated 4 percent of the interest paid to IBL,

representing funds IBL retained that had not been kicked back to Barzani.  Thus,

the district court held, it was "entirely conceivable" that the Second Arbitration

panel "would limit any future award against IBL to the roughly $5.92 million that

[IBL] retained." Special App'x at 32. Accordingly, the district court concluded

that Telecom was entitled to an attachment of no more than $8.92 million,

comprising the $3 million award from the First Arbitration and the potential

$5.92 million award from the Second Arbitration.

Next, the district court held that "any arbitration award may be

rendered ineffectual without a prejudgment attachment of IBL assets." *Id.* at 35.

In particular, Telecom established that IBL was likely insolvent, and the

attachment was thus necessary to ensure that Telecom could receive the full

benefit of an award against IBL. The district court also found that Telecom had a

cause of action and that no counterclaims exceeded the value of the claims.

Thus, the district court found that Telecom satisfied all of the statutory

requirements for attachment in aid of arbitration.

Finally, the district court reduced the attachment from $8.92 million

to $3 million. The district court observed that the decision whether to grant a

motion for an order of attachment "rests within the discretion of the court," *id.* at

22, and it held that that discretion encompassed consideration of "extraordinary

circumstances" even where, as here, the statutory requirements for attachment

had been satisfied, *id.* at 30. The district court identified the following

- 8 -

extraordinary circumstances present in this case: the attachment (1) could force IBL into insolvency, affecting the fragile Lebanese economy; (2) would cause IBL to fall out of compliance with crisis management regulations imposed by Lebanon's central bank; (3) interfered with innocent third parties' access to their money; (4) could undermine confidence in New York's financial institutions; and (5) should not be lightly imposed because Barzani, not IBL, was the principal wrongdoer. It held that those circumstances posed "sever[e]," "perilous," and "calamitous" risks militating reduction of the attachment, noting that the larger attachment "would be entered" absent them. *Id.* at 40-42.

Accordingly, the district court granted in part the motion to confirm as to $3 million and granted in part the cross-motion to vacate.

This appeal followed.

## *DISCUSSION*

I. *Applicable Law*

A. **Attachment in Aid of Arbitration**

Attachment is available in federal court "under the law of the state where the court is located." Fed. R. Civ. P. 64. "Under New York law, an attachment bars any sale, assignment or transfer of, or any interference with the

property attached." *Cap. Ventures Int'l v. Republic of Argentina* (*Cap. Ventures II*),
652 F.3d 266, 270 (2d Cir. 2011) (internal quotation marks omitted).

As pertinent here, section 7502(c) of New York's Civil Practice Law
and Rules provides for attachment in aid of arbitration "only upon the ground
that the award to which the applicant may be entitled may be rendered
ineffectual without such provisional relief." N.Y. C.P.L.R. 7502(c). Section
7502(c) incorporates New York's general attachment statute, article 62 of the Civil
Practice Law and Rules, which requires a plaintiff seeking attachment to
establish one of five statutory bases for attachment, among them that "the
defendant is a nondomiciliary residing without the state, or is a foreign
corporation not qualified to do business in the state." N.Y. C.P.L.R. 6201(1). In
addition to one of those grounds, the plaintiff must show that (1) "there is a cause
of action," (2) "it is probable that the plaintiff will succeed on the merits," and
(3) "the amount demanded from the defendant exceeds all counterclaims known
to the plaintiff." N.Y. C.P.L.R. 6212(a); *see Cap. Ventures Int'l v. Republic of
Argentina* (*Cap. Ventures I*), 443 F.3d 214, 219 (2d Cir. 2006).

On a motion for attachment in aid of arbitration, probability of
success is "measured in terms of the likelihood of success in arbitration." *SG*

*Cowen Sec. Corp. v. Messih*, 224 F.3d 79, 84 (2d Cir. 2000) (emphasis omitted).

Where an arbitration is pending, probability of success "cannot be predicted with

the confidence a court would have in predicting the merits of a dispute awaiting

litigation in court" because "arbitration is frequently marked by great flexibility

in procedure, choice of law, legal and equitable analysis, evidence, and remedy."

*Id*. Even so, the plaintiff must be given "the benefit of all legitimate inferences

and deductions that can be made from the facts stated." *Swiss Bank Corp. v.*

*Eatessami*, 273 N.Y.S.2d 935, 938 (1st Dep't 1966) (internal quotation marks

omitted).

On a defendant's motion to vacate or modify an order of attachment,

the plaintiff bears the burden of establishing "the need for continuing the levy."

N.Y. C.P.L.R. 6223(b). It "must demonstrate an identifiable risk that the

defendant will not be able to satisfy the judgment." *VisionChina Media Inc. v.*

*S'holder Representative Servs., LLC*, 967 N.Y.S.2d 338, 345-46 (1st Dep't 2013). "The

risk should be real" and may include "a defendant's financial position," "past and

present conduct," "history of paying creditors," or a "stated or indicated intent to

dispose of assets." *Id.* at 346 (internal quotation marks omitted).

### B.    Exercise of Discretion

In the context of an application for an attachment under article 62, whether to grant the application "rests within the discretion of the court." *Id.* at 345 (citing *Morgenthau v. Avion Res. Ltd.*, 11 N.Y.3d 383, 387 (2008) (reviewing denial of motion to confirm attachment for abuse of discretion)). But neither this Court nor the New York Court of Appeals has ruled on whether that discretion includes the power to consider nonstatutory factors such as extraordinary circumstances.

This Court explicitly left open the issue in two previous decisions. In *Capital Ventures I*, we held that where "a statutory ground for attachment exists and both need and likelihood of success are established, [a motion court's] discretion does not permit denial of the remedy for some other reason, at least absent extraordinary circumstances and perhaps even then." 443 F.3d at 222. This Court left the issue open again in *Capital Ventures II*. 652 F.3d at 273-74. There, we held that Capital Ventures had satisfied the statutory standards and that none of the circumstances presented by Argentina were "extraordinary enough to justify a discretionary modification of the attachments, even assuming the possibility of such a modification." *Id.*

- 12 -

C.      **Standard of Review**

We review for abuse of discretion the district court's findings as to

whether the statutory requirements for attachment have been satisfied.  *Cap.*

*Ventures I*, 443 F.3d at 222; *EM Ltd. v. Republic of Argentina*, 473 F.3d 463, 472 (2d

Cir. 2007).  "A district court abuses its discretion if it (1) bases its decision on an

error of law or uses the wrong legal standard; (2) bases its decision on a clearly

erroneous factual finding; or (3) reaches a conclusion that, though not necessarily

the product of a legal error or a clearly erroneous factual finding, cannot be

located within the range of permissible decisions."  *Villiers v. Decker*, 31 F.4th 825,

831 (2d Cir. 2022).

II.     *Application*

Principally, the parties dispute whether the district court had

discretion to consider extraordinary circumstances when reducing the

attachment and, if it did, whether it abused that discretion in reducing the

attachment to $3 million.

As to the statutory factors governing attachment, the parties do not

dispute that Telecom established one or more grounds for attachment under

C.P.L.R. 6201, has a cause of action, and demanded an amount that exceeds all

- 13 -

known counterclaims.  They agree that Telecom is likely to succeed on the merits as to a total award of $8.92 million between the two arbitrations, *see* Appellee's Br. at 47, but they disagree as to whether Telecom is likely to succeed as to any more than that.[2]

Accordingly, two issues are presented:  first, whether a court has discretion to consider extraordinary circumstances even where the statutory requirements for attachment have been satisfied; and second, whether the district court abused its discretion here in (1) weighing the identified extraordinary circumstances, (2) concluding that the greater culpability of one of the wrongdoers was a reason to reduce the amount of the attachment, and (3) assessing Telecom's probability of success.  We address each issue in turn.

---

[2]     IBL also argues that Telecom has not established the continuing need for the levy.  We disagree.  As the district court held, any award from the Second Arbitration would be "ineffectual without an attachment since IBL appears to be insolvent."  Special App'x at 30.  Further, IBL admitted that it intends to dissipate the funds held in the correspondent accounts to process transactions.  Dist. Ct. Dkt. 54-1 at 5-6.  Thus, Telecom has established the risk that it will not be able to collect absent attachment based on IBL's financial position and its stated intent to dispose of its assets.  *See VisionChina*, 967 N.Y.S.2d at 346.

### A.     Whether Extraordinary Circumstances May Be Considered

Because neither this Court nor the New York Court of Appeals has ruled on whether courts have discretion to consider nonstatutory factors such as extraordinary circumstances on a motion to vacate or modify attachment, we must "predict how the state court would resolve an ambiguity in state law." *Donohue v. Hochul*, 32 F.4th 200, 207 (2d Cir. 2022) (internal quotation marks omitted).[3]  In so doing, we may look to the decisions of the Appellate Divisions to predict what the New York Court of Appeals would do, although such decisions are entitled only to "some weight."  *Khan v. Yale Univ.*, 27 F.4th 805, 825 (2d Cir. 2022).  Other relevant authorities include "case law from other jurisdictions on the same or analogous issues, scholarly writings in the field, and any other resources available to the state's highest court."  *Michalski v. Home Depot, Inc.*, 225 F.3d 113, 116 (2d Cir. 2000).

The Appellate Division, First Department, has held that whether to grant an attachment "rests within the discretion of the court."  *VisionChina*, 967 N.Y.S.2d at 345.  It has also held that that discretion includes the power to

---

[3]     Certification to the New York Court of Appeals would be an option, but given the need for a prompt resolution of this matter, certification is not warranted here.  *See Tunick v. Safir*, 94 N.Y.2d 709, 712 (2000) (*per curiam*); *SG Cowen Sec. Corp.*, 224 F.3d at 83.

consider nonstatutory factors. *See Cargill Fin. Servs. Int'l, Inc. v. Bank Fin. & Credit Ltd.*, 896 N.Y.S.2d 317, 318 (1st Dep't 2010).

In *Cargill*, the First Department held that the motion court did not abuse its discretion when it denied plaintiff's attachment application because attachment would interfere with innocent third parties' access to their money. *Id.* As here, and as Telecom acknowledges, *Cargill* concerned a plaintiff's request to attach funds in a foreign bank's correspondent accounts. The accounts contained some funds belonging to innocent third parties. *Id.* The First Department held that the motion court had discretion to consider the impact an attachment would have on those third parties, which was not a statutory factor. *Id.* Thus, although *Cargill* did not explicitly mention "extraordinary circumstances," it dealt with a circumstance that militated against granting an attachment even though all the statutory factors had been met. In short, the Appellate Division approved consideration of a nonstatutory, discretionary factor.[4]

---

[4]     We find Telecom's further effort to distinguish *Cargill* unavailing. A district court case discussing *Cargill* explained that *Cargill* "considered whether a court could use its discretion to deny an otherwise legal attachment of a bank account" and concluded that it was not an abuse of discretion to do so. *Toisa Ltd. v. PT. Transamudra Usaha Sejahtera*, No. 13-CV-1407, 2013 WL 12125701, at *14 (S.D.N.Y. Sept. 20, 2013). Contrary to Telecom's position, *Toisa* thus does not stand for the proposition that *Cargill*'s holding was based on a statute rather than discretion.

- 16 -

As noted above, this Court previously left the issue open in two cases. In *Capital Ventures I*, plaintiff Capital Ventures had satisfied the statutory requirements and demonstrated a need for attachment. 443 F.3d at 223. We concluded that the district court erred "to the extent it denied relief because it considered [Capital Ventures'] chances of realizing on the Principal Collateral to be remote." *Id.* But the Court also noted that "[w]e can conceive, perhaps, of a situation in which an order of attachment might be against the public interest for some reason not addressed in the CPLR" and observed that the public interest is pertinent when considering another provisional remedy, the preliminary injunction. *Id.* & n.7. Thus, *Capital Ventures I* left open whether courts may consider extraordinary circumstances when assessing attachment. And in *Capital Ventures II*, because we did not find any extraordinary circumstances, we did not have occasion to determine whether it would be appropriate to consider them if they did exist. 652 F.3d at 273-74.

Two leading treatises support consideration of extraordinary circumstances. Siegel explains that "[e]ven if the plaintiff makes out a case for attachment under CPLR 6201, its granting is still discretionary with the court. The plaintiff cannot demand it as a matter of right." DAVID D. SIEGEL & PATRICK

M. CONNORS, NEW YORK PRACTICE § 317 (6th ed. 2018) (citing *Sartwell v. Field*, 68

N.Y. 341, 342-43 (1877)).  Weinstein, Korn & Miller states that "[a]ttachment is a

remedy that is subject to the court's broad discretion" and a "court may therefore

vacate an attachment on any ground and is not limited to those enumerated."  12

JACK B. WEINSTEIN, HAROLD L. KORN & ARTHUR R. MILLER, NEW YORK CIVIL

PRACTICE:  C.P.L.R. ¶ 6223.09 (David L. Ferstendig ed., 2022).  For that

proposition it cites a New York Supreme Court case recognizing hardship and

"the equities" as grounds for vacatur.  *See Interpetrol Berm. Ltd. v. Trin. & Tobago*

*Oil Co.*, 513 N.Y.S.2d 598, 604-05 (Sup. Ct. 1987).

      Today, we answer the question left open by *Capital Ventures I* and *II*.

Given the available authorities, we predict that the New York Court of Appeals

would conclude that a court has discretion to weigh extraordinary circumstances

even where the statutory requirements for attachment are satisfied.  Common-

sense application of First Department caselaw compels this conclusion.  Trial

courts have discretion in deciding motions for attachment, *see VisionChina*, 967

N.Y.S.2d at 345, and that discretion includes the power to consider nonstatutory

factors such as the impact an attachment would have on nonparties, *see Cargill*,

896 N.Y.S.2d at 318.  It makes sense that this discretion would encompass other

considerations, such as the impact an attachment might have on a nation's economy.  Accordingly, the district court did not err when it considered whether extraordinary circumstances existed in deciding the motions here.

**B.      Whether the District Court Abused Its Discretion**

Next, we address whether the district court abused its discretion in reducing the attachment to $3 million.  We conclude that it did, in three respects: failing to consider alternative attachment amounts, concluding that the greater culpability of one of the wrongdoers was a reason to reduce the attachment, and applying the wrong legal standard in assessing Telecom's probability of success.

1.      *Failure to Consider Alternative Attachment Amounts*

Although the district court properly held that it was entitled to consider extraordinary circumstances, it abused that discretion when it assessed them here and vacated all but $3 million of the attachment.  The district court considered five extraordinary circumstances and weighed them with respect to attachment amounts of $97 million and $42 million.  It then used those circumstances as a basis to deny any attachment greater than $3 million.

Turning to four of those circumstances, we hold that they are all fair considerations, but the district court should have assessed whether attachments

- 19 -

greater than $3 million but less than $42 million would have the same grave impact on the circumstance identified.[5]

The district court first found that IBL was one of five "viable" banks in Lebanon, which was facing a drastic economic crisis. Special App'x at 42. It concluded that "the attachment poses a not insignificant risk of forcing IBL . . . into failure," which had the "potential to impact the economy of the entire nation." *Id.* Those "severe repercussions," the district court concluded, "militate against granting [Telecom's] request to confirm (much less to expand) the attachment." *Id.*

In reaching that conclusion, the district court was considering Telecom's motion to confirm the entire $100 million attachment and expand it to include all of IBL's property in the district, the value of which was not specified. While the risk of impact on the Lebanese economy was a grave concern, the potential repercussions were not so severe as to preclude the $3 million attachment, which the district court confirmed.

Next, the district court held that the attachment of $42 million -- the portion of the $100 million *ex parte* attachment that Telecom was able to attach

---

[5]     The fifth circumstance, which the district court called "the principal wrongdoer," is addressed below.

from Southern District-based funds -- "will cause IBL to fall out of compliance"

with emergency regulations promulgated by the Lebanese central bank Banque

du Liban ("BdL") to manage the Lebanese economic crisis. *Id*. at 45. Those

regulations appear in publications known as BdL Circulars. BdL Circular 150

prohibits Lebanese banks from restricting customer withdrawals of "fresh" funds,

which are foreign currencies deposited with the banks after April 9, 2020. BdL

Circular 154 requires banks to maintain 3 percent of their foreign currency

reserves "free of any commitments." BdL Circular 158 requires banks to permit

limited withdrawals of U.S. dollars when certain conditions are met; thus, banks

must keep adequate funds in correspondent accounts in the United States.

The district court found that the $42 million attachment froze nearly

all of the funds that the BdL Circulars require IBL to keep on hand because the

attachment froze the entirety of IBL's correspondent accounts in New York. But

it did not consider whether IBL would still have access to funds sufficient to

remain in compliance with the BdL Circulars if some amount less than $42

million were attached.

Similarly, the district court found that the $42 million attachment

precluded IBL from providing to its customers international banking services in

U.S. dollars.  It held that it would not "further burden" those customers, which it called "innocent third parties."  *Id.* at 47.

The district court next considered "whether an attachment on the scale at issue here will undermine confidence in New York's financial institutions."  *Id.* at 48.  It concluded that Telecom had not shown that "unintended damage" would not be done to the New York correspondent banking system.  *Id.* at 49.  The district court did not mention the precise figure it analyzed, but it noted that Telecom's arguments "might have more force" if it "had an arbitration award of $97 million which it was seeking to confirm and enforce."  *Id.*  It also referred to the "attachment on the scale at issue here."  Those references suggest that the district court did not consider the impact of an attachment of less than $42 million.[6]  *Id.* at 48.

The district court abused its discretion in weighing these four circumstances because it concluded that no attachment greater than $3 million was appropriate based on its finding that the larger $42 million attachment

_____

[6]     The district court observed that an application for attachment "should be supported by expert testimony on New York's correspondent banking system to allay a court's concern that unintended damage will not be done to that system by the attachment."  Special App'x at 49.  Whether such testimony is required is not before this Court, and we express no opinion on the issue.

- 22 -

would have a deleterious effect.  But the district court failed to consider whether some amount less than $42 million but greater than $3 million would create the same risks that it identified for the greater amount.  For example, as noted above, BdL Circular 154 requires IBL to hold 3 percent of its foreign currency reserves free of any commitments.  It is unclear, then, whether an attachment of $17 million would result in any negative effects given that IBL is already required by Lebanese regulations to hold that money in its U.S. accounts.  Indeed, at oral argument on appeal, IBL effectively conceded that an attachment of $17 million would not cause any negative ramifications to IBL or the Lebanese banking system.  Oral Argument at 12:00-:30, 16:50-18:10, *Iraq Telecom Ltd. v. IBL Bank S.A.L.* (2d Cir. June 9, 2022) (No. 22-540), https://www.ca2.uscourts.gov/ decisions/isysquery/c2b7b85f-5bd9-40d4-ba5e-dd4636116c06/1/doc/22-540.mp3.

Accordingly, the district court should have considered what effect, if any, an alternative attachment size would have on the extraordinary circumstances it identified, and it thus abused its discretion by confirming the attachment as to only $3 million.

2. *The Greater Culpability of One of the Wrongdoers*

As to the fifth and final circumstance, the district court found that Barzani was the principal wrongdoer, not IBL, and that Telecom therefore "may have other avenues to make itself whole." Special App'x at 49. It concluded that "the unpredictable effect of maintaining the attachment on IBL in these circumstances counsels restraint." *Id.*

On the record before this Court, the availability to Telecom of other avenues of recovery is not an extraordinary circumstance militating against confirmation of the attachment. The district court points to nothing extraordinary about Barzani's liability as compared to IBL's meriting special consideration here. Thus, it seems that the sole basis for the district court's determination here is the fact of IBL's joint and several liability, discussed further below, which is not itself extraordinary -- otherwise, any defendant could avoid attachment merely by pointing to the existence of joint tortfeasors.

IBL argues that the district court's "principal wrongdoer" holding is not a separate extraordinary circumstance but merely one factor that the district court assessed in determining that the case "as a whole" presents extraordinary circumstances. But this is belied by the district court's plain reference to "the

- 24 -

extraordinary circumstances described below," followed by the enumerated

analysis of the five circumstances. *Id*. at 40.

We do not hold that the existence of another "principal wrongdoer"

may never be an extraordinary circumstance meriting consideration on a motion

to vacate an attachment, but the record does not support such a finding here.

3. *Probability of Success*

The district court abused its discretion when it concluded that

Telecom established that it was likely to succeed on the merits in the Second

Arbitration as to only $5.92 million. The district court found that IBL and

Barzani "deprived" Telecom of $97 million. *Id*. at 32. It recognized that, under

Lebanese law, joint and several liability is established if defendants have "acted

in concert."[7] *Id*. at 33. It then found that Telecom was likely to demonstrate in

the Second Arbitration that IBL "acted in concert" with Barzani. *Id.* But the

---

[7]     The parties agree that Lebanese law -- specifically, Article 137 of the Lebanese Code of Obligations and Contracts -- provides that joint and several liability "is presumed only where (i) those persons acted in concert; (ii) it is impossible to determine the proportion of damages attributable to each of those persons." Appellee's Br. at 53; App'x at 897-98, 1375; Appellant's Br. at 27. According to the First Arbitration award, a plaintiff need show only one element to establish joint and several liability. App'x at 304-05 (Article 137's "conditions are not cumulative"). Accordingly, joint and several liability is established here if Telecom can show either that IBL and Barzani acted in concert *or* that it was impossible to determine the proportion of damages attributable to each of them. Telecom need not establish both.

- 25 -

district court held that Telecom had not succeeded in showing that it was likely to obtain an award of $97 million jointly and severally against IBL and others, apparently because "IBL retained only a small portion of the damages" sought. *Id.* at 33-34. This was an abuse of discretion for two related reasons.

First, the district court concluded that "it is entirely conceivable" that the Second Arbitration panel "would limit any future award against IBL to the roughly $5.92 million that [IBL] retained" based on a theoretical exercise of discretion. *Id.* at 32. Even assuming this observation were correct, whether a panel's outcome is "*conceivable*" is not the correct legal standard. Rather, the district court must assess what is *probable*. N.Y. C.P.L.R. 6212(a); *see Cap. Ventures I*, 443 F.3d at 219.

Second, although the district court correctly observed that arbitration is "marked by great flexibility in . . . legal and equitable analysis," *SG Cower Sec. Corp.*, 224 F.3d at 84, it did not explain why the Second Arbitration panel would exercise its discretion to depart from the law. The First Arbitration panel found that IBL and Barzani acted "in concert" to defraud Telecom of $97 million. Thus, as the district court correctly held, Telecom is likely to establish joint and several liability. *See* Code of Obligations and Contracts art. 137 (Leb.).

Under general tort principles, if two tortfeasors jointly commit a fraud, they are jointly and severally liable for all damages. RESTATEMENT (THIRD) OF TORTS: APPORTIONMENT OF LIAB. §§ 10, 12. In other words, Telecom likely can seek to collect the entirety of the $97 million from IBL alone. While it is undisputed that IBL is in dire financial straits, the district court cites no law to support the proposition that a tortfeasor is liable only for the amount it can pay. The district court pointed to no provision of Lebanese law or general tort principle that would allow a defendant who acted in concert with others to avoid joint and several liability merely because it did not retain all of the fraud proceeds.

Accordingly, based on the district court's own findings that IBL and Barzani in concert defrauded Telecom of $97 million, and that Telecom was likely to establish joint and several liability as to IBL, it was error to conclude that the Second Arbitration panel was not likely to hold IBL jointly and severally liable. The district court therefore abused its discretion when it held that Telecom failed to establish a probability of success as to the $97 million award.

\*     \*     \*

On remand, the district court should consider whether an amount less than $42 million but more than $3 million should be attached. At a

minimum, the district court should consider an attachment of $17 million in light of IBL's concession at oral argument.

## CONCLUSION

For the foregoing reasons,

(1)    the order of the district court is AFFIRMED to the extent that the district court held that it had discretion to consider extraordinary circumstances and that Telecom demonstrated a continuing need for the attachment, and to the extent that the district court attached $3 million;

(2)    the order is VACATED to the extent the district court attached only $3 million based on the existence of extraordinary circumstances without considering how those circumstances might change given an attachment greater than $3 million but less than $42 million; and

(3)    the case is REMANDED for further proceedings as to (a) Telecom's probability of success, (b) the assessment of extraordinary circumstances, and (c) the amount of the attachment above $3 million.

A True Copy
Catherine O'Hagan Wolfe, Clerk
United States Court of Appeals, Second Circuit

- 28 -