UNITED STATES DISTRICT COURT
THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IRAQ TELECOM LIMITED,<br><br>            Petitioner,<br><br>v.<br><br>IBL BANK S.A.L,<br><br>            Respondent. | Civil Action No. 21-cv-10940 (DLC) |

**IRAQ TELECOM'S OPENING POST-REMAND MEMORANDUM IN FURTHER SUPPORT OF ITS MOTION TO CONFIRM ATTACHMENT AND IN OPPOSITION TO IBL'S CROSS-MOTION TO VACATE ATTACHMENT**

# **TABLE OF CONTENTS**

PROCEDURAL HISTORY ...................................................................................................... 1

ARGUMENT ............................................................................................................................ 4

I.  THE AMOUNT OF THE ATTACHMENT SHOULD BE NO LESS THAN $28 MILLION ..................................................................................................................... 4

II. IRAQ TELECOM SHOULD BE AFFORDED TARGETED DISCOVERY TO TEST IBL'S CLAIM OF EXTRAORDINARY CIRCUMSTANCES .............................. 6

CONCLUSION ......................................................................................................................... 9

i

# **TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*Iraq Telecom Ltd. v. IBL Bank S.A.L.*,
    No. 22-540 (2d Cir. Mar. 24, 2022) ................................................................................... 2

*Iraq Telecom Ltd. v. IBL Bank S.A.L.*,
    No. 22-540 (2d Cir. Apr. 4, 2022) ..................................................................................... 8

**OTHER AUTHORITIES**

*Lebanon's central bank chief is suspect in 120 mln euro asset freeze case -German prosecutor*, Reuters (Mar. 28, 2022), https://www.reuters.com/world/middle-east/eu-criminal-justice-agency- says-120-million-euros-lebanese-assets-frozen-2022-03-28/ ............................................................................................................................. 6

**RULES**

N.Y. Civ. Prac. L. & R. 6201(1) ............................................................................................... 5

N.Y. Civ. Prac. L. & R. 6212(a) ............................................................................................... 5

N.Y. Civ. Prac. L. & R. 6220 .................................................................................................... 7

N.Y. Civ. Prac. L. & R. 7502(c) ................................................................................................ 5

Petitioner, Iraq Telecom Ltd. ("Iraq Telecom"), respectfully submits this memorandum in further support of its motion to confirm the attachment preliminarily granted by this Court and in opposition to Respondent IBL Bank S.A.L.'s ("IBL") motion to vacate that attachment.

The sole open question before this Court on remand is whether the extraordinary circumstances proffered by IBL justify reducing the attachment of its New York correspondent accounts below $42 million and, if so, by what specific amount. As discussed below, since this matter was last before this Court, new circumstances have arisen that are highly relevant to that question: For the past six months, IBL froze by agreement $28 million in its correspondent accounts without causing any of the extraordinary harms it previously contended would result from an attachment of $42 million in those accounts. This proves, at a minimum, that an attachment by this Court of $28 million is not precluded by extraordinary circumstances and, Iraq Telecom respectfully submits, establishes $28 million as the absolute floor for an attachment. It also severely undermines IBL's contention that an attachment of $42 million should be denied on account of extraordinary circumstances—and even more severely undermines IBL's instant position that the attachment should go as low as $17 million. To the extent IBL is nonetheless taking a position at odds with the known facts, it is only appropriate that Iraq Telecom now be permitted to test that position and any claimed bases for it (still unknown) through targeted discovery. Such discovery can be narrowly targeted but affords the only means through which a balanced evidentiary record can be fairly assembled in order to inform this Court's decision. As matters stand, there is every reason to question and doubt IBL's claim that a $42 million attachment will cause the sky to fall when a $28 million freeze did not.

## PROCEDURAL HISTORY

On March 16, 2022, this Court ordered that Iraq Telecom's attachment on IBL's New York correspondent accounts be reduced from $42 million to $3 million, due to the presence of

1

"extraordinary circumstances"[1] and a finding that Iraq Telecom was only likely to succeed on $5.92 million of its pending arbitration claim for an additional $97 million. Iraq Telecom noticed an appeal later that day and, two days later, moved the United States Court of Appeals for the Second Circuit for an interim stay and a stay pending appeal. *See* Dkt. 112; *Iraq Telecom Ltd. v. IBL Bank S.A.L.* (2d Cir. Mar. 18, 2022) (No. 22-540), Dkt. 16.

The Second Circuit granted an interim stay and heard argument on the motion for a stay pending appeal on April 6, 2022. *See* Dkt. 114. In its brief opposing the stay pending appeal, IBL conceded that, irrespective of any court-ordered attachment, IBL was required by Lebanese regulatory requirements to keep **$17.36 million** in its New York correspondent accounts. *See Iraq Telecom Ltd. v. IBL Bank S.A.L.*, No. 22-540 (2d Cir. Mar. 24, 2022), Dkt. 42 at 12 ("As of the date of attachment, the subject accounts held approximately $17.36 million that IBL must maintain in its U.S. correspondent accounts to comply with Basic Circular 154."). "That number," IBL's counsel admitted at oral argument on the stay motion, "if anything, has to go up. So they can't go below the 17.36." *See* Apr. 6, 2022 Oral Argument at 29:29-30:02.

Pressed further, IBL's counsel stated his belief that maintaining the freeze of up to **$26 million** in IBL's correspondent accounts would prevent it from running afoul of Lebanese regulators *and* allow it to satisfy the expected rate of customer withdrawals. *See id.* at 33:20-34:02 ("[I]f Judge Calabresi's asking what number above the 17.36 makes sense, if you take the number that Judge Cote said was a . . . reasonable prospect of success, that's 8.9 million, let's make life

---

[1] The "extraordinary circumstances" that this Court previously considered in reducing the initial $42 million attachment were: (1) the potential that the attachment would create a liquidity crunch that would cause IBL and the Lebanese economy to fail; (2) that an attachment could cause IBL to fall out of compliance with Banque du Liban ("BDL") Circulars; (3) the impact on IBL's creditors; (4) the broader effect on New York banks from an attachment of funds in correspondent bank accounts; and (5) that IBL's alleged co-conspirator Sirwan Saber Mustafa ("Barzani") was the principal wrongdoer, not IBL. *See* Dkt. 124 at 28, 38-48.

2

easy for those of us who're arithmetically challenged, uh, 9 million plus that, then you're looking at 26 million. That gives the bank, I think, look I'm not on the phone with the bankers in Beirut, but that gives the bank a plausible margin with which to operate.").

Ultimately, with the motion's panel's encouragement, the parties agreed on the terms of a standstill agreement that mooted the motion for a stay pending appeal. The motions panel so-ordered the agreement in a Motion Order, entered on consent and dated April 11, 2022, which provided that, pending the resolution of Iraq Telecom's appeal, IBL would maintain a balance of not less than **$28 million** in its New York correspondent accounts.[2] Dkt. 124. This amount has remained frozen since that date—a period of nearly six months.

On May 11, 2022, Iraq Telecom filed an unopposed motion to expedite its appeal, which the Second Circuit granted on May 19, 2022. Argument on the appeal was held on June 9, 2022. During the argument, counsel for IBL "effectively conceded that an attachment of $17 million would not cause any negative ramifications to IBL or the Lebanese banking system." Dkt. 133 at 23.

The Second Circuit issued its decision on August 5, 2022. The court affirmed this Court's holding that trial courts deciding motions for attachment under New York law have discretion to deny or limit an attachment on account of extraordinary circumstances, even where the statutory requirements for attachment are satisfied. *Id.* at 18-19. The court also held that four of the five extraordinary circumstances this Court relied upon in its ruling were appropriately considered, the exception being the purportedly greater culpability of IBL's co-conspirator, Barzani, relative to IBL, which the court held was not supported by the record. *Id.* at 19-25.

---

[2] Those funds included $9 million in Citibank correspondent account #-9262, $9 million in JPMorgan Chase correspondent account #-3882, and $10 million in Bank of New York Mellon correspondent account #-5046. Dkt. 124 at 1.

3

Having found that this Court appropriately considered those four extraordinary circumstances, the Second Circuit found that this Court abused its discretion by failing to consider whether they allowed for an attachment greater than $3 million but less than $42 million. *Id.* at 22-23. The Second Circuit also found that this Court abused its discretion in finding that Iraq Telecom was likely to succeed on the merits in its arbitration against IBL only as to $5.92 million, holding that the record demonstrated that Iraq Telecom had demonstrated a probability of success as to the entire $97 million it seeks in the pending arbitration. *Id.* at 25-27. The court remanded the case within instructions to "consider whether an amount less than $42 million but more than $3 million should be attached. At a minimum, the district court should consider an attachment of $17 million in light of IBL's concession at oral argument." *Id.* at 27-28.

In late August, in anticipation of their standstill agreement expiring upon the Second Circuit's issuance of its mandate (which would resolve the appeal), the parties agreed to extend the standstill, which requires IBL to keep not less than $28 million in its New York correspondent accounts, "pending any subsequent contrary agreement of the parties or order of the District Court." Decl. of Kevin S. Reed, Ex. A at 2 (Aug. 26, 2022 Email from Mitchell Berger). The Second Circuit issued its mandate on August 29, 2022. Later that day, this Court directed the parties to "confer as to whether an attachment in the amount of $17 million is appropriate" and, absent an agreement, to "propose a briefing schedule resolving any open issue." Dkt. No. 135. The parties were unable to reach an agreement as to the amount of the attachment.

## ARGUMENT

### I. THE AMOUNT OF THE ATTACHMENT SHOULD BE NO LESS THAN $28 MILLION

This Court recognized in its prior decision that Iraq Telecom had satisfied the statutory prerequisites for an attachment in aid of arbitration by establishing that (1) IBL is a non-

4

domiciliary residing outside New York, (2) there is a cause of action against IBL, (3) it is probable that the Iraq Telecom will succeed on the merits as to $5.92 million of its $97 million claim, (4) the amount demanded from IBL exceeds all known counterclaims, and (5) the arbitration award to which Iraq Telecom may be entitled may be rendered ineffectual without an attachment, and there is a continuing need for same, because of IBL's financial position and its stated intent to dissipate its assets.  *See* Dkt. 112 at 27-30, 33, 37-38; CPLR 6201(1), 6212(a), 7502(c).  The Second Circuit agreed, noting that these facts were either undisputed or had been established on the record.  It also made clear that Iraq Telecom had established a probability of success on the full $97 million it seeks to recover from IBL.  Dkt. 133 at 27-28.

In view of the above, the only question left open on remand is the extent, if any, that the extraordinary circumstances proffered by IBL justify denying Iraq Telecom an attachment of the full $42 million initially captured in IBL's New York correspondent accounts, a sum that is already less than half of the $97 million the Second Circuit ruled Iraq Telecom is entitled to attach under the applicable statutes.

That question seemingly has been answered, at least partially, by the events of the last six months, and equally by the lack of events during that period.  To wit, in early April 2022, IBL voluntarily agreed to maintain a balance of not less than $28 million in its New York correspondent accounts until Iraq Telecom's appeal of this Court's order dropping the attachment to $3 million had been resolved.  That agreement on IBL's part, which effectively froze $28 million in the correspondent accounts for an indeterminate period that IBL must have expected would last months (and which turned out to be roughly five months), is powerful evidence of IBL's understanding that an attachment of $28 million would not result in the parade of horribles that it

5

claimed constituted extraordinary circumstances requiring vacatur of this Court's order attaching $42 million of those accounts.

Indeed, the extended freeze of $28 million in the correspondent accounts did *not* result in those proffered horribles. IBL was not forced into failure; the attachment did not cause the Lebanese economy any ill effects;[3] IBL did not face problems from failing to comply with regulations promulgated by Lebanon's central bank, the BdL; and customers were not prevented from withdrawing or transferring their U.S. deposits. Nor is there any indication that anyone lost confidence in New York's financial institutions or the correspondent banking system as a result of the agreed freeze. To its credit, IBL even in late August recognized the appropriateness of maintaining the freeze pending any contrary agreement of the parties or order of this Court. The question now is what, if any, extraordinary circumstances prevent a relatively modest increase in the attachment—and, alternatively, what extraordinary circumstances suddenly warrant *reducing* it.

As of now, there is empirical proof that no extraordinary circumstances necessitate reducing Iraq Telecom's attachment of IBL's New York correspondent accounts below $28 million. That amount, not $17 million, should be the floor in assessing how much Iraq Telecom should be permitted to attach in order to partially secure its $97 million claim against IBL.

## II.   IRAQ TELECOM SHOULD BE AFFORDED TARGETED DISCOVERY TO TEST IBL'S CLAIM OF EXTRAORDINARY CIRCUMSTANCES

The absence of any harm resulting from freezing $28 million in IBL's New York correspondent accounts, as well as IBL's concessions that freezing $26 million or $17.36 million

---

[3]   Nor did financial ruin result from European governments freezing more than $132 million in Lebanese foreign assets. *See Lebanon's central bank chief is suspect in 120 mln euro asset freeze case -German prosecutor*, Reuters (Mar. 28, 2022), https://www.reuters.com/world/middle-east/eu-criminal-justice-agency- says-120-million-euros-lebanese-assets-frozen-2022-03-28/.

6

in those accounts works no harm, at a minimum call into serious question whether there are extraordinary circumstances justifying any reduction of the $42 million attachment initially captured by the attachment order.

To the extent IBL contends otherwise, Iraq Telecom respectfully requests that this Court permit Iraq Telecom to serve targeted discovery on IBL, pursuant to this Court's inherent power to manage proceedings before it and CPLR 6220, which provides that, "after the granting of an order of attachment and prior to final judgment in the action, … the court may order disclosure by any person of information regarding any property in which the defendant has an interest, or any debts owing to the defendant." Such discovery would be narrowly contoured to permit Iraq Telecom to test any assertions by IBL that an attachment of up to the full $42 million on deposit in its correspondent accounts creates extraordinary circumstances that freezing $28 million in those accounts did not. The precise scope of such discovery would necessarily be defined by the submission IBL will make simultaneously with this one, but, at present, Iraq Telecom anticipates it would target the following areas:

- <u>The current balance in each of IBL's New York correspondent accounts.</u>  That amount would inform the upper bound of any attachment this Court might issue with respect to those accounts.

- <u>IBL's compliance with BdL Circulars 150, 154, and 158.</u>  IBL has maintained that an attachment could force it out of compliance with Lebanese banking regulations, Dkt. 119 at 62:1-11, but if freezing $28 million in its correspondent account did not do that, there are serious questions as to whether attaching up to $42 million would.  IBL should disclose its communications with BdL and internal analyses on this topic, and it should disclose whether it has suffered any adverse consequence due to being out of compliance with these BdL circulars.

- <u>IBL's foreign currency deposits.</u>  IBL contends that BdL Circular 154 requires IBL to maintain at least 3% of its customers' foreign currency deposits (based on their account balances on July 31, 2020) in offshore correspondent accounts, free of any restrictions or commitments.  IBL has also conceded that it suffers no harm from an attachment in that amount.  IBL should thus be required to

7

disclose the amount of its customers' foreign currency deposits, so that 3% of that amount can be ascertained.[4]

- IBL's "fresh money" assets.  IBL has claimed that an attachment of its correspondent accounts will leave it without sufficient liquid "fresh money" to comply with BdL circulars 150 and 158 and process customer transactions.  IBL should, therefore, disclose the extent of its fresh money assets.

- Other IBL assets.  To the extent IBL claims it has insufficient "fresh money" to comply with BdL circulars 150 and 158 and process customer transactions, IBL should disclose other assets belonging to the bank that could be used for those purposes during the pendency of an attachment.  As Iraq Telecom has previously noted, IBL has not established that it is prohibited from using other assets to address any unavailability of "fresh money" occasioned by an attachment.[5]

- IBL's volume of customer transactions.  To assess whether a particular attachment amount will impair IBL's ability to process customer transactions, it is necessary to know the amount of such transactions.  IBL previously provided information on this topic.  Dkts. 97 – 97-5.  It should be updated.

- IBL's processing of customer transactions.  IBL has been able to process customers' dollar transactions during the six months $28 million has been frozen in its correspondent accounts.  It should disclose how it has been able to do so, in light of its claim that an attachment of its correspondent accounts would prevent that, so that this Court can assess whether an attachment up to $42 million would preclude IBL from continuing to do so.

- IBL's communications with BdL regarding this matter.  In prior proceedings, IBL submitted a conclusory declaration from the general counsel of BdL asserting that any attachment of funds in IBL's New York correspondent accounts "may have adverse consequences on critical elements of BdL's emergency measures and policies."  Dkt. 107 ¶ 8.  Yet the freezing of $28 million in IBL's correspondent accounts apparently did not trigger such consequences.  To assess the credibility of this declaration, IBL should disclose the communications and documents relating to this declaration.

---

[4]  IBL has previously suggested that it has over $500 million of foreign currency reserves.  In particular, it states that the $17.6 million currently held in the correspondent accounts is less than the 3% of the foreign currency reserves that it must maintain in correspondent accounts abroad.  Dkt. 95 ¶¶ 23, 35-36.  That suggests that IBL has more than $580 million in foreign currency deposits.  Iraq Telecom made this point on appeal, *Iraq Telecom Ltd. v. IBL Bank S.A.L.*, No. 22-540 (2d Cir. Apr. 4, 2022), Dkt. 61 at 45 n.8, and IBL did not deny it.

[5]  IBL has previously asserted that it has over $4.9 billion in assets.  Dkt. 95 ¶ 9.

8

Iraq Telecom commits that it will draft its discovery no more broadly than necessary to serve its purpose, and it will pursue the discovery, if authorized, with maximum expedition. Petitioner has no desire to extend these proceedings any longer than necessary, but any claim that freezing $42 million will cause more harm than freezing $28 million should not be accepted at face value and deserves to be tested.

## CONCLUSION

For the foregoing reasons, Iraq Telecom respectfully requests that this Court confirm an attachment of $42 million held in IBL's New York-based correspondent bank accounts, or, in the alternative, grant Iraq Telecom leave to conduct targeted discovery to assess the extent to which any extraordinary circumstances may warrant reducing such an attachment to an amount below $42 million.

DATED:  October 7, 2022

Respectfully submitted,

QUINN EMANUEL URQUHART & SULLIVAN, LLP

/s/ Kevin S. Reed
Kevin S. Reed

51 Madison Avenue, 22nd Floor
New York, NY 10010
212-849-7000 Main Office Number
212-849-7100 FAX

Derek L. Shaffer
1300 I Street NW, 9th Floor
Washington, D.C. 20005
Tel: (202) 538-8000
derekshaffer@quinnemanuel.com

Kristin Tahler

9

865 S. Figueroa St., 10th Floor
Los Angeles, CA 90017
213-443-3000 Main Office Number
213-443-3100 FAX

Alex Loomis (*Pro hac vice*)
111 Huntington Ave, Suite 520
Boston, MA 02199
617-712-7100 Main Office Number
617-712-7200 FAX

*Counsel for Petitioner Iraq Telecom Limited*

10