UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IRAQ TELECOM LIMITED,<br><br>     Petitioner,<br><br>v.<br><br>IBL BANK S.A.L,<br><br>     Respondent. | Civil Action No. 21-cv-10940 (DLC) |

### DECLARATION OF PROFESSOR ANTHONY SAUNDERS

I, Anthony Saunders, hereby declare as follows under penalty of perjury of the laws of the United States pursuant to 28 U.S.C. § 1746:

1. I am currently the John M. Schiff Professor of Finance at the New York University ("NYU") Stern School of Business. I have been employed by NYU since 1978 and have served various leadership roles there, including Chair of the Department of Finance between 1997-2007. Attached as Exhibit 1 is a true and correct copy of my curriculum vitae.

2. I submit this Declaration in further support of Petitioner Iraq Telecom Limited's ("**Iraq Telecom**") motion to confirm attachment, and in opposition to Respondent IBL Bank S.A.L.'s ("**IBL**") cross-motion to vacate attachment, and specifically to address IBL's contention that an attachment of its correspondent accounts in the United States will undermine confidence in New York's correspondent banking system.

1

3.  As I will explain below, in my opinion, an attachment of the modest sum of approximately $30 million in IBL's correspondent accounts will have no impact whatsoever on New York's correspondent banking system or the confidence that the international banking community places in that system. This is especially true in a case like this where the attachment derives from wrongdoing of the bank itself and the attachment is expressly crafted not to disrupt customers' electronic funds transfers.

I.  **BACKGROUND AND CREDENTIALS**

4.  During my tenure at NYU Stern, I have taught courses in banking and international banking to undergraduates, MBAs, and PhDs. I have also taught a wide range of executive courses to bankers around the world. My book Risk Management in Financial Institutions, published by McGraw-Hill, is now in its 10th edition and has been used by over 1 million students world-wide. A number of special-country editions have also been published.

5.  My research has focused on the areas of banking and international banking, where I have published over 200 articles and books. I was ranked the most prolific author in the top seven leading finance journals over the period from 1959 to 2008. Research.com ranked me as one of the 300 top economists in the world in December 2021. A list of my articles can be found in Exhibit 1.

6.  During my career, several bank regulators have asked me to provide consulting and scholarly advice on various matters relating to banking and international banking regulations. These regulators include: The Office of the Comptroller of the Currency, The Federal Reserve Board of Governors, The Federal Reserve Bank of New York, The Federal Reserve Bank of Philadelphia, The International Monetary Fund, and The World Bank among others.

7. Moreover, I have served on the Nominating Committee for the Nobel Prize in Economics for over 20 years, and in 2011 I was elected as President of the Financial Management Association, one of the two largest associations of financial economists in the world.

## II. INTERNATIONAL BANKING AND CORRESPONDENT BANKING

8. One of the key issues in bank regulation has been access of the foreign banks to the U.S. banking system. Over the years, a wide debate has occurred about how and who should regulate foreign entrants, including whether a foreign bank should be allowed to set up branches and subsidiaries in the United States and have access to the Federal Reserve's wire transfer system and deposit insurance. Indeed, this was the major issue I was involved with when acting as advisor to The Office of the Comptroller of the Currency. In the end, the International Banking Act of 1978 (on which I have written scholarly papers and described in my books) created a level playing field whereby foreign bank entrants in large part are treated equally as domestic banks in terms of entry and access to the Federal Reserve wire transfer system and deposit insurance.

9. While direct entry through branches and subsidiaries has been an option for large foreign banks who can afford the cost of setting up a *de novo* banking operation or acquiring a domestic US bank, this cost of entry has often been prohibitive for smaller and medium sized banks because they only require entry to the U.S. banking market to conduct some specialized banking activities on their own behalf and that of their clients.

10. Historically, this has been achieved by a foreign bank entering into a correspondent banking relationship with a U.S. bank. The core feature of the correspondent banking relationship is that the foreign bank places funds in a deposit account at the U.S. bank. These foreign bank deposit accounts are widely known as "nostro" accounts. From the U.S. bank's perspective, the

3

same account is called a "vostro" account. It is important to note that the funds invested by the foreign bank in a deposit account with the U.S. bank will be viewed as an asset on the balance sheet of the foreign bank and a liability on the balance sheet of the U.S. correspondent bank.

11. Once the foreign bank has set up its dollar denominated nostro account, it can use the funds for dollar wire transactions utilizing the access the U.S. bank correspondent has to the Federal Reserve Board's wire network and the Clearing House Interbank Payments System's payment networks. This enables the foreign bank to transfer funds to customers and clients anywhere in the world. In exchange for doing this service, the U.S. correspondent bank will charge fees.

12. In addition to the nostro account funds being used for wire transfers, they can be used for other purposes by the foreign bank, such as the purchase of standby letters of credit issued by the U.S. banking system and Capital Market instruments such as bonds and stocks.

13. In an ideal world, the correspondent banking system provides access to U.S. banking for many smaller and medium sized foreign banks who cannot afford direct physical entry through branches and the like. The U.S. correspondent banks in turn can generate profits by charging fees for the services they provide. However, as will be discussed below, in addition to considering returns, it is the trade-off between returns and risks that determine whether the U.S. correspondent bank wishes to continue with a correspondent banking relationship and at what level.

## III.   THE RECENT DECLINE IN CORRESPONDENT BANKING

14. One of the most evident trends in international banking since 2008, and one that has been widely documented by reports from the International Monetary Fund ("IMF"), World

4

Bank, Financial Stability Board, Congress, and The Financial Action Task Force ("FATF") (see references below),[1] has been the quite dramatic drop in the number of correspondent banking relationships. These studies all show this trend occurred not only in the United States, but also in Europe and the United Kingdom (the 3 largest banking markets), and that fewer banks are willing to continue to offer correspondent banking relationships, thereby cutting many small and medium sized foreign banks off from correspondent access and the dollar, euro, and British pound banking systems.

15. The above-referenced studies offer some common explanations for this global decline. In my opinion, the major reason has been the trend among large correspondent banks towards "de-risking" their operations in the wake of the 2008 financial crisis and the regulatory and public responses to that crisis which resulted in regulators and the public having to bail out many large U.S. and European banks. In response to the crisis, correspondent bankers have been taking a much tougher stance on what foreign banks they are willing to do business with. This has, in part, been triggered by regulators who have taken actions such as imposing enhanced capital requirements for banks who suffer reputational damage. One well-cited example occurred in 2018, when Danske Bank admitted to laundering over $230 billion through its Estonian branch for Russians and other nationalities, resulting in the termination of executives and increased capital requirements imposed on Danske Bank by 10 billion krone.  This also resulted in massive

---

[1] *Withdrawal of Correspondent Banking Relationships (CBRs) in the Arab Region*, ARAB MONETARY FUNDS, IMF AND WORLD BANK GROUP (September 2016), https://www.imf.org/-/media/Files/Miscellaneous/AMFIMFWBreport090516.ashx; *FSB Correspondent Banking Data Report*, FINANCIAL STABILITY BOARDS (July 2017), https://www.fsb.org/2017/07/fsb-correspondent-banking-data-report/; Michaela Erbenova, et al., *The Withdrawal of Correspondent Banking Relationships: A Case for Policy Action*, IMF STAFF DISCUSSION NOTE (June 2016), https://www.imf.org/external/pubs/ft/sdn/2016/sdn1606.pdf; *Correspondent Banking Services*, FATF GUIDANCE (October 2016), https://www.fatf-gafi.org/media/fatf/documents/reports/guidance-correspondent-banking-services.pdf; *Correspondent Banking*, BANK FOR INTERNATIONAL SETTLEMENTS (July 2016), https://www.bis.org/cpmi/publ/d147.pdf.

reputational loss to the Bank and a drop in its equity value. In a broader context, the IMF and United Nations Office of Drugs and Crime estimated in 2017 that more than $2 trillion is being laundered annually, one avenue of laundering being through global banking correspondent relationships.[2]

16. A second reason for the decline in correspondent banking in the United States, in my opinion, is increased emphasis by bank supervisors and regulators since the global financial crisis on "know your customer" and "due diligence." U.S. banks, in the presence of the growth of international money laundering, have placed greater emphasis on these two key client aspects. This means that the U.S. correspondent banks should seek to know not only who is running the foreign correspondent bank, but also who the customers of the foreign bank are. In particular, on whose behalf is a client wire-transfer taking place. This has caused correspondent banks to become more cautious in establishing relationships with foreign banks.

17. I would add three other reasons for the recent decline in correspondent banking generally. First, tightened regulations such as the Basel Three Capital requirements that were introduced in 2011, making many international transactions, such as lending, more costly for banks. Second, concerns about international terrorism and the passing of the Patriot Act in the United States in 2001. Third, heightened concerns about so-called sovereign risk. In particular, the safety and soundness of a foreign bank seeking a correspondent relationship depends not only on its own solvency but the solvency and economic actions of the country in which it is domiciled.

---

[2] *See* Gabriella Gricius, The Danske Bank Scandal Is the Tip of the Iceberg, FOREIGN POLICY (Oct. 8, 2018), https://foreignpolicy.com/2018/10/08/the-danske-bank-scandal-is-the-tip-of-the-iceberg-money-laundering-estonia-denmark-regulation-financial-crime/.

IV.   **SUMMARY OF FACTS**

18.   In preparing my opinions in this case, I have reviewed portions of the file, including Iraq Telecom's petition to enforce the arbitration award and for an attachment, the attachment order as amended, this Court's opinion and order confirming the attachment, the Second Circuit Court of Appeal's decision remanding the matter back to this Court, as well as the post-remand filings, including the recent declarations and memorandum of law IBL submitted to this Court.

19.   It is my understanding that the attachment of IBL's correspondent accounts arises out of a September 2021 arbitral award in Iraq Telecom's favor. The award found that IBL actively participated in the commission of dol [fraud] in connection with the subordination of a loan made by Iraq Telcom and ordered IBL to pay Iraq Telecom $3 million. A second arbitration is pending in which Iraq Telecom seeks at least $97 million in damages against IBL and others for this fraud. Iraq Telecom filed a verified petition to enforce its $3 million Award and also sought a $100 million attachment of all IBL funds in the United States. On January 19, 2022, the district court granted Iraq Telecom's motion and Iraq Telecom subsequently levied on approximately $42 million in IBL's New York correspondent accounts at three major banks, J. P. Morgan Chase, Citibank and The Bank of New York Mellon.

20.   On February 4, 2022, this Court amended the attachment order to specify that:

> no attachment or levy shall be made on any funds transferred to, from, or through the IBL Accounts after the entry of this Order as part of an Electronic Funds Transfer for the ultimate benefit of a third party other than Respondent a branch of Respondent, or person acting on Respondent's behalf.

Dkt. 85 at 3.

21. On March 16, 2022, the District Court issued an opinion and order confirming the arbitration award but modifying its attachment order down from $100 million to just $3 million.

22. An appeal followed and the matter was remanded back to this Court for further proceedings as to the proper amount of the attachment. While the appeal was in place, IBL agreed to maintain a balance of not less than $28 million in its correspondent accounts.

23. One of the contentions IBL raised to justify continuing a limited attachment of funds is that "Attachment of IBL's Correspondent Accounts Will Undermine Confidence in New York's Correspondent Banking System." Dkt. 143 at 19. IBL has argued that permitting the attachment of IBL's Correspondent Accounts will erode the confidence foreign regulators and financial institutions place in New York's correspondent banking system. *Id.* at 19-20.

V. **OPINION: AN ATTACHMENT OF IBL'S NEW YORK CORRESPONDENT NOSTRO ACCOUNTS WILL NOT ERODE THE CONFIDENCE FOREIGN REGULATORS AND FINANCIAL INSTITUTIONS PLACE IN NEW YORK'S CORRESPONDENT BANKING SYSTEM OR CAUSE UNINTENDED CONSEQUENCES.**

24. In this section, I will draw on the discussion in Section III as applied to the facts set forth in Section IV, to explain my opinion that the attachment of IBL's nostro accounts at New York correspondent banks will not hurt the confidence of foreign banks and regulators in New York's correspondent banking system.

25. An important aspect of this argument is the long-term post-2008 decline in the number of small- and medium-sized foreign banks currently having access to the New York system as a result of the "de-risking" of U.S. banking, *i.e.* the issue of whether one small foreign bank losing its nostro accounts of around $30 million will really have any material contagious effects on the many thousands of foreign banks still with access. In my opinion, other pressures on the

8

correspondent banking system far outweigh any impact of a single attachment order applicable to a single bank.

26.    To put the attachment at issue here in context, page 82 of the Financial Stability Board's correspondent banking survey report of July 2017 (*see supra* note 1) showed 2,360 U.S. dollar correspondent accounts and 4,049 across all currencies at the U.S. correspondent banks who were surveyed.

27.    It is important to note that the country in which the foreign bank is located is relevant. This is the sovereign risk concern noted in paragraph 17 above. By many accounts, Lebanon's economy is broken. For example, according to the World Bank (January 24, 2022), Lebanon's GDP plummeted from close to $52 billion in 2019 to a projected $21.8 billion in 2021, which is about a 58.1% contraction, and the highest contraction in a World Bank list of 193 countries. Indeed, the World Bank called Lebanon a "zombie" economy. Other zombie economies in the past, such as North Korea and Cuba, have responded to such states by restricting foreign currency outflows and activities of their country with the United States and other countries, thereby making correspondent banking moot. Because the accounts at issue are owned by an insolvent Lebanese bank, the international banking community will hardly be troubled by the attachment under the circumstances here.

28.    In fact, in my view, there are a number of reasons why IBL's nostro account attachment will have no adverse effect on New York correspondent banking activity and may even be viewed by some international bankers and regulators as a positive factor demonstrating the integrity of the correspondent banking system.

29. First, the Lebanese banking system and economy is small in the international context and attachment of nostro accounts of a single Lebanese bank is unlikely to garner attention or generate concern in the international banking community. .

30. Second, IBL, even in terms of the Lebanese banking system, is not a top ten bank in asset size. Thus, even in Lebanese terms it is not a systematically important bank.

31. Third, IBL, like many Lebanese banks, is insolvent. In my opinion, if a bank with the size and scale of IBL's negative net worth (the amount by which its liabilities exceed its assets) were to be operating in the US, it would be closed immediately. Specifically, one well-known writer on economics and geopolitics, James Rickards, carefully analyzed IBL's balance sheet and the degree to which its liabilities exceeded its assets, and concluded that it needed a capital infusion of $1.9 billion to return it to solvency.[3] In short, IBL has been allowed to continue operating by the Lebanese bank regulators even though it is massively insolvent. In my opinion, in a country with a functioning regulatory system, IBL would have been closed some time ago. Limiting attachments to funds held in correspondent accounts by insolvent banks would very likely have little, if any, impact on the correspondent banking system, as most governments do not even allow insolvent banks to operate.

32. In addition, the attachment at issue here is immaterial in light of the huge amounts maintained in correspondent bank accounts in the United States. The three banks holding the correspondent accounts at issue here, J.P. Morgan Chase, Citibank and The Bank of New York Mellon, hold billions of dollars in correspondent accounts. The probability that an attachment in

---

[3] James Rickards, *Crisis in Lebanon Anatomy of a Financial Collapse*, FOUNDATION FOR DEFENSE OF DEMOCRACIES, August 2020, at 17 (available at https://www.fdd.org/wp-content/uploads/2020/08/fdd-monograph-crisis-in-lebanon.pdf).

the amounts at issue here (approximately $30 million) would undermine confidence in New York's correspondent banking system is, for to all intents and purposes, practically zero.

33. It is also my understanding that the attachments in place here have been crafted to expressly allow for the processing of customer EFTs. This means that if an IBL customer wishes to make a U.S. dollar transfer from its account at IBL, those transfers will be completed. The fact that ordinary customer banking transactions can continue is another reason that this attachment will not negatively impact the correspondent banking system or cause unintended consequences.

34. The only funds that are frozen by the current attachment are those that belong to IBL. As mentioned above, IBL has itself engaged in wrongdoing and it will not undermine confidence in the correspondent banking system to secure these amounts to allow recovery by IBL's creditors.

## VI.  CONCLUSION

35. In my opinion, Iraq Telecom attaching the remaining nostro account balances of IBL, thereby, potentially excluding it from the New York correspondent banking system will not have an adverse effect on New York's correspondent banking system or undermine confidence in that system. If anything, many banks and regulators may view it as a positive development for the following reasons:

- First, IBL is massively insolvent and there are no signs that it will be recapitalized in the near future, as such it is a "zombie bank."

- Second, IBL is based in Lebanon with one of the worst performing economies in the world, that is, it is participating in a "zombie economy."

- Third, even in the context of a zombie bank, performing in a zombie economy, it is a relatively small bank, that is, it is not even one of the ten largest banks in Lebanon. The attachment amount of approximately $30 million in the bank's nostro account is a very small amount in the context of the billions of dollars that remain in the nostro

11

accounts of the thousands of foreign banks with operational correspondent bank nostro accounts among US and New York correspondent banks.

- Fourth, IBL is not an innocent bystander and has been found to have engaged in a massive fraud by an arbitral panel.

- Finally, the attachment is crafted in such a way that it does not interfere with customer wire transfers.

Executed on this 28th day of October 2022, at New York, New York.

_____
Anthony Saunders