UNITED STATES DISTRICT COURT

THE SOUTHERN DISTRICT OF NEW YORK

IRAQ TELECOM LIMITED,

           Petitioner,

v.

IBL BANK S.A.L.,

           Respondent.

Civil Action No. 21-cv-10940 (DLC)

## **DECLARATION OF LAWYER DR. PAUL G. MORCOS**

    I, the undersigned, Paul G. Morcos, *Ph.D.*, hereby declare as follows under penalty of perjury of the laws of the United States pursuant to 28 U.S.C. § 1746:

    1.    I am a lawyer, a *Ph.D.* holder residing in Beirut, Lebanon, and the founder and manager of JUSTICIA Beirut Consult Law offices.

    2.    I am the head of the Studies and Banking Committee of the Beirut Bar Association, a Professor of Banking Law at Saint-Joseph University, and a trainer at the Association of Banks in Lebanon and at the Lawyer Institute at the Beirut Bar Association. I have acquired more than 25 years of experience as a legal and compliance consultant for Lebanese and Arab banks. I am knowledgeable about Lebanese banking regulations and the ongoing financial crisis in Lebanon. I am the author and co-author of more than 30 books in different areas of law, many of which



relate to the Lebanese banking sector.

3. I have attended and chaired several conferences related to the banking sector. The most recent of such conferences, "***The Arab Banks facing legal challenges***," was moderated by JUSTICIA and held in Beirut on September, the 26th and 27th, 2022, at the request of the Council of Arab Ministers of Justice and the League of Arab States.

4. A complete description of my credentials and list of publications is contained in my CV attached hereto as Exhibit A.

5. I submit this Declaration in further support of IRAQ TELECOM LIMITED's ("Iraq Telecom") motion to confirm the attachment and in opposition to IBL BANK S.A.L.'s ("IBL") cross-motion to vacate the attachment.

6. For the Purpose of this Declaration, I received soft copies of the following documents by E-mail:

1) The "**Declaration of Professor Nasri Antoine Diab**" (without exhibits), dated 28 February 2022.

2) The order of the "**United States Court of Appeals for the Second Circuit**", dated August 5, 2022.

3) The "**Respondent IBL Bank's Opening Post-Remand Memorandum Of Law Concerning The Attachment Amount**", dated October 7, 2022.

4) The "**Supplemental Declaration of Nakhlé Khoneisser**" (without exhibits), dated October 5, 2022.

5) The "**Supplemental Declaration of Boutros Kanaan**" (without exhibits), dated October 5, 2022.



6) The "Supplemental Declaration of Karim Habib" (without exhibits), dated October 6, 2022.

7) The "Declaration of Kevin S. Reed in support of Iraq Telecom Limited's opening Post-Remand Memorandum in further support of its Motion to confirm Attachment and in opposition of IBL's Cross-Motion to Vacate Attachment", dated October 7, 2022.

8) Iraq Telecom's opening Post-Remand Memorandum in further support of its motion to confirm attachment and in opposition to IBL's Cross- Motion to Vacate Attachment, dated October 7, 2022.

7. In this regard, I offer the below legal opinion in my personal capacity as a private lawyer and Doctor in law, without binding any of the institutions I represent or I work for:

## BACKGROUND

8. It is my understanding that IBL has claimed that Iraq Telecom's attachment of approximately $30 million in its US correspondent accounts *(1) could* ▓▓▓ *affecting the Lebanese economy, (2)* ▓▓▓ ▓▓▓ *(3) would interfere with innocent third parties' access to their money; (4) could undermine confidence in New York's financial institutions.*

9. I submit this declaration to address the first three of these purported "extraordinary circumstances" based on my informed understanding of Lebanese law, including circulars issued by the Banque du Liban ("BDL"), as well as Lebanese jurisprudence and doctrine.



3

## BASES FOR OPINION

I. **Lebanon's Economic Crisis Does Not Pose An Extraordinary Circumstance That Justifies Taking Away Iraq Telecom's Attachment**

    A. **IBL Overstates The Attachment's Potential Impact On The Lebanese Economy And Banking Sector**

10. I understand that IBL has stated that an attachment of approximately $30 million ▇▇▇▇▇▇▇▇▇▇ and significantly harm the Lebanese banking sector and the Lebanese economy. I do not find this statement convincing.

11. IBL is one of many banks operating in Lebanon. Based on my professional experience in and knowledge of the Lebanese banking sector, I seriously doubt that executing the attachment will affect the Lebanese economy as a whole. Reducing a single bank's liquidity does not rise to a national economic crisis.

12. The attachment of IBL's US accounts has been in place for many months. To my knowledge, I have not heard significant concerns about this attachment in the Lebanese banking community. Nor have I seen any evidence that this attachment might exacerbated the Lebanese economic crisis.

    B. **Lebanese Courts Do Not Consider Lebanon's Economic Crisis To Be An Extraordinary Circumstance That Relieves Banks' Obligations To Their Creditors**

13. I also do not believe that Lebanon's current economic challenges are a valid excuse to absolve Lebanese banks of their obligations to creditors.

14. Lebanese courts have not allowed Lebanese banks to use the current financial crisis as an excuse to disregard obligations to creditors because the Lebanese authorities along with Lebanese banks were responsible for fostering that crisis. As one court put it, banks *"received depositors' funds and chose to employ them with very high interest compared to global interest,*

4



with the encountering high risk, reaping and disseminating fictional profits that were **never shown to help remedy the crisis invoked by banks (...).**" (Decision of the Sole Civil Judge of Beirut Examining Urgent Matters Cases, No. /1/ dated 3/1/2020).

15.  Another court similarly ruled: "*The extraordinary circumstances of the country, invoked by the defendant bank, do not amount to force majeure, that is, the unexpected and unavoidable event of ("le fait imprévisible et irrésistible") and beyond the will of those who invoke it to avoid responsibility, ("extérieur à la volonté de celui qui s' en prévaut"), because the liquidity crisis in both national and foreign currencies was expected by financial experts, which could have been avoided by banks, in cooperation with the BDL, taking due precautions to improve the banking situation and prevent the disturbance of depositors' confidence, which would require a response to the defendant's statements contrary to this side*". (Decision of the Sole Civil Judge of Zahle Examining Urgent Matters Cases, No. /5/ dated 13/1/2020).

16.  A third Lebanese court has ruled that: "*The extraordinary circumstances invoked by the latter (the bank) did not occur on the result of the moment or unexpectedly, and have not served as a sudden event, especially for the banking sector, which is supposed to be the first to expect the crisis to happen sooner or later, more than two years ago, which everyone was anticipating. It has been the subject of several reports, articles, and studies by financial experts that could have been avoided by banks' taking precautions and measures to prevent the crisis. (...) The current crisis cannot be described as an emergency external event that could not have been excluded and therefore cannot constitute the force majeure invoked to dissolve the bank from its obligation toward its customer (...)* " (Decision of the Beirut Civil Sole Judge in Urgent Matters Cases, President Carla Shweih, No. /186/ Dated 31/3/2020).

5



17. Finally, a recent case from the United Kingdom has held that "*the current crisis in Lebanon and/or a desire to follow any advice of the [Association of Lebanese Banks] and/or a desire to avoid a rush on the banks or to treat depositors according to some notion of fairness on the banks does not provide a legitimate reason or an acceptable reason (if there is such an exception to the obligation on the part of the bank to transfer money to the order of the Claimant) for not acceding to the requests for the international transfers in this case.*" *Bitar v. Bank of Beirut, S.A.L.*, [2022] EWHC 2163 (QB), ¶ 155.

18. Accordingly, I believe a Lebanese court would be unsympathetic to any claim by IBL that Lebanon's financial crisis limits IBL's obligations to third-party creditors and would find a decision by this Court in favor of the bank to be at the very least unusual.

II. ▬▬▬▬▬ **With The BDL Circulars Does Not Pose An Extraordinary Circumstance**

   A. **BDL Circulars Cannot Limit The Rights Of Third-Party Creditors**

19. I understand that IBL has asserted in this proceeding that its obligation to remain in compliance with BDL Circulars 150, 154, and 158 poses an extraordinary circumstance in this case that justifies limiting the attachment. I believe that this argument misunderstands the limited binding effect of BDL Circulars under Lebanese law.

20. BDL Circulars are administrative decisions and, as such, rank under laws (i.e., statues enacted by the legislative branch). Although BDL is an independent entity, it constitutes a part of Lebanon's "Executive" branch under the Lebanese constitution, and must abide by statutes enacted by Lebanon's Parliament and by rulings by Lebanese courts. **(The Lebanese State Consultative Council/ Majlis Al-Shura, Decision No. /475/ Dated March 29, 1995).** Any circulars and decisions issued by the BDL are revocable and invalid to the extent that they exceed

6



the limits of BDL's authority under the law. Lebanese courts have accordingly held that BDL Circulars are not binding when they conflict with mandatory statutes or treaties.

21. A recent case explains the above point as follows: *"The circulars issued by the Governor of the BDL are **not binding to the courts except to the extent of their compatibility with the legal provisions whereas, according to the principle of the sequence of legal rules** stipulated in Article 2 of the civil procedures law, such circulars cannot be applied whenever they conflict with the mandatory legal rules, especially those related to public order"* **(Decision of the Head of the Beirut Execution Department, on 12/15/2020).**

22. The BDL Circulars apply to banks operating in Lebanon but do not excuse or exempt IBL from satisfying its obligations towards third party creditors. The BDL Circulars are only administrative decisions, not statutes, and administrative decisions can limit only the function of the regulated bodies themselves (in this case IBL) and cannot undermine third-party rights guaranteed by statute. Accordingly, Lebanese banks' implementation of the BDL circulars do not exempt them from satisfying their financial obligations to third parties.

23. Recent Lebanese courts decisions have accordingly held that banks may not use BDL Circulars as a justification for refusing to honor banks' obligations to creditors. One court held: *"As the defendant first submits that his refusal to make **the requested transfer abroad is justified by the extraordinary circumstances of the country, and the aggravated measures taken by the Banking Association in consultation with the BDL**, (…) Where, a fortiori, the said circulars **do not enjoy any binding status towards customers of the bank** and the right of such persons to conduct any banking operation that meets the established banking requirements and is not contrary to the laws and regulations, cannot in any way be restricted, as this restricts the freedom to trade capital ("La libre circulation des capitaux"), a right derived from natural law*



*(Le Droit Naturel) which is at the heart of human nature, and is enshrined in the Lebanese Constitution, and in the international treaties sponsoring fundamental human rights..."* **(Decision of the Sole Civil Judge of Zahle Examining Urgent Matters Cases, No. 5/2020 dated 13/1/2020).**

24. Another court similarly ruled that a Lebanese bank was required to honor Lebanese customers' international transfers, notwithstanding the bank's argument that doing so would interfere with its obligations to maintain liquidity reserves under applicable BDL circulars: *"Therefore, <u>the appellant's invocation of the economic crisis and the accompanying extraordinary circumstances, do not constitute a justification</u> for his refusal to complete the transfer requested, especially since no legislative provisions prohibiting the transfer of funds out of the country or limiting the possibility of transfer have been issued till date, <u>With regard to the preservation of liquidity, the legislative and regulatory provisions sponsoring the operation of commercial banks in Lebanon place the obligation on banks to secure liquidity and solvency.</u> (...) <u>Since the appellant's argument for maintaining his foreign currency reserves does not, therefore, constitute</u>, in the light of the proven solvency of the appellant's account, <u>a legitimate ground</u> for refusing the transfer procedure requested by the appellant. Whereas, in the same vein, <u>the appellant bank cannot invoke the status of its accounts in correspondent banks to justify its failure</u> to make the transfer required, for the incompatibility of this position with the banking institution's duty to maintain the elements of trust, security, and respect of its customers."* **(Decision of the Civil Court of Appeal of Beirut 3rd Chamber in Urgent Matters Cases, No. /260/, dated 31/3/2022).**

8

B.  **Whether The BDL Is Unlikely To Impose Any Penalties On IBL**

25.  I also understand that ███████████████████████████████████ ███████████████████████████████ I believe the BDL is very unlikely to impose penalties on IBL in such circumstances.

26.  While it is theoretically true that BDL has the ability to impose sanctions ███ ███████████████████████████ in practice, to my knowledge, BDL has not imposed considerable sanctions on banks ███████████████████████████████ ██████████ that threatened any bank's existence.

27.  For example, there are some talks in the banking sector that a number of Lebanese banks, including prime bank/s, like IBL, have not reached the 3% foreign-currency-reserve requirement imposed by BDL Circular 154 yet still have not been sanctioned or faced severe penalties for this noncompliance. This suggests that the BDL is lenient when enforcing compliance with the Circulars during this crisis. To further illustrate the BDL's flexibility, the BDL initially required banks to achieve compliance with BDL Circular 154's 3%-reserve requirement by February 28, 2021, this deadline was extended to December 31, 2022, then to December 31, 2023.

III. **Whether The Attachment Will Not Interfere With Depositors' Rights**

28.  I understand that IBL has argued that the attachment will threaten IBL customers' access to their funds held pursuant to BDL Circular 158. I do not believe this is necessarily to be the case depending on many other financial and technical factors including, but not limited to, the bank's overall property and the number of customers benefiting from Circular 158.

29.  BDL Circular 158 allows bank clients to transfer a maximum of 50,000 USD per person from all their foreign currency accounts to a "Special Sub Account" created for applying this circular, and permits customers to withdraw only up to 800 USD per month, and 10,000 USD



per year. Only half of these funds are paid in cash USD; the other half is paid in Lebanese Pounds. Circular 158 thus states: *"The liquidity needed to meet the requirements of this Decision shall be secured equally from the concerned bank's liquidity at foreign correspondent banks and the banks' foreign currency mandatory placements at BDL that the latter will release for this purpose"*. Accordingly, only half of IBL's obligations under Circular 158 need be secured by USD held by IBL.

30. I also understand that IBL has claimed that it must have access to funds in its US accounts to satisfy customer withdrawal requests under Circular 158. As per article of /6/ of this circular, I do not believe this is the case where IBL is not exclusively required to satisfy customer withdrawals using funds presently held in its New York correspondent accounts. It may instead use any available assets to fund fresh money customer withdrawals. It may also increase its net fresh funds by liquidating or using its property in Lebanon or abroad to facilitate such transactions and to fulfill other obligations.

## CONCLUSION

For the above reasons, I am of the opinion that the "extraordinary circumstances" invoked by IBL do not excuse it from securing its obligations to Iraq Telecom under the attachment.

I declare under penalty of perjury of the laws of the United States pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct to the best of my knowledge.

Executed in Beirut – Lebanon, on October, 28, 2022,

Docteur Paul Morcos
Avocat à la Cour

Paul G. Morcos, *PhD.*
Attorney at Law