UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IRAQ TELECOM LIMITED,<br><br>                              Petitioner,<br><br>v.<br><br>IBL Bank S.A.L.,<br><br>                              Respondent. | Civil Action No. 21-cv-10940 (DLC) |

## DECLARATION OF WADDAH H. EL CHAER

Waddah H. El Chaer declares as follows pursuant to 28 U.S.C. § 1746:

1.     I am an attorney and a member of the Beirut Bar Association. I have been licensed to practice law in Lebanon since 1994. I founded El Chaer Law Firm, a Lebanese law firm based in Beirut, in 1996 and I advise and represent numerous Lebanese banks and financial institutions.

2.     I submit this declaration in support of the sur-reply of IBL Bank S.A.L. ("IBL") regarding the amount to be attached in IBL's U.S. correspondent bank accounts (the "Correspondent Accounts") and to respond to certain of the statements set forth in the brief filed by Iraq Telecom ("IT") on October 28, 2022 (ECF No. 160) ("IT Response"), as well as the declaration of Paul Morcos (ECF No. 161) (the "Morcos Declaration") also filed on that date.

3.     I am familiar with the facts set forth in this Declaration based on my experience as a Lebanese attorney, as well as my review of records and publicly available information related to this action, and on that basis I believe the facts set forth in this Declaration to be true and correct.

4.     A summary of my opinions, which are explained more fully below, is as follows:

- Circulars issued by Lebanon's central bank, the Banque du Liban ("BdL"), have the force of law and are legally binding on Lebanese banks (and Lebanese branches of

- foreign banks). These include, but are not limited to, BdL's crisis-management directives, including BdL Basic Circulars Nos. 150, 154, and 158. Any suggestion that BdL Circulars do not have the force of law is incorrect and inconsistent with Lebanese law.

- The statements by IT and Mr. Morcos that BdL Circulars have "limited" or no force of law are, in my opinion, incorrect and inconsistent with Lebanese law. Nor do the Lebanese court cases cited in the Morcos Declaration support such statements, for multiple reasons, as further explained below.

- As also explained below, the cases cited in the Morcos Declaration do not support his assertions regarding the obligations of Lebanese banks to "creditors" in the context of the ongoing Lebanese economic crisis.

- BdL is authorized to impose a broad range of sanctions on Lebanese banks for failure to comply with BdL Circulars, and Mr. Morcos could not possibly know what actions BdL would take if it were to find IBL noncompliant with one or more BdL Circulars.

- Pursuant to BdL's crisis-management directives, including but not limited to Basic Circular 150, there now exists a legal distinction in Lebanon between "fresh" foreign currency and "non-fresh" foreign currency. "Fresh" foreign currency (including U.S. dollars) is freely transferable abroad and can be withdrawn in cash from a Lebanese bank, while "non-fresh" foreign currency is not freely transferable abroad and cannot be withdrawn in cash.

- Due to the distinction between "fresh" currency, which can be freely transferred abroad, and "non-fresh" currency, which cannot, ████████████████████████████████████████████████████████████████████████████████████████

5. Under Lebanese law, BdL is authorized to (and frequently does) issue Circulars and Decisions governing Lebanese banks (as well as Lebanese branches or subsidiaries of foreign banks). While BdL Circulars and Decisions must conform to higher forms of Lebanese laws that would take precedence (including the Constitution and laws passed by the Lebanese Parliament), BdL Circulars and Decisions have the force of law and are legally binding on Lebanese banks.

6. In my opinion, the statement in the Morcos Declaration that BdL Circulars have "limited binding effect . . . under Lebanese law" (Morcos Declaration ¶ 19), and the statement in the IT Response that BdL Circulars "do not have force of law" (IT Response at 10) are incorrect

as a matter of Lebanese law. As stated above, BdL is empowered by Lebanese law to issue Circulars and Decisions, which have the force of law and are binding on Lebanese banks. Specifically, the Lebanese Code of Money and Credit ("CMC") sets forth BdL's mission, which includes safeguarding the integrity of the Lebanese economy, safeguarding the stability of the economy, safeguarding the integrity of the banking system, and development of the monetary and financial market. CMC, Art. 70. The CMC further provides that, to carry out its mission, BdL shall exercise the powers conferred on it by virtue of the CMC. *Id.* The CMC then provides that BdL shall have the power to make recommendations and use such means as may ensure the proper conduct of banking business, and may establish general regulations regarding the relationship of banks with their depositors and customers. CMC, Art. 174. The BdL also may determine and amend, whenever it deems necessary, the rules of conduct of business by which banks must abide. *Id.* The CMC further provides that when a bank, *inter alia*, violates measures imposed by BdL under the powers derived from the CMC, BdL can impose penalties on the violating bank, ranging from a warning, to restricting the operations the bank may carry out, to appointment of a temporary manager of the violating bank, to delisting from the official list of Lebanese banks (equivalent to revoking the violating bank's operating license). These provisions of the CMC make clear that BdL is authorized to issue Circulars and Decisions, and that these are legally enforceable and are binding on Lebanese banks.[1]

      7.      The Morcos Declaration cites six Lebanese court decisions in support of the opinions Mr. Morcos asserts therein. However, those decisions do not support any assertion that BdL Circulars do not have the force of law in Lebanon, which is not true. Nor do they support Mr. Morcos's assertion, with which I also disagree, that "Lebanese Courts Do Not Consider

---

[1] The BdL website itself confirms the above. *See* https://www.bdl.gov.lb/pages/index/1/137/Role-and-Functions.html.

Lebanon's Economic Crisis To Be An Extraordinary Circumstance That Relieves Banks' Obligations To Their Creditors" (Morcos Declaration at 4).  There are several reasons none of the decisions Mr. Morcos cites provide support for these decisions, as explained below.

8. <u>First</u>, it is important to note that, with only one exception, the cases cited in the Morcos Declaration related to requests filed either before Judges of Urgent Matters or the Head of the Beirut Execution Department.  Under Lebanese law, these judges are not competent to rule on the merits of cases.  Rather, they are empowered only to take urgent measures and to provide temporary relief to avoid harm to a party, as provided for in article 579 of the Lebanese Code of Civil Procedure (which I understand is similar to a court granting preliminary injunctive relief in a U.S. court).  Accordingly, the decisions cited in the Morcos Declaration should not be considered final judgments, or determinations of the merits of any of those cases.

9. <u>Second</u>, these preliminary decisions of a Judge of Urgent Matters or the Head of the Beirut Execution Department are not final, and may be appealed to the Courts of Appeal and the Court of Cassation (Lebanon's supreme court).  Indeed, while neither IT nor Mr. Morcos mention this, at least one of the decisions cited in the Morcos Declaration already has been stayed by a higher court.  Specifically, the Decision of the Sole Civil Judge of Zahle Examining Urgent Matters Cases, No. 5/2020 dated 13/1/2020, cited in paragraphs 15 and 23 of the Morcos Declaration, was appealed to the Court of Cassation, which issued a decision on February 17, 2020 <u>staying</u> the execution of the Urgent Matters Judge's decision.  To my knowledge, none of the Urgent Matters decisions or the Head of Beirut Execution Department decision cited in the Morcos Declaration have actually been affirmed by the Court of Cassation, nor have any actually resulted in a final judgment or resulted in the ordered payment(s) by the bank in question being made.

10. In my view, the fact that one of the decisions cited in the Morcos Declaration has been stayed by the Court of Cassation, and none has been affirmed by the Court of Cassation, undermines any suggestion that these cases should be considered to reflect authoritative—or even accurate—statements of Lebanese law, which, in my view, they do not.

11. <u>Third</u>, none of the cases cited in the Morcos Declaration involved BdL Basic Circulars 150, 154, or 158, which I understand to be the BdL Circulars at issue in this case. Indeed, of the six cases cited in the Morcos Declaration, five did not involve the court's consideration of any BdL Circulars at all. Rather, all but two of the decisions (specifically, those cited at Morcos Declaration ¶¶ 14, 15, 16, 23, and 24) relate to a temporary directive issued by the Association of Banks in Lebanon on November 18, 2019, at the onset of the crisis. This directive was not issued by BdL and is not a BdL Circular.

12. In light of the above, I find the statement in paragraph 23 of the Morcos Declaration, in which Mr. Morcos states that "[r]ecent Lebanese court decisions have accordingly held that banks may not use BDL Circulars as a justification for refusing to honor banks' obligations to creditors," to be inaccurate at best, and certainly misleading. As noted above, the cases Mr. Morcos cites at paragraphs 23 and 24 of his declaration did not involve bank defendants relying on, or the courts determining the application of, BdL Circulars at all. Rather, at issue in those cases was a temporary directive from the Association of Banks in Lebanon.[2]

13. The decision cited in paragraph 20 of the Morcos Declaration also did not involve BdL Circulars, but rather involved an administrative decision by BdL to deny a credit-facility application. The court determined that the relevant law and governmental decrees did not provide

---

[2] While the cases Mr. Morcos cites do not involve BdL Circulars 150, 154, or 158, it should be noted that even if a judge determines in a particular case that a BdL Circular is contrary to Lebanese law, and finds against a bank in that case, the BdL Circular at issue remains mandatory and binding on Lebanese banks notwithstanding that decision.

BdL with discretionary authority regarding the credit facilities. (The date of this decision, March 29, 1995, further confirms that it cannot relate to the economic crisis or BdL's crisis-management efforts.)

14. The only decision that relates to any BdL Circular at all is the Decision of the Head of the Beirut Execution Department, issued on December 15, 2020 and cited at paragraph 21 of the Morcos Declaration. And even that decision does not relate to BdL Circulars 150, 154, or 158, the circulars that I understand are at issue in this case. Rather, that decision relates to BdL Circular No. 568, which mandates the repayment of bank loans in the currency stipulated in the loan agreement. The Head of the Beirut Execution Department (whose decisions, as noted above, are non-final and are not determinations on the merits of the case) found that specific provisions of the Lebanese Code of Money and Credit, the Penal Code, and the Code of Obligations and Contracts expressly contradicted BdL Circular 568, and instead permitted the plaintiff to choose to settle his dollar-denominated loan via a notary-public check in Lebanese pounds.

15. <u>Fourth</u>, none of the cases cited in the Morcos Declaration involves a private creditor seeking to attach (or obtain) funds from a Lebanese bank, as IT is here. Several of the cited cases (those cited at Morcos Declaration ¶¶ 14, 15, 16, 23, 24) involved <u>customers</u> of Lebanese banks asking that the court order their bank to perform cross-border wire transfers. These courts then determined (again, in preliminary rulings, not on the merits of the cases) that the Lebanese financial crisis does not constitute *force majeure*, such as would relieve the Lebanese bank of its contractual obligation to its customer. Accordingly, the Morcos Declaration is misleading when it refers broadly to "creditors" of a bank; these decisions relate specifically to bank <u>depositors</u>, and involve the application of the contract-specific doctrine of *force majeure*.

16. Aside from the multiple reasons set forth above why these decisions should not be considered authoritative pronouncements of Lebanese law, the contractual defense of *force majeure* considered by the Lebanese courts is entirely distinct from the question that I understand is before this Court: whether, in light of the Lebanese economic crisis, there are "extraordinary circumstances" that this Court should consider when determining the amount of any attachment to impose on IBL's Correspondent Accounts in favor of IT, a third-party creditor. This is particularly true given that the decisions cited in the Morcos Declaration are in favor of granting Lebanese bank customers access to their funds. Here, meanwhile, one of the "extraordinary circumstances" I understand this Court is considering is whether a substantial attachment of funds held in IBL's Correspondent Accounts could risk ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

17. Mr. Morcos also states his belief that BdL "is very unlikely to impose penalties on IBL" should ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮, and that BdL is "lenient when enforcing compliance with the Circulars during this crisis." (Morcos Declaration ¶¶ 25-27.) I see no way that Mr. Morcos could have insight into BdL's views on this matter. To my knowledge, BdL has imposed sanctions on Lebanese banks for failure to comply with BdL Circulars in the past. As noted above, BdL is authorized to impose a broad range of sanctions for failure to comply with its directives, up to and including delisting of a bank from the official list of Lebanese banks (equivalent to revoking the bank's operating license). I, of course, do not know what specific actions BdL might take it if were to determine IBL was noncompliant with BdL requirements—nor, in my view, could Mr. Morcos possibly know what BdL might do in such circumstance.

18. IT and Mr. Morcos also argue that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (*See* IT Response at 6-7; Morcos

Declaration ¶ 30.) However, for the reasons explained below, I believe this would either be an impossibility, or would ███████████████████████████████████████ ████████████████

19. First, I understand that deposits with central banks (primarily funds held on deposit with BdL) ████████████████████████████████████████████████████████████ ████████████████████████████████ Under the circumstances of the Lebanese economic crisis, Lebanese commercial banks require authorization from the BdL to access their funds on deposit with BdL. █████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████.

20. Second, █████████████████████████████████████████████████████ ████████████████ █████████████████████████████ █████████████████ This is because of the distinction between "fresh" currency, which is freely transferable abroad and can be withdrawn from Lebanese banks in cash, and "non-fresh" currency, which cannot be freely transferred out of Lebanon and cannot be withdrawn in cash. (This distinction was also noted by in the declaration of IT's expert Nasri Diab, *see* ECF No. 102, ¶¶ 12-13 ("Fresh Money is freely transferable abroad and can be withdrawn in cash, whereas non-Fresh Money is not.").

21. Because of the distinction between freely-transferable "fresh" funds and non-transferable "non-fresh" funds, █████████████████████████████████████████ █████████████████████████████████████████████████████████████████ ████████████████████████████████. █████████████████████████████████ █████████████████████████████████████████████████████████████████



22. I understand that this declaration is not intended to waive any of IBL's privileges, immunities, objections, or defenses in this action, all of which are reserved.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed in Beirut, Lebanon, on the 16th day of November, 2022.

Waddah H. El Chaer